IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY<br>Plaintiff<br><br>v.<br><br>UNITED STATES<br>Defendant | No. 01-249-C<br>(Judge Lettow) |

---

**TVA'S DAMAGES TRIAL MEMORANDUM OF FACTS AND LAW**

---

Electronically filed: May 26, 2005

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Maureen H. Dunn
General Counsel

Edwin W. Small
Assistant General Counsel

Peter K. Shea
Senior Attorney/Attorney of Record
Telephone 865-632-7319

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

SUMMARY OF KEY FACTS AND ISSUES ....................................................................2

PERTINENT FACTS ..............................................................................................4

A. Contract Formation ..................................................................................4

B. NWPA Purposes and the SNF Acceptance Rate ........................................5

C. DOE's Reduced-Rate Schedule ..............................................................13

D. TVA's SNF Storage Situation ................................................................15

E. TVA's ISFSI Projects and Quantum Claim...............................................18

1. TVA labor ..........................................................................................20

2. Contract services and procurement ......................................................20

3. Internal chargebacks.............................................................................21

4. Overhead ............................................................................................22

5. Travel ................................................................................................23

ISSUES REGARDING THE AWARD OF DAMAGES ..........................................23

A. Defendant's Challenges to TVA's Damages ..........................................23

B. TVA's Responses to Defendant's Challenges ...........................................25

1. The technical studies were necessary with one exception. ..................25

2. TVA's $6.9 million of internal costs are recoverable as damages........27

3. AFUDC is a recoverable item in this case. .........................................30

4. Under fundamental legal principles, damages should be determined based on an acceptance rate obligation of not less than 3,000 tons annually beginning not later than 2008. ......................32

CONCLUSION.....................................................................................................37

## INTRODUCTION

This breach of contract action arises out of a standardized contract entered into on June 28, 1983, between the Tennessee Valley Authority (TVA) and the United States of America acting by and through the Department of Energy (DOE), as authorized by the Nuclear Waste Policy Act of 1982 (NWPA).[1] In exchange for TVA's payments under the Standard Contract, DOE is obligated to accept custody of, and title to, all spent nuclear fuel (SNF) created by the operation of TVA's nuclear power plants and to transport it from the plants and dispose of it as DOE sees fit.[2] Under the Standard Contract, DOE was required to begin accepting SNF from Standard Contract holders not later than January 31, 1998, and to continue accepting SNF thereafter based generally on an oldest-fuel-first principle. In breach of its contractual obligations, DOE has not yet started accepting SNF, and DOE has not stated when it will start accepting SNF.

The Court has ruled that it has jurisdiction over this case. *TVA v. United States*, 51 Fed. Cl. 284 (2001) (*TVA I*). Also, the Court has ruled that DOE breached the Standard Contract by failing to act on TVA's submitted delivery commitment schedules (DCSs) and ultimately by not accepting, transporting, and disposing of TVA's SNF. *TVA v. United States*, 60 Fed. Cl. 665, 674 (2004) (*TVA II*). The case is set for trial beginning on June 21, 2005, on the issue of the damages incurred by TVA through the end of its 2004 fiscal year (i.e., September 30, 2004) as a result of DOE's indefinite and

---

**1** Pub. L. 97-425, 96 Stat. 2201 (1983) (*codified as amended* at 42 U.S.C. §§ 10101-10270 (2000)).

**2** Under the Standard Contract (Article VII), DOE is solely responsible for SNF once it is transferred to DOE, and DOE has "the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title" (Jt. Ex. 1 at 17).

ongoing delay in beginning SNF pickups. As the Court stated: "[T]o the extent that TVA is able to show at trial that it has incurred damages as a result of DOE's failure to act upon the proposed DCSs and its failure to collect SNF, TVA may recover those damages." *Id*. at 674-75.

## SUMMARY OF KEY FACTS AND ISSUES

TVA's damages through FY2004 are the costs TVA incurred to provide for dry storage of SNF at Sequoyah Nuclear Plant (SQN) and Browns Ferry Nuclear Plant (BFN) because of DOE's indefinite and ongoing delay in beginning SNF pickups. Had DOE started pickups in 1998 and picked up even at the reduced rate DOE contends was its contract obligation for the first ten years of pickup operations (with the first TVA pickup occurring in 2002 in accordance with the oldest-fuel-first principle), TVA would have had sufficient capacity in its SNF storage pools at SQN and BFN such that TVA would not have needed additional storage during the first ten years of pickup operations. Thereafter, had DOE continued pickups at the rate of 3000 metric tons[3] of uranium (MTU) annually (the rate that DOE repeatedly has stated was, and currently states is, its planned steady-state rate), TVA would have had sufficient capacity in its SNF storage pools at SQN and BFN for the life of the plants, even assuming 20-year license extensions and maximum possible SNF discharges from the plants.

Because of DOE's delay in beginning pickup operations, out-of-pool storage was needed at SQN in 2004 and is needed at BFN in 2005. Accordingly, TVA constructed a dry storage facility or ISFSI (independent spent fuel storage installation) at SQN and began using it for SNF storage in 2004; and TVA expects to complete

---

3 In this brief, all references to "tons" are to metric tons (2,204.6 pounds).

construction and begin operation of an ISFSI at BFN in 2005. The SNF dry storage costs incurred by TVA through FY2004 for which TVA seeks recovery in this action total approximately $35.7 million. DOE has not challenged the necessity or timing of TVA's decision to build the SQN and BFN ISFSIs, the reasonableness of the costs incurred by TVA in building the ISFSIs, or the reasonableness of the costs associated with moving SNF from SQN's fuel pool to the ISFSI in 2004.

Based on the reports of three experts (an engineer, an accountant, and an economist) which the Department of Justice (DOJ) recently furnished to TVA in preparation for the damages trial, we anticipate there will be two overarching issues at trial: (1) whether approximately $7 million of TVA's incurred costs of $35.7 million are not recoverable on the theory that these internal costs were purely fixed rather than incremental in nature, and (2) whether TVA's damages recovery should be reduced based on speculation that, in the hypothetical non-breach world, DOE (a) might never have ramped-up to an acceptance rate of 3,000 tons annually or (b) might not have done so for many years after 2008 with the result that TVA might have needed to build SNF dry storage facilities sometime even in a non-breach world.

The evidence at trial will show that all the costs for which TVA seeks recovery are allowable as a matter of law; that, in any event, the costs were incremental in nature; and that, should the Court find it appropriate to inquire into DOE's acceptance obligation beyond the first ten years of acceptance operations (that is, after the 1998-2007 reduced-rate period) that obligation is not less than 3,000 tons annually beginning not later than 2008.

## PERTINENT FACTS

### A. Contract Formation

Enacted in January 1983, the NWPA required the Nation's nuclear utilities to enter into the contracts with DOE not later than June 30, 1983, or face severe consequences. *See* 42 U.S.C. § 10222(b).[4] As noted in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000), "[t]he Act effectively made entry into such contracts mandatory for the utilities."

In February 1983, DOE published a proposed standardized contract for comment (48 Fed. Reg. 5458 (Feb. 4, 1983)); and in April 1983, DOE published the standardized contract in final form (48 Fed. Reg. 16,590 (April 18, 1983)). The proposed and final versions of the standardized contract provided that DOE's acceptance services would begin not later than January 31, 1998, and would continue thereafter until all SNF was accepted, but neither document stated a minimum acceptance rate. In comments to DOE on the proposed standardized contract, TVA objected to the absence of any minimum acceptance rate provision pointing out that "a commitment to do no more than

---

[4] Under 42 U.S.C. § 10222(b)(1), the Nuclear Regulatory Commission is precluded from issuing or renewing a license to operate a nuclear plant to any person unless the person has entered into a contract with DOE for the disposal of SNF under the NWPA or is actively engaged in negotiations for such a contract. Further, § 10222(b)(2) provides that no SNF generated by any person may be disposed of by DOE under the NWPA unless the person has entered into an SNF disposal contract with DOE under the NWPA not later than either June 30, 1983, or the date on which such person first commences generation of SNF (which for TVA was prior to June 30, 1983). Because of these statutory provisions, TVA was required to enter into the Standard Contract by June 30, 1983, in order to preserve its option to renew the licenses of its nuclear units that were then operating (SQN and BFN) and in order to seek an operating license for Watts Bar Nuclear Plant Unit 1 which was then under construction with an expected operating date of June 1984 (Jt. Ex. 1 at 37-42).

start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance" (PX-1 at TVA000019). Other utilities made similar comments (PX-2 at 02, 04). Nevertheless, DOE did not insert an acceptance rate obligation into the final contract. *See Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 94 (2003) ("Several utilities urged that the Standard Contract include a minimum rate of acceptance, but DOE refused.").

To avoid the severe consequences of not contracting with DOE by June 30, 1983, TVA executed the standardized contract despite the document's failure to state an annual acceptance rate obligation (Jt. Ex. 1). TVA's June 24, 1983 letter transmitting the signed contract specifically informed DOE that TVA had signed the contract only because of the consequences TVA otherwise would suffer under the NWPA:

> TVA, like other purchasers, did not have the opportunity to effectively negotiate the contract that we thought we should have based on our reading of the NWPA.
>
> Because of the severe consequences which TVA would suffer under the NWPA if it did not execute the contract, TVA has no real alternative but to do so. However, TVA is relying on the good faith of DOE to reexamine the contract to correct the most serious deficiencies.

(PX-3 at 1.)

Through December 31, 2004, TVA's payments to DOE under the Standard Contract totaled $683.7 **million**, and the payments of all nuclear utilities totaled $13.45 **billion** (upon which DOE has earned interest of $7.57 **billion**) (PX-56 at 5-6, 11).

### B. NWPA Purposes and the SNF Acceptance Rate

DOE's own published documents and the testimony of DOE officers and managers clearly show that throughout the early years of the program (i.e., prior to the

late 1980s when DOE started taking actions in an attempt to limit its contractual obligations), DOE recognized that achievement of a steady-state SNF acceptance rate of 3,000 tons annually shortly after 1998 was reasonable[5] and necessary to achieve the purposes of the NWPA and the Standard Contract. Because a 3,000 ton acceptance rate would exceed the industry SNF discharge rate of approximately 2,000 tons annually, that acceptance rate would on an industry-wide basis eliminate the need for construction of additional storage facilities and reduce the accumulated SNF storage backlog (36,567 tons as of January 1998; 47,163 tons as of December 31, 2002) in an efficient manner (PX-36). This evidence includes the following:

- At a December 12-15, 1983, Information Meeting sponsored by DOE's Office of Civilian Radioactive Waste Management (OCRWM)[6] the Acting Director of OCRWM explained DOE's interpretation of the intent of the NWPA:

> **I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998.** Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, **if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site.** During the first year of operation of the repository in 1998, we should be

---

5 That a 3,000-ton steady-state annual acceptance rate is a reasonable rate cannot be disputed. DOE witnesses have affirmatively testified that it is a reasonable rate, and DOE has used a 3,000 ton rate in numerous program documents from the outset of the program through the present. (See, e.g*.,* Barrett 5/10/02 Dep. at 1334-35, 1370; Klein 30(b)(6) Dep. at 291, 354.)

6 The OCRWM was created by statute to carry out DOE's functions under the NWPA. 42 U.S.C. § 10224. The OCRWM Director is appointed by the President with the advice and consent of the Senate. *Id.*

> receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.[7]

(Proceedings of the 1983 Civilian Radioactive Waste Management Information Management Meeting at 11; PX-8 at SN069599.)

- The December 1983 Draft Civilian Radioactive Waste Management Program Mission Plan distributed by DOE for comment identified a 3,000 ton annual steady-state rate after a five-year ramp up as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998" (PX-7 at 2-2).

- The April 1984 Draft Mission Plan for the Civilian Radioactive Waste Management Program distributed by DOE for comment identified a 3,000 ton annual steady-state acceptance rate after a five-year ramp up period (DX-42).

- The June 1985 Mission Plan for the Civilian Radioactive Waste Management Program identified a 3,000 ton annual steady-state acceptance rate after a five-year ramp up period (and also identified an enhanced performance system with a higher acceptance rate) (PX-11 at 26).

- DOE's Rule 30(b)(6) witness on acceptance rates, Tom Pollog, testified that the 3,000-ton rate was the rate that DOE determined in the mid-1980s would achieve the program objective of alleviating the need for utilities to construct additional on-site storage after 1998 (Pollog 4/11/02 30(b)(6) Dep. at 96-97).

- Lake Barrett, who has been employed at OCRWM since 1985 in various positions, and who was Deputy Director at the time of his 2002 deposition, testified that the 3,000 rate was established to comply with the intent of the NWPA:

---

[7] Emphasis added above and throughout this memorandum unless otherwise noted.

Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct? [Objection omitted.]

A Yes.

(Barrett 4/22/02 Dep. at 59.)

Q [Y]ou believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?

A Yes.

Q And could you explain to me that rationale that you believe has been clearly documented by the department?

A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.

. . . .

Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?

A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation rate in the nation.

Q Why was that important?

A Because we would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of facility would be.

. . . .

Q Why would you have liked to have caught up, as you stated in that answer?

A Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.

Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

A Because I believe that's the intent of the act.

Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?

A Correct.

(Barrett 5/10/02 Dep. at 1163-66.)

Q What other factors went into choosing a 3,000 MTU receipt rate?

A The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have — you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

(Barrett 5/10/02 Dep. at 1333-34.)

Q And would you agree that the 3,000 annual steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?

A Generally so, yes.

Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?

A I would think that's low.

Q Why?

A Because that's about what the generation rate is, and if we start with that, matching the generation at 2010 — if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.

(Barrett 5/10/02 Dep. at 1370-71.)

As indicated by the above-quoted testimony of Deputy Director Barrett about the proper balance of total life-cycle costs, the 3,000-ton rate is based on economic efficiency and the avoidance of economic waste. Economic efficiency is, of course, one of the fundamental objectives of the NWPA. See June 1985 Mission Plan for the Civilian Radioactive Waste Management Program at 15 (PX-11) ("The program must be conducted in a financially responsible, cost-effective manner . . . ."). As Deputy Director Barrett further testified:

> Q What is your understanding of the relationship between the objective of economic efficiency and the fu[l]l cost recovery nature of the contract?
>
> A I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.

(Barrett 5/14/02 Dep. at 177-78.)

The NWPA requires DOE to annually review the adequacy of the ongoing Standard Contract fees initially set by statute (42 U.S.C. § 10222(a)(4)), and DOE has repeatedly used a 3,000-ton rate for determining the projected total system life cycle cost which DOE then uses as the cost basis to determine the adequacy of the fees paid by the utility contract holders. (Barrett 4/23/02 Dep. at 337-39, 5/8/02 Dep. at 956, 5/10/02 Dep. at 1334; Klein 4/24/02 30(b)(6) Dep. at 351-354.) As Deputy Director Barrett testified:

> Q And can you tell me based on your understanding what is the relevance to the Department of Energy of repository acceptance rates in determining the adequacy of fees assessed against operators of nuclear reactors? [Objection omitted.]
>
> A To determine if the fee is adequate you need to know when the costs are incurred. So timing of the costs are important in knowing what the fee adequacy situation is.

Q And how does that relate to the repository acceptance rate?

A Earlier, higher receipt rates cost more earlier at high level, therefore they influence the fee adequacy calculations.

(Barrett 4/23/02 Dep. at 337-38.)

Q To your knowledge, Mr. Barrett, have all TSLCC [Total System Life Cycle Cost] or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?

A Some had more.

Q Some had more? Which ones had more?

A Ones that had two repositories in it had rates higher than 3,000.

Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to? [Objection omitted.]

A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at nominal 6,000 tons.

Q Per year?

A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.

Q And by recent ones—I'm sorry.

A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.

Q And what about the most recent study?

A I believe the most recent ones [objection omitted] is 3,000 tons per year steady state.

(Barrett 4/23/02 Dep. at 349-50.)

Thus, DOE's own fee adequacy determinations show that a 3,000-ton rate represents the contract bargain for which TVA and the other utilities have paid.[8]

The 3,000-ton rate also furthers the NWPA's environmental and public safety goals. See Mission Plan for the Civilian Radioactive Waste Management Program at 6 ("The protection of public health and safety and environmental acceptability are of paramount importance.") (PX-11). DOE used the 3,000-ton rate for evaluating the environmental risks and consequences of transporting 70,000 tons of SNF from the various nuclear plants around the nation to DOE's proposed repository in Nevada (see Barrett 4/26/02 Dep. at 608-09). In evaluating potential transportation impacts in chapter 6 of its Final Environmental Impact Statement, DOE repeatedly notes that the planned duration of the transportation program is 24 years and that potential transportation impacts will therefore be limited in time (PX-32, *passim*).

In addition, the 3,000-ton rate reflects the NWPA's goal of reducing, beginning in 1998, the SNF in temporary storage at utility plant sites because of potential health and safety problems. See Mission Plan for the Civilian Radioactive Waste Management Program at 4 ("The growing accumulation of this waste in temporary storage poses potential health and safety problems for the public.") (PX-11).

Finally, as to what most likely would have happened in the non-breach world, Deputy Director Barrett testified:

---

**8** As noted in *Ala. Power Co. v. United States DOE*, 307 F.3d 1300, 1303 (11th Cir. 2002), DOE has never found a fee change to be necessary as a result of its annual fee reviews. *See also Nat'l Ass'n of Reg. Util. Comm'rs v. U.S. DOE*, 851 F.2d 1424, 1426 (D.C. Cir. 1988) ("Each year since 1983, the Secretary has published an annual 'Fee Adequacy Report' concluding, not unlike Goldilocks, that the statutory fee is not too high, and not too low, but just right.").

Q What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract? [Objection omitted.]

A We would have operated our system at our plan[] which was, you know, whatever the operation rate which transiented and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.

Q That's what you would have done?

A That's what we would have done if we could have gotten the, you know, the sites approved, et cetera.

(Barrett 5/14/02 Dep. at 120-21.)

### C. DOE's Reduced-Rate Schedule

In 1991, 1992, and 1995, DOE published a reduced-rate acceptance schedule for the first ten years of acceptance operations, namely, 400 tons for year one, 600 tons for year two, and 900 tons for years three through ten (PX-15, 18, & 19). DOE's stated justification for this reduced-rate schedule was that lowered rates were necessary because of limitations arising out of the 1987 amendments to the NWPA that related to DOE's possible use of a monitored retrievable storage (MRS) facility to store SNF. In fact, however, DOE continued to espouse the reduced-rate schedule for the first ten years of acceptance operations even after it was clear that DOE would not construct an MRS. DOE's current Contracting Officer for the Standard Contract has acknowledged that the reduced rates were adopted by DOE with the goal of attempting to limit its legal obligations (D. Zebransky 4/18/02 Dep. at 365).

TVA's SNF acceptance allocations as set out in the March 1995 ACR/APR (PX-19) under DOE's reduced-rate schedule and the Standard Contract's oldest-fuel-first principle are shown in the following table.

| Acceptance Year | Calendar Year | Reduced-Rate Acceptance Schedule (MTU) | TVA's Reduced-Rate Allocations (MTU) |
|---|---|---|---|
| 1 | 1998 | 400 | 0.0 |
| 2 | 1999 | 600 | 0.0 |
| 3 | 2000 | 900 | 0.0 |
| 4 | 2001 | 900 | 0.0 |
| 5 | 2002 | 900 | 58.7 |
| 6 | 2003 | 900 | 5.5 |
| 7 | 2004 | 900 | 115.6 |
| 8 | 2005 | 900 | 66.0 |
| 9 | 2006 | 900 | 116.2 |
| 10 | 2007 | 900 | 52.4 |
| Totals | | 8,200 | 414.4 |

In accordance with DOE's instructions that only DCSs matching the reduced-rate allocations would be considered for approval (PX-17 at TVA001560, 1564-65), TVA submitted DCSs to DOE matching TVA's reduced-rate allocations for the years 2002-2007 (PX-58), but DOE breached the Standard Contract by neither approving nor disapproving TVA's DCS submittals. *TVA II*, 60 Fed. Cl. at 674 ("DOE breached its obligation to act on TVA's DCSs in good faith and ultimately to accept, transport, and dispose of TVA's SNF.").[9]

It is TVA's position that DOE was contractually obligated to ramp up to a 3,000-ton steady-state acceptance rate promptly after beginning acceptances in 1998; but, for purposes of damages analysis in this case, TVA does not object to the use of DOE's reduced-rate schedule for the period 1998-2007. *Id*. at 669. However, should the Court determine it is appropriate to inquire into DOE's acceptance obligations for 2008 and

[9] TVA also submitted DCSs for 2008 and 2009; these, too, were returned with DOE's standard notice that it was unable to approve or disapprove the DCSs (PX-58). In July 2004, DOE reinstituted the DCS process only to abandon it within several months. *See Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 339-40 (2005).

subsequent years, the 3,000-ton steady-state acceptance rate acknowledged by DOE as reasonable and necessary to meet the purposes of the NWPA is fully applicable and provides the standard for assessing the quantum of damages for which DOE is responsible

**D. TVA's SNF Storage Situation**

TVA has three operating nuclear plants, SQN, BFN, and Watts Bar Nuclear Plant (WBN). At each plant, SNF is stored in pools filled with water. WBN is a one-reactor plant with one pool. SQN is a two-reactor plant with one pool. BFN is a three-reactor plant with three pools; the BFN units 1 and 2 pools are interconnected, and BFN unit 3 has a separate pool. In each pool, SNF storage capacity is less than the total pool capacity for two reasons. First, in accordance with standard industry practice, TVA maintains sufficient room in each pool to offload the fuel in the reactor itself should that become necessary. Where the pools are interconnected or shared by two reactors (the BFN units 1 and 2 pools and the SQN pool), only one full-core reserve is maintained. Second, in each pool, a few storage cells are unavailable for SNF storage for various reasons (e.g., deformed/damaged cells, piping interferences). Thus, the usable SNF storage capacities of TVA's pools are net of full-core reserve and unusable cells.

As of 1998, TVA had adequate SNF storage in place or planned[10] in its SQN and

---

[10] In reliance upon DOE's contractual obligation to pick up SNF from the domestic nuclear utility industry beginning in 1998, TVA had planned its SNF pool storage capacity such that TVA would have sufficient storage space until DOE began its pickup of TVA's SNF in 2002. TVA implemented its plans by installing high density racks for SNF assemblies at SQN and BFN in a series of expansion storage projects which were completed in 2000. Because TVA installed those racks to insure sufficient storage capacity until DOE began picking up SNF in accordance with the Standard Contract, TVA has made no claim for those reracking projects.

BFN storage pools to fully meet SNF storage needs for more than the first decade of DOE's pickup operations, even assuming DOE's reduced-rate schedule for the first ten years applied and that TVA discharged the maximum possible SNF from the plants.[11] Thereafter, had DOE continued pickups at the rate of 3,000 tons annually, TVA would have had sufficient capacity in its storage pools at SQN and BFN such that TVA would not have needed out-of-pool storage during the life of those plants (again assuming maximum SNF discharges from those plants). This point is shown by the following chart (PX-89) which summarizes the SNF storage needs for SQN and BFN based on maximum reasonably possible future discharges, the application of DOE's reduced-rate schedule for 1998-2007 and a 3,000 ton pickup rate annually thereafter.[12]

---

(. . . continued)

The usable SNF storage capacities of TVA's pools after the rerackings and the amount of SNF in storage in each pool as of the end of 1998 are shown in the following table.

| Pool | Usable SNF Pool Storage (MTU) | SNF in Pool as of the end of 1998 (MTU) |
|---|---|---|
| BFN1&2 | 1139.61 | 738.13 |
| BFN3 | 488.02 | 293.55 |
| SQN | 873.30 | 586.40 |
| WBN | 541.35 | 32.12 |

11 TVA bases its SNF planning on maximum reasonably possible SNF discharges. In other words, TVA assumes high capacity generation and no outages except scheduled refueling and maintenance outages that last the minimum reasonable time. Of course, based on actual experience in the industry, such an idealized plant operating assumption is unlikely to actually occur in the long-run due to numerous factors, and actual SNF discharges likely will be less than TVA's idealized projection. Thus, TVA's projections of SNF discharges from its plants are higher than the forecasted discharge projections for TVA plants used by DOE in its planning.

12 The chart summarizes outputs from two components of a DOE computer model (relied upon by Defendant's expert economist) through which a nuclear plant's SNF storage needs at any point in time readily can be projected based on different

**BFN & SQN STORAGE NEEDS COMPARED TO USABLE SNF POOL STORAGE CAPACITY USING DOE'S REDUCED-RATE ACCEPTANCE SCHEDULE 1998-2007 AND 3000 TONS ANNUALLY THEREAFTER (TVA PROJECTED DISCHARGES)**




In light of DOE's 1995 announcement that DOE would not begin accepting SNF until 2010 at the earliest, TVA formed a Spent Fuel Assessment Team in 1997 to examine SNF storage options. Based on TVA's projected SNF discharges, the team estimated that, without any DOE pickups and without further actions by TVA, full core reserve capacity would be lost in the SQN pool in 2005 and in the BFN unit 3 pool in 2006 (PX-22 at 1). The team found that WBN had pool storage capacity in place to store SNF until 2018 (*id.*).

---

(. . . continued)
assumptions. The first DOE model component maintains historic SNF discharge data for all nuclear plants covered by the Standard Contract and projects future discharges by plant by year based on projected plant operating characteristics. The second DOE model component calculates SNF acceptance allocations by plant by year using an oldest-fuel-first algorithm for the specified acceptance rate that is input to the model. A plant's SNF storage need for any given year is simply the plant's cumulative SNF discharges (from the first model component) minus the plant's cumulative allocations (from the second model component).

Ultimately, based on the team's recommendations, TVA determined that the most reasonable and prudent action for dealing with the SNF storage problems caused by DOE's delay was to build dry storage facilities at SQN and BFN. Because the WBN pool capacity would be sufficient for many years, even without any SNF acceptances by DOE, no action was needed at WBN.

### E. TVA's ISFSI Projects and Quantum Claim

In 2004, TVA finished construction of the SQN ISFSI and loaded three multi-purpose canisters with SNF assemblies which are being stored in overpacks on the SQN ISFSI pad. In 2005, TVA expects to finish construction of the BFN ISFSI and to load SNF assemblies into canisters for storage on the BFN ISFSI pad. As this Court already has found, "TVA's construction of dry storage facilities for spent nuclear fuel at its Browns Ferry and Sequoyah nuclear plants must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach." *TVA II*, 60 Fed. Cl. at 674.

The building of an ISFSI is a major construction project which involves significant design, engineering, and construction work, as well as Nuclear Regulatory Commission (NRC) approvals, and which usually requires four to five years from planning to operation. In addition to the engineering and construction work associated with the ISFSI itself (i.e., construction of the pad and the haul path to the pad), a suitable dry storage system has to be procured to contain the SNF assemblies removed from the fuel pool; significant modifications to the nuclear plant buildings are necessary to insure safety; security enhancements are required; and additional equipment has to be purchased

for fuel loading and transportation at the site. Finally, procedures must be developed for the actual fuel loading and the movement of the SNF from the fuel pools to the ISFSI.

Not all the costs associated with TVA's ISFSI projects and the loading of SNF at SQN are for Defendant's account because certain aspects of the work would have had to have been accomplished even if DOE had performed. Thus, TVA's claim does not include any amounts for design, construction, or procurement that TVA would have had to undertake had DOE performed the contract in a timely manner. As a general rule, this means that any costs associated with modifications made inside the nuclear plant buildings (such as the single-failure proofing of the cranes used to lift SNF assemblies, canisters, and casks or the purchase of cask assembly stands and other items which would have been required to load SNF in DOE transportation casks) have not been claimed and are considered nonrecoverable costs. Similarly, for TVA's operations and maintenance claim at SQN, all work performed in moving the SNF from the fuel pool and into a sealed canister is considered nonrecoverable as similar work would have been required had DOE performed.

Conversely, recoverable costs include all costs associated with the construction of the ISFSIs and the attendant haul paths, the procurement of the dry storage systems for the SNF, and the movement of the loaded canisters and storage overpacks from the SQN reactor building to the ISFSI.

As of September 30, 2004, TVA incurred recoverable costs of $35,752,512.11 ($20,138,184.28 for SQN and $15,614,327.83 for BFN) (PX-72, 73). These costs represent claims for TVA labor, for construction services and procurement, for internal chargebacks from TVA organizations that supported the projects, for overhead, including an allowance for funds

used during construction (AFUDC), and for travel. An overview of TVA's claim categories and the work and costs associated with each follows.

**1. TVA labor**

TVA has claimed $1,401,283 in labor charges for work on the ISFSIs. This work includes planning for the project, drafting the project specifications, issuing and evaluating the various requests for proposals for project work, contract negotiations, project management and on-site engineering, the development of design change notices which are the base engineering design documents through which changes to the plant are accomplished, and the review of procedures. The project managers (Charles R. Davis, R. Alan Chapman) were TVA employees who devoted between 50 and 100 percent of their time to the ISFSI projects. Many other TVA employees spent substantial amount of time working on the ISFSI projects, thereby depriving TVA of their services on other projects; and TVA also supplemented its site forces with contractors who worked thousands of hours as staff augmentation employees.

**2. Contract services and procurement**

TVA has claimed contract services and procurement costs of $28,632,647. This amount represents payments to third-party contractors and vendors and is approximately 80 percent of all the costs claimed by TVA. Two contractors, Holtec International, Inc. (Holtec), and Stone and Webster Construction Company (SWEC), account for well over $20 million of the claimed costs.[13] Holtec's scope of work included base engineering work, the supply and documentation of multipurpose canisters and storage overpacks in which SNF was to be stored, and the supply and documentation

---

13 The Holtec contract initially covered only the Sequoyah plant; Browns Ferry was added to the contract on June 1, 2000.

of the equipment needed to transport the loaded overpacks to the ISFSIs while SWEC provided construction labor at the sites as well as fuel loading work. Other significant contractors included Vulcan Materials, Stein Construction Company and Garner Contracting which provided backfill and concrete, and Retiree Resources Corporation which provided staff augmentation employees for the projects.

**3. Internal chargebacks**

TVA has claimed $2,975,750 for project support work performed by various TVA organizations. This claim primarily is comprised of $1,813,345 in design services by TVA's Nuclear Design Internal Services group, of which approximately 50 percent ($956,645) represents security design for BFN which had to build its ISFSI outside the plant's security perimeter. Nuclear Design also provided services in connection with haul path and ISFSI designs, and the documentation of ancillary equipment.

Other significant internal charges included $699,583 in equipment and tool rentals and shop distributions from TVA's Heavy Equipment Division (HED); $277,530 in quality assurance work by TVA's Nuclear Inspection Services Organization (ISO); and $95,964 by TVA's Power Service Shops for work including the fabrication of a low profile transporter used to move the Holtec storage overpacks into the railroad bay building at SQN for loading with the sealed multipurpose canisters containing SNF.

Nuclear Design and ISO are essentially self-supporting organizations, that is, each must recoup the costs of its services from other organizations or face cutbacks. Thus, each expands or contracts depending upon the work available; and each relies upon staff augmentation workers to support its base work. HED also is a self-supporting

organization which depends upon equipment rentals to support itself. In addition, HED also rents equipment from third parties as necessary to supplement TVA's fleet; such charges are passed directly through to the using organizations. For example, $133,900.98 of $273,094.98 HED equipment charges at SQN and $121,699.33 of $165,001.33 HED equipment charges at BFN represent the cost of rental equipment (DX 218; PX 93). Generally speaking, HED's rental charges for TVA-owned equipment are approximately 70 percent of market rental rates.

**4. Overhead**

TVA has claimed overhead costs of $2,690,404, the vast majority of which ($2,342,581) represents a claim for AFUDC reflecting the cost of capital for the projects incurred through FY2004 at SQN ($1,484,453.20) and BFN ($858,127.87). The AFUDC claim represents only the cost of capital associated with recoverable portions of the projects.

AFUDC is a standard utility industry accounting practice (in use by TVA since 1961) that recognizes capital costs associated with financing long-term construction as part of the cost of a capital project. The Federal Energy Regulatory Commission's Uniform System of Accounts has long provided for the inclusion of AFUDC in a utility's capital cost — *see* 18 C.F.R. pt. 101 Electric Plant Instructions § 3 (17) (2004)).

The underlying principle is that part of the full cost of a capital project (which cost is used for setting utility rates) is the cost of capital borrowed to finance the construction of the project. For example, when a utility builds a generation plant, a charge for the cost of capital associated with constructing the plant is added to the utility's rate base once the plant goes into operation. These AFUDC costs are incurred

only during the construction phase of the capital projects, and TVA has made no claim associated with AFUDC charges for maintenance and operations work. (An example of a typical monthly AFUDC allocation is set out in PX-92, see also PX-50, accounting memo on AFUDC.) TVA's debt level rises and falls in accordance with capital projects, which themselves compete for the amount of capital funding that will be available, and TVA's ratepayers bear the burden of paying for that capital funding.

In addition, the overhead category encompasses $246,020 in overheads associated with a payment for the SWEC core management team located at SQN, and corporate expense distributions of approximately $25,000. The cost of maintaining the SWEC management team at SQN is allocated pro rata on a cost basis to the projects for which they provide oversight.

**5. Travel**

TVA has claimed travel costs of $52,427 which represents expenses incurred in traveling to TVA locations for meetings, to seminars on SNF management, to Holtec headquarters, to NRC regional and national offices for briefings and presentations, and to other domestic nuclear utility plants to observe ISFSI construction and operation, including fuel loading.

## ISSUES REGARDING THE AWARD OF DAMAGES

### A. Defendant's Challenges to TVA's Damages

Defendant has not asserted that TVA failed to mitigate its damages or that TVA's costs of building dry storage facilities are unreasonable. In fact, DOE's technical expert, Warren K. Brewer (who was charged with reviewing TVA's costs and claims)

concluded that TVA's construction and operational costs were neither "unduly high" nor "unduly low" and that his "review determined that within the areas of my expertise [the handling and storage of spent nuclear fuel], there was not any justification or supportable reason to challenge those costs" (Brewer Dep. at 88, *ll*. 6-7 and at 89, *ll*. 7-10). However, Defendant's experts have challenged portions of TVA's $35.7 million claim on several other grounds.

Mr. Brewer contends that $328,000 representing the cost of certain technical studies should be removed from TVA's claim based upon his view that the studies were unnecessary for the design, construction, or operation of an ISFSI, would have been required had DOE performed, or already were covered by a Holtec license.

Defendant's accountant adopts this $328,000 deduction and contends that an additional $6,631,909 (for a total of $6,959,909) should be removed from TVA's claim. Essentially, Defendant argues that TVA's claims for labor charges, internal chargebacks, SWEC management overhead, and AFUDC represent fixed costs which TVA would have incurred in any event rather than incremental costs attributable to the breach because TVA does not have specific debt instruments associated with the ISFSI capital projects. In addition, Defendant appears to argue that the AFUDC portion of the claim ($2.34 million) is the equivalent of prejudgment interest which is not recoverable against Defendant.

Finally, Defendant's economist adopts the opinions of the technical and accounting experts and then calculates that, had DOE performed the contract at DOE's reduced acceptance rates 1998-2007 and continued performance thereafter at three hypothetical rate scenarios specified by DOJ lawyers, TVA would in the future have had

to build at least one ISFSI.[14] The economist then concludes that, depending upon which of the three DOJ hypothetical rates is used, TVA's damages should be further adjusted downward to a range between $11.5 to $17.38 million to account for the fact that TVA would have had to build an ISFSI anyway and thus lost only the time value of money.

### B. TVA's Responses to Defendant's Challenges

#### 1. The technical studies were necessary with one exception.

Of the $328,000 in challenged costs for technical studies, TVA agrees that a $48,000 Holtec analysis of fuel racks at BFN should be removed from the claim. As to the other studies, they were reasonably necessary for the ISFSI projects because TVA is required to perform certain site-specific evaluations, because the studies deal with storage issues and/or will have to be repeated for potentially different systems when DOE performs, and because the storage system procured required such a study be made.

For example, although Defendant contends that the $100,000 Holtec analysis of the load-bearing capability of the SQN railroad bay floor was unnecessary, TVA will show at trial that, as the name suggests, the railroad bay was designed to hold weights such that a railroad cask could have been loaded; however, the configuration of the Holtec operating equipment and storage containers impose different stresses on the floor than the railroad car configuration for which the bay was designed and built. In addition, given that it is unknown what type of transport cask DOE would have brought,

---

[14] The DOJ rate scenarios all assumed DOE's reduced-rate schedule for 1998-2007 and then continued as follows: (1) 900 metric tons annually in 2008 and thereafter; (2) 900 metric tons annually 2008-2009, 1800 metric tons annually 2010-2014, and 2100 metric tons annually in 2015 and thereafter; (3) 900 metric tons annually 2008-2009, 1800 metric tons annually 2010-2014, and 3000 metric tons annually in 2015 and thereafter.

it is impossible to state whether TVA would have had to perform a similar study had DOE performed.

As to the BFN studies, a Design Basis Thermal Analysis ($10,000) was necessary because the arrays covered by the Holtec license (a "2 x n" and a square array) are different than the design at BFN which is a "4 x 26" array. Thus, the study was necessary to ensure that the cask spacing was adequate to maintain regulatory limits for fuel peak cladding temperatures. The Design Basis Criticality Analysis ($5,000) was necessary to ensure that the fuel characteristics limitations listed in Appendix B to the Holtec overpack Certificate of Compliance would not be exceeded. The Cask Tipover Analysis ($5,000) and Carry-Height Analysis ($5,000) were required because the Holtec Final Safety Analysis Reviews at the time had not yet incorporated the "Version B Hi-Storm" which was selected by BFN. The Transfer Cask Analysis ($85,000) specifically evaluated the suitability of the equipment at various locations for seismic conditions unique to BFN and also evaluated potential hazards within the BFN reactor building. The Storage Overpack Blocked Duct Analysis ($20,000) and Buried Storage Overpack Analysis ($15,000) evaluate the impact of air duct blockages as a result of switchyard structural debris accumulating following tornadic or other high-wind conditions. The MPC [multipurpose canister] Lid Brittle Fracture Analysis ($10,000) provided assurance that lid-to-shell weld would not fail during lifting and handling; and the MPC Analysis ($25,000) was performed to ensure, to the extent possible given the absence of any DOE transportation package criteria, that the canisters would achieve compliance with anticipated transport requirements.

In sum, with the single exception noted for the analysis of the fuel racks which does not relate directly to Defendant's breach, the above studies were reasonable and required steps for construction or operation of the ISFSIs. Accordingly, TVA is entitled to recover the cost of the studies.

**2. TVA's $6.9 million of internal costs are recoverable as damages.**

Other than the accountant's downward adjustment of $21,074 in charges associated with upgrading the SQN auxiliary crane (a nonrecoverable category), there is no legal basis for any reduction to TVA's claims on the ground that TVA's internal costs are fixed rather than incremental.[15] It is a well-settled damages law that an injured party can recover the reasonable costs of in-house labor and equipment expended to remedy the consequences of a defendant's wrongful conduct. Were the law otherwise, injured parties often would find themselves in the anomalous position of responding to a breach by seeking out the most cost-effective solution (here diverting TVA's own resources to extra work necessitated solely by Defendant's breach) only to be faced with an argument that so doing precludes a recovery available had the work been performed by a third party, even at a higher cost.

Not surprisingly, then, the courts have rejected the approach advocated by Defendant. For example, *Freeport Sulphur Co. v S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976), involved a claim for repairs to a dock performed by the owner's in-house resources. On appeal, the defendant objected to plaintiff's recovery for the work of its

---

[15] As pointed out in TVA's description of the claim elements, in addition to diverting employees from its work force to the ISFSI projects, TVA had to hire contractors as staff augmentation employees to accomplish the work.

own salaried engineers and draftsmen on the ground that no incremental cost or expense was incurred by plaintiff for their work. In affirming the award, the Fifth Circuit stated:

> Freeport has arranged with an independent engineering concern to be furnished supplemental personnel when its own salaried engineering staff is overworked. Because Freeport found it unnecessary to tap this outside [firm] during the period of the engineering work on the dock, Pansuiza contends that, were it not for the dock work, Freeport's engineers would have been idle or engaged in essentially nonproductive work. Pansuiza argues, therefore, that the engineering work was performed without any additional expense or overhead. We reject this argument as being wholly based on speculation. It is at least as plausible that there were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.
>
> . . . .
>
> The cost of repairs performed internally by the injured party, including overhead, are recoverable in a negligence action. [Citations omitted.] The district court properly concluded that Freeport was entitled to recover its in-house engineering costs.

526 F.2d at 303-04.

Similarly, in *Dep't of Water & Power of Los Angeles v. United States*, 131 F. Supp. 329 (S.D. Cal. 1955), a municipal utility department sought to recover the costs it incurred in repairing damage to a power pole which had been struck by a post office truck. The Government did not dispute liability for the plaintiff's direct charges for labor and material, but disputed liability for the following indirect charges: superintendence of direct labor, tool expense, charges for two trucks involved in the repair, and administrative and general expense. *Id.* at 330-31. Based on evidence that the charges were based on accepted accounting practices in the utility field and the costs were reasonable in amount and factually related to the repair work, the court found that

plaintiff was entitled to recover its full costs as recorded in its accounting records. *Id*. at 332.

In *United States v. The John R. Williams*, 144 F.2d 451 (2d Cir. 1944), the court affirmed a damages award to the Government based on the Government's in-house costs incurred in repairing a submarine cable with its own repair vessel. In rejecting the defendant's argument that vessel operating expenses were not recoverable, the court (in an opinion authored by Judge Augustus Hand) stated:

> The [defendant] contends . . . that these expenses during the period of the repair work were a necessary cost of maintaining a vessel which [the Government] regularly kept for repairing cables. The [defendant] showed that the repairing of the cable . . . did not prevent the use of the vessel for other repair work and, therefore added nothing to the [Government's] necessary outlay. But, if the government had not maintained such a vessel it would have had to employ an outside contractor to make the repairs. We can see so reason why the [defendant], who caused the damage to the government's cable, should not pay the expense of the repairs while they were being made.

*Id*. at 452-53. *See also United States v. Peavey Barge Line*, 748 F.2d 395, 399 (7th Cir. 1984) (affirming award to the United States of overhead charges for lock and dam repair work because "reasonable overhead charges can be included in the cost of repairs even if the injured party makes the repairs itself since such charges would be billed by any outside firm selected to complete the repairs"); *United States v. Commercial Am. Barge Line Co*., 424 F. Supp. 453, 456 (E.D. Mo. 1977) (awarding damages to United States for repairs to a lock, including in-house expenses for damage examination by Army Corps of Engineers and overhead, because "[i]t is clear than plaintiff may recover indirect expenses . . . and the costs incurred by its own personnel"); *United States v. New England S.S. Co*., 297 F. 651 (S.D.N.Y. 1923) (awarding damages to the United States for the use of a Government dry dock to make repairs to a Government vessel).

The damages principle allowing recovery of in-house costs applied in the above tort cases is directly applicable to contract cases such as this because in both situations the goal is to compensate the plaintiff for the reasonable cost of the extra work made necessary by the defendant's wrongful conduct. As held in *Convoy Co. v. Sperry Rand Corp*., 672 F.2d 781, 785-86 (9th Cir. 1982), in affirming an award of breach of contract damages for a defective computer system:

> Univac argues that as a matter of law supervisory staff costs cannot be recovered because the plaintiff would have paid the staff's salary in any event. . . .
>
> The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for. . . .
>
> In *Clements Auto Supply* [298 F. Supp. 115, 134 (D. Minn. 1969), *aff'd in relevant part*, 444 F.2d 169 (8th Cir. 1971)], the court found that the supervisors' services were effectively lost to the plaintiff during the time they supervised a system which was of little benefit to the company. In relying on *Clements Auto Supply*, the district court implicitly found that Convoy had lost the benefit of its supervisors' services for the time they spent supervising the computer system.

*See also Dunn Appraisal Co. v. Honeywell Information Sys. Inc*., 687 F.2d 877 (6th Cir. 1982) (affirming award of damages for management time spent in resolving problems with a defective computer system because the loss of that time deprived the plaintiff of services it paid for).

**3. AFUDC is a recoverable item in this case.**

As noted earlier, AFUDC is a standard utility industry accounting practice that recognizes capital costs associated with financing long-term construction as part of the cost of a capital project. The legal question before the Court is whether AFUDC costs represent damages arising out of DOE's breach of contract or prejudgment interest

which is not recoverable against the Government. In this regard, this Court has distinguished between interest "on a claim" (e.g., prejudgment interest which begins accruing when a claim arises and continues to accrue during the entire pendency of the claim on the entire amount of the claim) and interest "*as* a claim" which implicates financing costs that represent a claim in themselves. *Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003) (emphasis in original). The Federal Circuit has held that such financing costs are recoverable as expectation damages so long as they are foreseeable. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-58 (Fed Cir. 2001); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344 (Fed Cir. 2003); *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003). As the Court stated in *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002):

> The court agrees that the 'interest' Westfed seeks to recover is not prejudgment interest. Westfed seeks to recover a cost expended in reliance on the contract in the form of interest. Such a characterization has been accepted by recent case law in this court. In *Bank United of Tex. v. United States*, 50 Fed. Cl. 645 (Fed. Cl. 2001), the court permitted interest paid on a loan and senior notes because the "plaintiff would not have incurred such added *interest cost* had defendant not breached."

*Id*. at 665; emphasis in original.

In this case, TVA's claim for AFUDC represents actual expenses incurred during the construction of dry storage as a result of the Government's breach which were accounted for in accordance with traditional, widely accepted utility principles. That expense for cost of capital, moreover, redounds to the detriment of TVA ratepayers who must shoulder it if the Government does not. As TVA will show at trial, had TVA not have had to build the ISFSIs, TVA's debt would have been lowered by the amount TVA seeks to recover. As the Federal Circuit recently noted, capital is not "'costless' to either the investor or the recipient." *LaSalle Talman,* 317 F.3d at 1374- 75. Accordingly, TVA

should recover the AFUDC cost of capital associated with the ISFSI capital projects required by DOE's breach of contract.

**4. Under fundamental legal principles, damages should be determined based on an acceptance rate obligation of not less than 3,000 tons annually beginning not later than 2008.**

When parties to a contract in a commercial setting fail to specify a term that is essential to a determination of their respective legal obligations, the missing term is supplied by the court based on standards of fairness and policy. The Restatement (Second) of Contracts § 204 (1981) sets out this fundamental legal principle:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

And Comment d specifies that principles of fairness and policy are to be used to establish the term:

> [T]he court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.

*See also Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (Where the Government's minimum order obligation under a contract was not expressly stated, this Court, quoting and relying on the above-quoted Restatement provisions, supplied a reasonable minimum order amount.); *David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) (Where the contract did not specify the size of a cafeteria that the building owner was required to furnish the Government, this Court determined the required size based on considerations of fairness.); *Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("Determination of what is a reasonable time requires an

inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy.").

This Court already has twice held that because there is no Standard Contract term specifying DOE's rate of performance obligation, the Restatement (Second) of Contracts § 204 is applicable; and thus the Court should supply an acceptance rate term which comports with standards of fairness and policy. *Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 96 (2003) (Judge Hodges) ("Here, the contract term is missing entirely."); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003) (Judge Hewitt) ("The court will, as it is required to do, *see David Nassif Assocs*., 557 F.2d at 258, determine the missing acceptance rate term in further proceedings for that purpose.").

In *Indiana Michigan*, 57 Fed. Cl. 88, the Court determined under Restatement § 204 principles that the Standard Contract required an acceptance rate of 400 metric tons in 1998, a ramp-up to an acceptance rate of 3,000 tons not later than the end of 2002, and a minimum rate of 3,000 tons annually thereafter:

> Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials. We have not attempted to discuss here the entire record support for DOE's intended 3,000-ton annual rate of delivery, but the evidence shows clearly that such a rate was the minimum needed to meet those objectives. . . .
>
> [U]tilities produce 2,000 metric tons of new waste per year. That is a generally accepted minimum quantity. A 3,000-ton acceptance rate would permit efficient reduction of the backlog as Congress intended. Defendant's 900-ton rate would cause the Department of Energy to fall farther behind each year. While the 3,000-ton rate has substantial support in the record, the 900-ton rate has none.
>
> Defendant argues that the 3,000-ton rate was a goal or a target, not a contract term. If so, it is the number used most often by Congress and

> by parties to the Standard Contract. It is a reasonable and responsible rate that represents the parties' intent. It accomplishes the purposes of the Nuclear Waste Policy Act and the Contract authorized by that statute.
>
> The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract. The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued performance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter.
>
> . . . .
>
> Utilities produce 2,000 metric tons of nuclear waste per year. Removing that amount would maintain waste accumulation at its current level. Congress and the parties intended that the Department of Energy would eliminate the backlog by removing an amount in excess of the 2,000-ton maintenance level. Plaintiff's share of a 3,000-ton annual rate of removal would dispose of [its] waste production and eliminate its backlog within a reasonable time.

*Id*. at 99-100.

Under these circumstances, as the Federal Circuit pointed out in *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.2d 1283, 1291 (2000) from a slightly different perspective, there is an implied obligation on the part of the Government to carry out its contractual duties within a reasonable time:

> The government has an "ever-present obligation to carry out its contractual duties within a reasonable time." . . . When the contract does not specify the period in which the government must respond, "the law imposes an obligation to act within a reasonable period of time.". . . That period is determined by "the reasonable expectations of the parties in the special circumstances in which they contracted."

*See also* Restatement (Second) of Contracts § 204 cmt. d ("[I]f no time is specified, a term calling for performance within a reasonable time is supplied."). That is, implicit in DOE's express obligation to begin removing all SNF from domestic nuclear utilities

beginning in 1998 is the obligation to complete that removal within a reasonable time, a temporal framework which requires a 3,000 steady-state acceptance rate be achieved not later than 2008.

Here, compliance by DOE with its reduced-rate schedule from 1998 through 2007 and with a steady-state 3,000-ton rate beginning in 2008 and continuing thereafter would have eliminated any reasonably possible need for out-of-pool storage by TVA during the entire anticipated lives of SQN and BFN. No acceptance rate obligation less than 3,000 tons annually in 2008 and the years thereafter (after use of DOE's reduced-rate schedule from 1998 through 2007) would comport with standards of fairness and policy or satisfy DOE's implied duty to carry out its contractual obligations within a reasonable time for the numerous reasons identified not only by DOE in its programmatic documents and in testimony by its officers but also by this Court in prior decisions in SNF cases:

- An express statement of DOE's acceptance rate obligation is missing from the Standard Contract because DOE refused to insert such a term despite objections by TVA and others. DOE was able to avoid inserting such a term only because the NWPA effectively mandated that TVA and other utilities enter into the Standard Contract.

- As shown by the testimony of DOE officers and agents and DOE documents, 3,000 tons annually after a short ramp-up period beginning in 1998 is the steady-state rate that DOE itself determined was the rate necessary to fulfill the purposes of the NWPA and the Standard Contract. Those purposes include the timely, safe, and secure storage of SNF at a central location rather than at numerous plant sites throughout the Nation.

- As shown by DOE's fee adequacy assessments, 3,000 tons annually is the steady-state rate that TVA and other utilities have effectively paid for in the payments they have made (and are continuing to make) under the Standard Contract. Thus, a rate of 3,000 tons annually reflects the contract bargain that TVA and the other utilities have paid for. Through 2004, TVA has paid $683.7 **million**, and the industry as a whole has paid $13.45 **billion** (upon

which DOE has earned interest of $7.57 **billion**).

- A steady-state rate of 3,000 tons annually after a short ramp-up period beginning in 1998 would have avoided significant economic waste by eliminating the need to construct significant numbers of expensive out-of-pool interim storage facilities. Lesser rates cause economic waste by requiring the construction of expensive interim SNF storage facilities such as the ISFSIs at SQN and BFN. Given the nature of the utilities' full-cost payment obligation under the Standard Contract, it would be unfair and contrary to public policy for DOE's contractual rate obligation to be one that engenders such economic waste.

- A steady-state rate of 3,000 tons annually is the rate DOE used in its Final Environmental Impact Statement (EIS) to assess the environmental impacts of transportation of SNF from utility plant sites to DOE's proposed permanent repository in Nevada. For EIS purposes, DOE assumed 70,000 tons of SNF would be transported over a period of 24 years. Throughout the EIS, DOE emphasizes that because the transportation program only extends for 24 years, its environmental risks and impacts are limited. The EIS does not mention alternative time periods.

- As shown by DOE's repeated use of the 3,000 rate in its analysis and planning for all aspects of the SNF removal program, 3,000 tons is a reasonable rate.

Because 3,000 tons annually in 2008 and the years thereafter is clearly the acceptance rate against which to evaluate the impact of DOE's breach in this case, there is no basis for reducing TVA's damages based on DOE's speculation about rates at which TVA might have had to build dry storage facilities sometime in the future in a non-breach world.

## CONCLUSION

The Court should award breach of contract damages to TVA in the amount of $35,683,438.11.

Respectfully submitted,

Electronically filed: May 26, 2005

Maureen H. Dunn
General Counsel

Edwin W. Small
Assistant General Counsel

s/Peter. K. Shea

Peter K. Shea
Senior Attorney/Attorney of Record
Telephone 865-632-7319

Attorneys for Tennessee Valley Authority

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

003735393