No. 01-249C
(Judge Lettow)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

# DEFENDANT'S MEMORANDUM OF FACTS AND LAW

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0534
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Civil Division
Washington, D.C. 20585

ALAN LO RE
Senior Trial Counsel

KEVIN B. CRAWFORD
SHARON A. SNYDER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

June 10, 2005

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 4

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 4

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . 6

A. The Proposed Rule . . . . . . . . . . 6

B. Public Comments . . . . . . . . . . 7

C. The Final Rule . . . . . . . . . . 9

III. TVA'S EXECUTION OF THE STANDARD CONTRACT . . . . . . . . . . 11

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT . . . . . . . . . . 12

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . 14

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . . . . . . . . 15

A. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . 15

B. The 1991 Annual Capacity Report . . . . . . . . . . 16

C. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . 18

VII. PRELIMINARY ESTIMATES OF THE TOTAL-SYSTEM LIFE CYCLE COST FOR THE RESTRUCTURED PROGRAM . . . . . . . . . . 20

VIII. TVA'S SUBMISSION OF DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . 21

IX. TVA'S NEED FOR DRY STORAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

X. DOE'S DELAY AND TVA'S DAMAGES SUIT . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I. TVA BEARS THE BURDEN AT TRIAL OF ESTABLISHING THAT ITS CLAIMED COSTS WERE CAUSED BY THE GOVERNMENT'S DELAY . 24

II. TVA CANNOT ESTABLISH THAT THE GOVERNMENT'S FAILURE TO BEGIN ACCEPTING ITS SNF BY 2002 CAUSED ITS PURPORTED DAMAGES RELATING TO DRY STORAGE OF ITS SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A. TVA Cannot Establish Any Causal Link Between Its Claimed Dry Storage Construction Costs and DOE's Delay In Beginning SNF Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1. The SNF Acceptance Scenario That TVA Attempts To Place Into The "But For" World Is Wholly Unsupported And In Conflict With Prior Rulings In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2. TVA's Efforts To Impose A 3,000 MTU Rate Into The Standard Contract Conflicts With The Language Of The Contract And The History Of Its Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

3. Under Any Reasonable Acceptance Rate Scenario, TVA Would Have To Build Dry Storage In The "But For" World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III. OTHER COSTS CLAIMED BY TVA WERE NOT CAUSED BY DOE'S DELAY IN ACCEPTING SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV. TVA'S COSTS MUST BE REDUCED BY THE COSTS THAT IT WOULD HAVE EXPERIENCED ABSENT A BREACH . . . . . . . . . . . . . . . 50

V. TVA'S CLAIMED DAMAGES MUST ALSO BE REDUCED BY AT LEAST AN ADDITIONAL $1,402,685 BASED UPON LACK OF SUPPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## TABLE OF AUTHORITIES

## CASES

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . . . . . . 47, 48

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 24

Autotrol Corp. v. Cont'l Water Sys. Corp,
918 F.2d 689 (7th Cir. 1990) . . . . . . . . . . 4

Barrow Utils. & Elec. Co. v. United States,
20 Cl. Ct. 113 (1990) . . . . . . . . . . 51

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 26, 49, 50

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . . . . . . 46, 48

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . . . . . . 38

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . 24

Castle v. United States,
48 Fed. Cl. 187 (2000),
aff'd on other grounds, 301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . . . 40

Commercial Metals Co. v. United States,
176 Ct. Cl. 343, 349 (1966) . . . . . . . . . . 37

Consumer Product Safety Commission v. GTE Sylvania, Inc.,
447 U.S. 102 (1980) . . . . . . . . . . 34

Convoy Co. v. Sperry Rand Corp.,
672 F.2d 781 (9th Cir. 1982) . . . . . . . . . . 48

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977) . . . . . . . . . . 34

England v. Contel Advanced Systems, Inc.,
384 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Jessup & Moore Paper Co. v. Bryant Paper Co.,
297 Pa. 483, 147 A. 519 (1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

McAbee Constr, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

National By-Products, Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Precision Pine & Timber v. United States,
63 Fed. Cl. 122 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

Quiman, S.A. v. United States,
39 Fed. Cl. 171 (1997),
aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

S.W. Eng'g Co. v. Cajun Elec. Power Coop.,
915 F.2d 972 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 41

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

TVA's SNF. Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23

Town of Grantwood Village v. United States,
55 Fed. Cl. 481 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Turtle Island Restoration Network v. Evans,
284 F.3d 1282 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United Indus. Syndicate, Inc. v. Western Auto Supply Co.,
686 F.2d 1312 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 50

Willred Company v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**FEDERAL STATUTES AND REGULATIONS**

42 U.S.C. §§ 10101-10270 (1982) . . . . . . . . . . 4

42 U.S.C. § 10131 . . . . . . . . . . 4, 33

42 U.S.C. §§ 10132 . . . . . . . . . . 4, 5

42 U.S.C. § 10161 . . . . . . . . . . 5, 12, 14

42 U.S.C. § 10162(b) . . . . . . . . . . 15

42 U.S.C. § 10168(d)(1) . . . . . . . . . . 15, 28

42 U.S.C. § 10172(a) . . . . . . . . . . 15

42 U.S.C. § 10221 . . . . . . . . . . 5, 12

42 U.S.C. § 10222(a)(1) (1982) . . . . . . . . . . 6, 34

42 U.S.C. § 10242(a) . . . . . . . . . . 15

10 C.F.R. § 961.11, Art. II . . . . . . . . . . passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-249C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF FACTS AND LAW

Pursuant to this Court's order dated February 4, 2005, defendant, the United States, respectfully submits the following memorandum of facts and law.

SUMMARY OF ARGUMENT

This case involves a claim by plaintiff, Tennessee Valley Authority ("TVA"), for $35,752,512.11 in costs that it has allegedly incurred for the design, licensing, and fabrication of dry storage facilities to store its spent nuclear fuel ("SNF") through the end of its 2004 fiscal year.[1] TVA contends that the Government is liable for these costs because its need for dry storage was caused by the Government's failure to begin accepting its spent nuclear fuel in 2002 pursuant to its Standard Contract with TVA.[2] As set forth below, TVA's claim cannot be

---

[1] TVA has submitted four separate damages reports in this case. In September 2002, TVA provided a report covering costs incurred through FY 2001. In July 2003, TVA provided a report addressing its costs incurred through FY 2003. In July of 2004, TVA submitted a report addressing its costs incurred through FY 2003 and in November of 2004, TVA submitted a report addressing its costs incurred through FY 2004. The Court has limited the scope of the forthcoming trial to TVA's costs incurred through fiscal year 2004. Tennessee Valley Authority v. United States, 60 Fed. Cl. 665, 679 (2004).

[2] Although DOE was to commence acceptance of spent nuclear fuel in 1998 from some commercial utilities, "TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. . . in July 2002. . . ." Tennessee

sustained, first, because the facts at trial will establish that TVA would have pursued dry storage regardless of the Government's breach, and further that even if the Government's breach did cause TVA to pursue dry storage, TVA has failed to properly account for a significant amount of costs that it would have incurred regardless of the breach.

TVA's entire theory of recovery in this case is based upon a DOE acceptance rate of spent nuclear fuel ("SNF") to which DOE was never obligated, nor the parties even contemplated prior to 1998. Indeed, TVA concedes that the rate of acceptance at which TVA expected DOE to perform beginning in 1998, would have resulted in the need for the construction of dry storage at TVA. Accordingly, TVA cannot show that its need to construct dry storage was caused by the Government's delay in accepting its spent nuclear fuel. Rather, as the Government will establish at trial, TVA would still have been required to construct dry cask storage in the absence of the Government's delay, only at a later date. Therefore, TVA cannot recover the cost associated with constructing a dry storage facility, except to the extent that it can prove incremental cost associated with an earlier construction date, or the present value of the time difference of those expenditures. Accordingly, TVA's claim should be reduced by $13.41 to $19.29 million on this basis alone.

Further, even if TVA could show that it would not have needed dry storage in the "but for" world, we will establish at trial that TVA's claim failed to properly account for costs in the "but for" world in that there is no causal connection between a number of other costs included in TVA's claim and the Department of Energy's ("DOE's") delay. Specifically, costs associated with analyzing the railroad bay floor multi-purpose canister ("MPC") transfer and trailer

---

Valley Authority, 60 Fed. Cl. at 674.

movement scenarios at TVA's nuclear reactor site at Sequoyah, and with assessing the costs of complying with Nuclear Regulatory Commission ("NRC") criteria for handling heavy loads identified in NRC Bulletin 96-02 would have also been required if DOE had started accepting spent nuclear fuel in 1998. Costs claimed for analyzing the acceptability of the spacing between the currently installed spent fuel storage racks at TVA's reactor site at TVA's reactor site at Browns Ferry, and for certain other engineering studies and evaluations are not required to design, construct or operate an ISFSI, or to load fuel to DOE. Moreover, certain costs claimed for labor, internal charge backs, and overhead would have been incurred regardless of the delay. These costs should be removed from TVA's claim altogether.

TVA's claim also suffers from a failure properly to account for savings TVA experienced as a result of the Government's delay. Although it claims to have accounted for such savings by removing various costs from its claim, including a portion of the fuel transfer costs, TVA has significantly understated these costs. Thus, TVA's claim should be adjusted by increasing the offset to TVA's claimed costs for these amounts.

Finally, TVA's claim suffers from a failure of proof. TVA has simply not documented that it has incurred a number of its claimed costs. Without proper documentation, these costs cannot be charged to the Government.

We will establish at trial that taken together, these omissions over state TVA's claim by at least $7,890,920 consisting of at least $353,000 relating to TVA's failure to properly account for fuel transfer costs it would have incurred absent the Government's delay;[3] $6,135,235 relating to

---

[3] The Government will argue that this credit is in the range of $353,000.00 to $430,000.00

non-incremental costs TVA erroneously included in its damages claim; and, $1,402,685 in claimed costs for which TVA failed to provide proper support. Accordingly, even if the Court finds that TVA pursued dry storage because of DOE's failure to begin SNF acceptance by January 31, 1998, TVA's claim should be reduced by at least $7,890,920.

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

The NWPA set forth a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. In addition to this process for the siting of a repository, the Secretary was to "prepare a comprehensive

report, to be known as the mission plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982). The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the NRC, and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, to provide the appropriate committees of Congress with the mission plan. Id. § 10221(b)(2)-(3).

Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the Secretary's proposal could "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).

In addition, the NWPA provided that the Secretary would enter into contracts with

the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided, inter alia, a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents,

rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year. Id. at 5463 (Art. IV.C).

The term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided that written comments had to be submitted by March 7, 1983. Id. 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule. A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. For instance, TVA submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 0005.063 at 5 (ARC0010537). TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at

which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.[4]

DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
>> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 0019 at 3-4.

EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX. 0005.034 at 4 of attachment. They stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility)

---

[4] TVA also proposed that the contract provide that, "[a]fter January 31, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for Purchaser's nuclear power plants specified in Appendix A." Id.

before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." DX 0005.034 at 4 of attachment (ARC 0010336). See also DX 005.014 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 005.069 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," Id. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

DOE did not adopt TVA's request that DOE add a provision to the Standard Contract to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." See DX 0005.063 at 5 (ARC0010537). TVA acknowledged this fact in an internal memorandum dated May 24, 1983. DX 28 at 3 of attachment 2 (TV 1470). Nor did DOE adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 0005.043 at 1 of attachment 1 (ARC00010439). However, the final Standard Contract included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).

The Standard contract also contained an "unavoidable delays" clause. Specifically, it provided that

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the purchaser or DOE – such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusally severe weather – cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

10 C.F.R. § 961.11, Art. IX.A

Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

## III. TVA'S EXECUTION OF THE STANDARD CONTRACT

On June 28, 1983, TVA executed its Standard Contract with DOE. See Complaint, ¶ 4, in Tennessee Valley Authority v. United States, No. 01-249C (April 26, 2001). TVA's Standard

Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983.

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 0045 at 25 (HQR0031129) ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). The 1985 Mission Plan also described an improved performance system that would include a MRS facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." DX 0045 at 24 (HQR0031128), 28-29 (HQR0031132-HQR0031133). Based upon these assumptions, the Mission Plan at pages 26-27 in Tables 2-2 and 2-3 uses a two repository assumption and the following waste acceptance rates (the improved system with an MRS):

| Authorized System | | Improved System |
|---|---|---|
| First Repository | Second Repository | |

| Year | MTU | | MTU |
|---|---|---|---|
| Pre-1998 | | | 2,200 |
| 1998 | 400 | | 3,000 |
| 1999 | 400 | | 3,000 |
| 2000 | 400 | | 3,000 |
| 2001 | 900 | | 3,000 |
| 2002 | 1,800 | | 3,000 |
| 2003 | 3,000 | 400 | 3,000 |
| 2004 | 3,000 | 400 | 3,000 |
| 2005 | 3,000 | 400 | 3,000 |
| 2006 | 3,900 | 400 | 3,900 |
| 2007 | 4,800 | 400 | 4,800 |
| Total | 21,600 | | 34,900 |

DX 0045 at 26-27 (HQR0031130-HQR0031131).

The 1985 Mission Plan also noted the controversy surrounding the program and set forth a contingency plan should the repository be substantially delayed. Specifically,

> If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage.

DX 045 at 19-20 (HQR0031123-HQR0031124).

In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. It explained that this recommendation was based on experience gained in the program, a budget decrease for fiscal year 1987, and budget uncertainty for fiscal year 1988. The Mission Plan also noted that DOE

could nonetheless start accepting waste in 1998 at an MRS facility.[5] DX 0049 at 6 (HQR-003-1634).

Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 0049 at 60 (HQR-003-1687). The 1987 Mission Plan Amendment also acknowledged the importance of the Annual Capacity Report that would be issued in 1991; namely that it would be used in the DCS process. DX 0049 at 60 (HQR-003-1687).

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." DX 0299 (S. Rep. No. 100-152, at 1 (Sept. 1, 1987)). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision

---

[5] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[6]

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 0050 at 2 (HQR-001-2713), 0057 at 1 (EDB-001-1103), 0066 at 2 (HQR0012494), 0050 (HQR0012780) ("projections in this initial

[6] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 0050 at 2 (HQR-001-2713), 0057 at 2 (EDB-001-1104), 0066 at 2 (HQR0012494).

B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 0076 at 1-2 (HQR0012362-HQR0012363). The 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 0076 at 2 (HQR0012363). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." DX 0076 at 2 (HQR0012363). See DX 0076 at 7 (HQR0012368) ("[t]hese allocations are the basis for DCS submittals").

The 1991 ACR specified the following acceptance allocations:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 0076 at 5 (HQR0012366). These allocations were created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0012365). Thus, as DOE explained "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, they "are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system

> configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

PX 16.

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 0084 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 0084 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on DOE or the Purchasers." DX 0085 at 1-2 (HQR0012322-HQR0012323).

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium

(MTU)." DX 0089 at 1 (HQR-001-2246). The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

DX 0089 at 4 (HQR-001-2249). See 0076 at 5 (HQR0012366), 0084 at 4 (HQR0012324). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). <u>The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations</u>. These projected nominal waste acceptance rates are presented in Table 1. <u>The Department will continue to process DCS submittals on an annual basis</u>.

DX 0089 at 3-4 (HQR-001-2248-HQR-001-2249) (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." DX 0089 at 1 (HQR-00102246). However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

## VII. PRELIMINARY ESTIMATES OF THE TOTAL-SYSTEM LIFE CYCLE COST FOR THE RESTRUCTURED PROGRAM

DOE's anticipation of performance at an MRS was also reflected in the cost analyses it preformed around the time of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. In its Preliminary Estimates of the Total-System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990, ("1990 PETSLCC") DOE utilized a schedule that was explicitly based on acceptance starting at an MRS. DX 292. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU would be accepted. Id. This schedule goes on to show what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted. In years thirteen through seventeen 1800 MTU would be accepted. And only in year eighteen would the system accept 3000 MTU. Id. During this time period, TVA expected that DOE would start accepting fuel in accordance with DOE's 1990 PETSLCC and the 1995 APR/ACR. DX 150, 176.

VIII. TVA'S SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

Between 1997 and 2003, TVA submitted DCSs for delivery of spent nuclear fuel in the years 2002 through 2009. The DCSs submitted by TVA for the first six years comported with the rate of acceptance set forth in the 1995 ACR. Unlike other utilities, TVA did not object to these rates in its submissions. The two final submissions, made on September 5, 2002, and August 21, 2003, do not comport with a rate set forth in any ACR. In response to all of these submissions, DOE stated it was not "able at this time to approve [TVA's] DCS submittal" and that, "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." See, e.g. DX 96, 110, 126, 139, 302.

IX. TVA'S NEED FOR DRY STORAGE

TVA has maintained a Spent Fuel Management Program to evaluate its need for storage of spent nuclear fuel at least since the inception of the Standard Contract. See DX 41. As early at 1983, TVA believed that, even were DOE to commence acceptance of spent nuclear fuel into a federal repository by 1998, there was only a 50-percent chance that TVA "might get by" without constructing additional storage. Id. at 9 (TVA001601). Indeed, at that time, TVA was already planning a dry cask storage demonstration project. Id. at 3 (TVA001595).

In addition, in 1989, TVA anticipated that it would require additional storage capacity even with an MRS. DX 62 (TVA002441). It further anticipated that, even if DOE began accepting SNF at an MRS, additional storage need could be created by "the breaking of any link in the MRS chain – shipment to the MRS, equipment malfunction, safety questions, licensing difficulties could bring the waste management system – and eventually our nuclear plants – to a screeching halt." Id. at 4 (TVA002431). In 1996, TVA anticipated that even if "a limited

quantity of on-site dry cask storage may be needed to store spent fuel generated after the fuel pools are full and until TVA's disposal allocation matched spent fuel generation," even if DOE met its contractual commitment and began accepting industry fuel by 1998 and TVA's spent nuclear fuel by 2003. DX 92 (TVA001404).

In 1997 TVA created a Spent Fuel Assessment Team to evaluate TVA's options for increasing its SNF storage capacity at its Sequoyah and Browns Ferry nuclear plants. The team examined a variety of options, including transhipment of its fuel between sites, dry cask storage, and expanding its wet storage by reracking its fuel pools altogether or adding peripheral racks or "baby racks" to the pools. For the purposes of its analysis, TVA continued to assume an acceptance rate no greater than that set forth in the 1990 PETSLCC. DX 282 (TVA003112).

The team generated an Initial Draft Assessment and Evaluation of Spent Fuel Storage Options in December 1997, DX 105 (TVA0020861-TVA0020904), and issued a final report captioned "Spent Fuel Storage Options Evaluation & Recommendations" in June 1998. DX 120. The final report indicates that transhipment was eliminated as an option at the direction of senior management. It recommended that a dry cask storage facility be built at Sequoyah. With regard to Browns Ferry, it recommended further evaluation of the structural adequacy of Browns Ferry pools for additional racks prior to constructing dry storage. Browns Ferry had reracked its pools during the late seventies or early eighties, and the pools had very little additional structural margin between the stresses generated by the racks and what was required by the code. By the late 1990s TVA no longer had access to an earlier analysis performed by General Electric in support of that reracking, which would have been necessary to add peripheral racks. In 1997, TVA had Holtec take a cursory look at the potential for reracking by comparing the Browns

Ferry pools to pools in other Mark 1 plants. NAC also performed a preliminary analysis of that potential. The results of those studies were not definitive, and TVA then had Holtec perform a more detailed evaluation of the potential for reracking. In the course of that study, Holtec recognized that, if the pool were reracked, there would be localized high stresses on certain parts of the floor which exceeded the nominal code limits. Holtec proposed an interpretation of the code to the effect that, from an overall capacity standpoint, TVA could average those stresses over some dimensions and that would meet the intent of the code. That interpretation, however, would have to be approved by the NRC, which TVA determined involved too much risk to pursue. Thus, toward the end of 2000, TVA decided to proceed with dry cask storage at Browns Ferry.

X. DOE'S DELAY AND TVA'S DAMAGES SUIT

DOE did not begin accepting SNF and/or HLW under the Standard Contract by January 31, 1998. On April 26, 2001, TVA (No. 01-249C) filed its complaint in this Court. In a decision dated June 2, 2004, the Court determined that TVA had accepted the rate set forth in DOE's 1995 ACR. Tennessee Valley Authority, 60 Fed. Cl. at 669. The Court further ordered that the case should proceed to trial to address TVA's damages accrued between the Government's initial alleged breach in 1998 and the conclusion of TVA's fiscal year ending September 20, 2004. Id. at 667.

TVA has submitted four separate damages claims since filing its complaint. Its final claim suffers from three broad defects. It includes a number of costs that TVA would have incurred regardless of DOE's delay in accepting its SNF. It also fails to account for savings that

accrued to TVA as a result of DOE's delay. In addition, TVA has failed to document that certain costs were actually incurred.

ARGUMENT

I. TVA BEARS THE BURDEN AT TRIAL OF ESTABLISHING THAT ITS CLAIMED COSTS WERE CAUSED BY THE GOVERNMENT'S DELAY

This Court's predecessor, the Court of Claims, adopted a basic rule for awarding damages for common law breach of contract:

> In awarding compensatory damages, the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract.

Northern Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975) (quoting Restatement of Contracts § 329 cmt. e).[7]

To recover damages, a plaintiff "must prove the requirements for an award of damages by a preponderance of the evidence," and these "requirements include: causation, foreseeability, and reasonable certainty in the amount of damages." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, TVA bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting TVA's SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The venerable decision in Myerle continues to represent the binding standard of this circuit. California Fed. Bank v. United States,

---

[7] In addition to these damages theories, as part of the Government's evidence at trial, we anticipate that Mr. Kouts and perhaps other witnesses will testify regarding the reasons for DOE's delay in beginning SNF acceptance and its excusability. The Court may find it necessary to resolve these issues at trial.

395 F.3d 1263, 1267-68 (Fed. Cir. 2005) (rejecting the "substantial factor" test and explaining that claimed damages must "inevitably and naturally, not possibly nor even probably flow from the defendant's breach" and that this causal connection between breach and claimed losses must be "definitely established"). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961).

To be recoverable, damages must be direct and not the result of any intervening incident. See Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Id. Further, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. Similarly, the loss must be one which the non-breaching party can show that, "but for" the breach of contract, would not have been suffered:

> [T]he loss for which a recovery may be had in an action against a wrongdoer must be the result of the wrong inflicted. The party complaining must show, not only that he has suffered a loss, but also that it would not have been incurred, but for the wrongful act of his adversary . . . .

Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960) (emphasis added) (quoting Osage Oil & Ref. Co. v. Chandler, 287 F. 848, 852 (2d Cir. 1923)); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)); accord United Indus. Syndicate, Inc. v. Western Auto Supply Co., 686 F.2d 1312, 1316 (8th Cir. 1982) ("[t]he

fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach").

Additionally, TVA has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996); see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). TVA may not recover speculative damages. San Carlos Irrigation, 111 F.3d at 1563.

## II. TVA CANNOT ESTABLISH THAT THE GOVERNMENT'S FAILURE TO BEGIN ACCEPTING ITS SNF BY 2002 CAUSED ITS PURPORTED DAMAGES RELATING TO DRY STORAGE OF ITS SNF

### A. TVA Cannot Establish Any Causal Link Between Its Claimed Dry Storage Construction Costs And DOE's Delay In Beginning SNF Acceptance

#### 1. The SNF Acceptance Scenario That TVA Attempts To Place Into The "But For" World Is Wholly Unsupported And In Conflict With Prior Rulings In This Case

In its pretrial brief, TVA contends that it has constructed a dry storage facility at Sequoyah and is in the process of constructing such a facility at Browns Ferry, and it asserts that the Government, because of its delay in beginning SNF acceptance, is responsible for these costs. Pl. Br. at 2. In fact, TVA's dry storage construction cost claim constitutes the large majority of its damages claim. Yet, TVA cannot recover these costs unless it establishes that it would not have incurred these construction costs had DOE timely begun SNF acceptance. See Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). To the contrary, "the

non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)). In this case, the evidence will show that, regardless of DOE's delay in beginning SNF acceptance from the nuclear industry, TVA, under any reasonable SNF acceptance scenario, would have to have built dry storage facilities at both its Sequoyah and Browns Ferry nuclear sites, albeit at a later time than that at which TVA has found it necessary to construct them. Specifically, depending upon the rate of SNF acceptance that the Court finds DOE had to satisfy in the "but for" world – that is, a world in which DOE timely began SNF acceptance – and assuming appropriate SNF generation projections, TVA would have run out of SNF storage space in its wet pools at Sequoyah and at Browns Ferry beginning as early as 2013, requiring TVA to build dry storage.

To avoid the need to build dry storage facilities at its reactors in the "but for" world, TVA needs this Court to find that DOE was obligated to accept SNF, after 1998, at a rate that directly conflicts with the rationale underlying the rate that this Court has already identified as applying in this case and that TVA does not dispute. In its rate of acceptance decision in this case, this Court found that the SNF acceptance rates and allocations that DOE identified in its 1991 through 1995 Annual Capacity Reports and Acceptance Priority Rankings governed this litigation. See Tennessee Valley Auth., 60 Fed. Cl. at 669-70. In the 1991 ACR and the 1995 ACR/APR, TVA obtained specific acceptance allocations for the first 10 years of DOE's SNF acceptance program, based upon DOE acceptance of 400 Metric Tons Uranium ("MTUs") of SNF in Year One, 600 MTUs of SNF in Year Two, and 900 MTUs of SNF from Years Three through Ten. Assuming an acceptance start date of 1998, the 1991 ACR and 1995 ACR/APR

allocations run through the end of 2007. In its pretrial brief, TVA accepts those rates, but asserts that, in 2008 and every year thereafter, DOE was somehow immediately obligated to begin accepting 3,000 MTUs of SNF each year. See Pl's Br. at 16. Apparently, TVA believes that, with such an acceptance obligation beginning in 2008, TVA could have avoided the need to build dry storage facilities in the "but for" world.[8]

Not only is TVA's "but for" world acceptance rate theory not supported by the contract itself, it is wholly unsupported by any plan for SNF acceptance that DOE has ever published or considered. As we anticipate establishing at trial, the rates of SNF acceptance identified in the 1991 ACR and the 1995 ACR/APR were predicated on the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at a Monitored Retrievable Storage ("MRS") facility prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010. Although the NWPA only required the ACR to include acceptance allocations for the first ten years of SNF acceptance, and although DOE complied with that requirement by identifying the first ten years' worth of acceptance allocations in the 1991 ACR, DOE's acceptance plan, as identified in the 1991 ACR and 1995 ACR/APR, was based upon its plan to accept 900 MTUs of

[8] Because the 3,000 MTU rate is based upon operation of a repository, TVA appears to insinuate that DOE was obligated to have a repository in place by 1998 or, perhaps, at least by 2008. However, the United States Court of Appeals for the District of Columbia Circuit has expressly rejected any argument that the Federal repository had, or has, to be available by any particular date. Indiana Michigan, 88 F.3d at 1276.

SNF in 2008 and 900 MTUs of SNF 2009. TVA's proposed acceptance rate obligations in the "but for" world are wholly inconsistent with this plan.

In fact, TVA's proposal to obligate DOE to accept 3,000 MTUs of SNF in 2008 and 2009 would have placed DOE in direct conflict with the statutory limitations imposed by the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. Beginning in the early 1990s, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998. DOE never informed utilities that it anticipated repository availability precisely in 2008. Yet, under TVA's proposed plan, DOE would have to accept SNF, beginning in 2008, in amounts exceeding the 10,000 MTU limitation upon SNF acceptance prior to the availability of a repository. TVA's proposed 2008 date not only is unsupported by any planning documents, but also would require DOE to violate the law established by the 1987 NWPA amendments.

Further, TVA cannot identify any DOE plans that DOE has ever considered in which any Federal repository would immediately begin accepting 3000 MTUs of SNF in the first year of repository operation, as TVA's proposed plan for damages calculations apparently might require. DOE planning documents specifically and uniformly have anticipated a transition from an MRS to a repository provide for an eventual ramp-up to an acceptance rate higher than 900 MTUs per year at the repository. None of those planning documents start at a 3000 rate the first year of repository operations. For instance, the Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990, ("May 1989

TSLCC"), DX 292, reflects a rate that is very different than the proposal that TVA now promotes: 900 MTU annually in years 2008 through 2009, 1800 MTU annually from 2010 through 2014, and 3000 MTU annually in 2015 through 2036.[9] Although this document does not reflect a binding commitment from the Government, given that it is only for planning purposes, it does provides an indication of the type of schedule that DOE thought could be possible as it transitioned from an MRS to a repository.

Moreover, TVA admits that, prior to 1998, TVA based its expectations of SNF acceptance upon the rates set forth in the May 1989 TSLCC. DX150, 282. Remarkably, TVA's own runs of the DOE model, which TVA apparently plans to use at trial, plainly demonstrate that, in the "but for" world, had DOE accepted SNF at the rates set forth in the 1991 ACR and 1995 ACR/APR for the first 10 years of the program and at the those set forth in the May 1989 TSLCC for the remaining years, TVA – as it has acknowledged in its own internal documents – would have needed additional on-site storage in the "but for" world. Further, because TVA's only practical option for such storage was dry storage, TVA would have pursued dry storage in the "but for" world.[10]

The need for some sort of ramp-up once the repository starts operating is also apparent in DOE documents that consider the repository outside of the context of the MRS. For instance, in DOE's 2004 annual capacity report, PX 36, which was based upon the use of a repository, DOE

---

[9] As for the portion of the ramp-up that is undisputed in this case, this document differs from the 1995 ACR rate only in 1999, where the rate remains at 400 MTU for a second year rather than jumping to 600 MTU.

[10] Like TVA's analysis, the analysis of the Government's expert, Mr. Hartman, also concludes that TVA would have developed dry storage in the "but for" world.

used an acceptance rate that ramped up to 3,000 tons per year in the fifth year based upon the acceptance capacity of the repository facilities that it anticipated would be operational in 2010.[11] Likewise, DOE's Civilian Radioactive Waste Management System Requirements Document – Rev. 6, September 2004, DOE/RW-0406, PX 40, which is also based on the use of a repository, does not provide for acceptance at a repository at the 3,000 rate until the fifth year of repository operations.[12] It is simply a matter of common sense to expect that a complex new facility would not start operations at maximum capacity, but, rather, would have some sort of ramp-up period commensurate with the learning curve of the operators.

As we will discuss below, the documents that DOE has issued over the course of time in the past relating to its future plans for SNF acceptance do not somehow create new extra-contractual obligations beyond those found in the Standard Contract itself. Nevertheless, even assuming that DOE's plans for performance could somehow become contractual baselines, TVA cannot identify any evidence that DOE has ever considered, much less planned, a SNF acceptance scenario like the one that TVA is now proposing – that is, SNF acceptance in the first ten years at the 1995 ACR/APR rates, followed by an immediate ramp-up to 3,000 MTUs in 2008. Clearly, based upon the planning documents issued in the past, TVA never anticipated the acceptance scenario that it now proposes. For these reasons and those that we expect to establish at trial, TVA's proposed "but for" world scenario is wholly unsupported.

---

[11] Specifically the ACR provides for acceptance of 400 MTU in 2010, 600 MTU in 2011, 1200 MTU in 2012, 2000 MTU in 2013, and 3000 MTU in 2014.

[12] The specific ramp-up is the same as that set forth in the 2004 ACR. The document notes that "[t]he rates in this schedule are targets only and do not create any binding legal obligation on the Department of Energy." Id. at 8.

2. TVA's Efforts To Impose A 3,000 MTU Rate Into The Standard Contract Conflicts With The Language Of The Contract And The History Of Its Development

Although TVA has attempted to infer from various DOE planning documents and statements that DOE has contractually obligated itself to accept utility SNF at some point at an annual rate of 3,000 MTUs, the language of the Standard Contract and the history of its development plainly establish that no such contractual obligation exists.[13] As will be discussed below, in response to TVA's and other nuclear utilities' explicit requests, DOE intentionally declined to place a minimum SNF acceptance rate obligation in the Standard Contract, believing that it could, and should, not do so because of the scope and extent of unknown potential technical and other difficulties that made the speed at which it would be able to accept SNF in the future unclear. Apparently, TVA now wants to get through the "back door" that which it was unable to obtain through the "front door" – that is, having failed to obtain a written term in the contract requiring DOE to accept 3,000 MTUs of SNF annually, TVA wants to convince this Court that, somehow, this requirement made it into the contract anyway.

Although TVA has further argued that the Court should impose a 3,000 MTU rate in the Standard Contract beginning 2008 because that rate comports with standards of fairness and policy, Pl's Br. at 32-36, TVA's request is based upon its unsupported theory that the NWPA and the Standard Contract were intended to achieve two fundamental objectives: (1) to prevent the

[13] We previously filed extensive briefing regarding the meaning of the SNF acceptance schedule provisions of the Standard Contract, the manner in which the Court should interpret those provisions, and the minimum rate of SNF acceptance required under the Standard Contract. To preclude the need to incorporate the entirety of that briefing in our pretrial briefing here, we respectfully request that the Court refer to those pleadings for a fuller discussion of the Government's arguments regarding the SNF acceptance rate and the appropriate manner in which to interpret the Standard Contract's terms.

nuclear utilities from having to build at-reactor storage after DOE began performance in 1998; and (2) to require DOE to accept SNF and/or HLW at a rate that would reduce the existing backlog of SNF and/or HLW already stored by utilities as of 1998. See Pl.s Br. at 5-6, 33-36. TVA then argues that an annual acceptance rate of 3,000 MTUs of SNF would have been necessary to achieve this objective. Id. TVA fails to cite any "evidence" from the most important means of determining this intent: the language of the NWPA and the Standard Contract themselves. By arguing that the Court should define a "reasonable" rate by reference to a two-part requirement that is not contained in the contract itself, TVA is again trying to obtain through the back door what it could not obtain through the front door.

The NWPA itself not only is devoid of any support for TVA's far-fetched arguments, but actually conflicts with it. Unlike many statutes, the NWPA expressly identifies, in the statute itself, the purposes of the Act, as well as the congressional findings supporting the Act. Nowhere in those express findings or purposes is the "intent" that TVA identifies regarding preventing additional at reactor storage or working off the backlog. See 42 U.S.C. § 10131. In fact, the identified purposes of the NWPA relate to protecting "the public and the environment . . . from the hazards posed" by SNF and HLW and in "ensur[ing] that the costs of carrying out activities relating to the disposal of [SNF and HLW] will be borne by the persons responsible for generating" it. Id. § 10131(b)(1) & (4). The NWPA not only says absolutely nothing about ensuring that private commercial nuclear utilities are protected against storage expenditures, but it affirmatively seeks to ensure that those utilities, rather than taxpayers, pay all incurred storage and disposal costs. Id. Further, the language of the Act that authorizes the Secretary of Energy to develop and enter into contracts with the owners and generators of SNF and/or HLW, 42

U.S.C. § 10222, makes no reference to the "intent" that TVA proposes. In short, the NWPA itself is devoid of any support TVA's alleged intent. Statutory interpretation begins with "the plain words of the law," Turtle Island Restoration Network v. Evans, 284 F.3d 1282, 1291 (Fed. Cir. 2002), petition for certiorari filed, 71 U.S.L.W. 3353 (Nov. 6, 2002), and the words of statutes are to be given their ordinary meaning. Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). Here, the words of the actual statute do not create the obligations, or "intent," that TVA alleges.

Further, much of the "evidence" upon which TVA apparently intends to rely to support the alleged intent of the NWPA, as well as the intent of the Standard Contract, is not even admissible for these purposes. For instance, TVA has cited to deposition testimony of individuals as evidence of the "intent" of Congress in the NWPA. See Pl.'s Br. at 7-9, 35. This method of discerning the intent of these documents is inadmissible, since even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). In its pretrial brief, TVA relies upon the beliefs of various individuals who began working with the NWPA long after Congress enacted it as to the meaning that Congress presumably intended when it passed the Act.

Similarly, TVA apparently attempts to introduce evidence regarding the goals of DOE's program, and the hopes of some individuals that, at some point in time after the repository is operational, DOE will be able to accept SNF at a rate of 3,000 MTUs per year. The identification of hopes and goals does not somehow make them contractual obligations for which, because the hopes and goals were not satisfied, damages can be awarded. In fact, these statements cannot be given any credence to the extent that they are contrary to the record of administrative rulemaking for the Standard Contract. In response to the notice of proposed rulemaking that generated the terms of the Standard Contract, several commenters, including TVA, suggested that DOE include in the Standard Contract a contractual obligation to accept SNF and HLW in a manner extremely similar to that which TVA now suggests. See DX 0005.063 at 5 (ARC0010537), 0005.013 (ARC0010169), 0005.017 at 5 (ARC0010216), 0005.033 at 1 (ARC00010316), 0005.066 (ARC0010568), 0005.081 at 8 (ARC0010680). As we will establish at trial, DOE specifically and intentionally declined TVA's and the other commenters' requests, believing that it could not create any such obligations upon itself because it could not know, in 1983, the scope and extent of the technical and other obstacles that it would face in attempting to develop an operational repository.

TVA fails to cite any language in the Standard Contract that converted the hopes and goals set forth in this testimony into contractual obligations.[14] Hopes and goals do not become

---

[14] Interestingly, the majority of the documentation and testimony that TVA cites to support its proposition that DOE has always planned, and still plans, to accept SNF at an annual rate of 3,000 MTU discusses SNF acceptance after a repository has opened. Yet, DOE was not required to have an operational repository by January 31, 1998. See Indiana Michigan, 88 F.3d at 1276. However, even if it was, DOE's hopes and goals of meeting a 3,000 MTU were specifically excluded from the Standard Contract.

mandatory contractual obligations absent their incorporation into a contract. In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In that case, the plaintiff had entered into a contract with the United States for the Government's purchase of a portion of the plaintiff's land needed in the construction of a left-bank levee and plaintiff's donation of a right-of-entry for the construction of a levee on plaintiff's own right-bank property. When signing the contract, the plaintiff had the impression that "the Government had undertaken to build, or have someone else build, a right-bank levee for plaintiff's protection," but the contract itself identified no such obligation, although the Government was attempting to negotiate with several individuals so that it could, in fact, build such a levee. Id. at 555, 405 F.2d at 1261. The Government subsequently had difficulties in obtaining the necessary right-of-entry from another individual to allow for the construction of a right-bank levee, and, although the agency constructed a left-bank levee, the right-bank levee remained unbuilt. Id. at 555-56, 405 F.2d at 1261. Following a subsequent flood of the plaintiff's right-bank property, which the plaintiff claimed would not have occurred had a right-bank levee been constructed, the plaintiff sued for breach of contract, claiming that, because the agency fully intended to construct a right-bank levee when the contract was executed, the agency had breached the parties' agreement. The Court of Claims rejected that argument, determining that mere statements reflecting the agency's hopes or goals did not become contractually binding on the agency unless those hopes or goals had been incorporated into a contract as contractual obligations:

> Under these principles, for a government representation that a right-bank levee would be built to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention. . . . If . . . the Government's statement was subject to two reasonable interpretations, one that it was an undertaking, the other that it was a prediction, and the parties chose opposite ones, then there is no contract covering that representation, unless one side either knew or should have known the meaning attached to it by the other. The Government prevails, in other words, if we find that the parties arrived at a contract which provided for no right-bank levee, or that they reached no mutual agreement at all on this issue.

Id. at 560, 405 F.2d at 1264 (emphasis added).

The Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur." Id. at 571, 405 F.2d at 1270; see id. at 570, 405 F.2d at 1269 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)). Accordingly, the Court found that the plaintiff had not established "any contractual obligation on the part of the Government to build, or have built, a right-bank levee." Id. at 575, 405 F.2d at 1272; see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and

the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose").

The testimony and evidence at trial will establish that DOE did never entered into any agreements, contractually binding or otherwise, to accept SNF at the rates that TVA proposes. None of the documents that TVA has identified to support its proposed two-part requirement for SNF acceptance, such as DOE's fee adequacy studies, evaluations of the total system life cycle costs, and environmental impact statement ("EIS"), are appropriate documents to use to determine the parties' contractual "intent." See Pl.'s Br. at 9-11, 35-36. The purpose of the fee adequacy studies (although required by the NWPA) and total system life cycle cost analyses was solely to determine whether the fees paid into the Nuclear Waste Fund were sufficient to pay for the costs of the entire program, see, e.g., DX 0295, 0298, while "[t]he purpose of the EIS is to provide information on potential environmental impacts that could result from a Proposed Action to construct, operate and monitor, and eventually close a geologic repository . . . ." See Final Enviornmental Impact Statement for a Geologic Repository for the Disposal of Spent Nuclear Fuel and High-Level Radioactive Waste at Yucca Mountain, Nye County, Nevada, DOE/EIS-0250, Volume 1 Impact Analyses, February 2002, at 1. These documents have nothing to do with the goals of the Standard Contract or the SNF program, and they do not pertain to the acceptance schedule to be developed pursuant to the Standard Contract. Additionally, these

documents relate to potential rates of acceptance at a repository once the repository is operational. See, e.g., PX96; DX 0296.[15]

Further, and importantly, the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire agreement between the parties with respect to the subject matter hereof." 10 C.F.R. § 961.11, Art. XXII(A). It further states that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. TVA's interpretation of the Standard Contract, which reads into the agreement the alleged program hopes and goals over a 20-year period, completely eradicates this provision from the Standard Contract. Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes plaintiff's burden of establishing a lack of integration "extremely heavy." Id. Further, given that the Standard Contract was promulgated through notice-and-comment rulemaking, any parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. TVA's efforts to introduce extensive deposition testimony and

[15] Even if these documents did govern the rate applicable to the start of the repository in the but-for world, they would not aid TVA’s cause. Although those documents examine various rates for the start of a repository, none of them considers a rate with less than a four year ramp-up to a steady state of 3,000 MTUs.

other documents to identify the contractual intent evidenced by the language of the Standard Contract are insupportable.[16]

### 3. Under Any Reasonable Acceptance Rate Scenario, TVA Would Have To Build Dry Storage In The "But For" World

Under any reasonable SNF acceptance rate scenario, and as TVA has acknowledged in internal documents, TVA would have to have built dry storage facilities in the "but for" world, although at a later date than it has built them following DOE's delay. Accordingly, because it would incur the same costs that it now seeks to recover in this litigation to build its dry storage facilities, TVA has no basis to claim that its dry storage construction costs are "incremental" to DOE's delay. Instead, those costs are costs that TVA would incur, regardless of DOE's breach. Further, to the extent that TVA wishes to argue that it should recover for the time value of the early expenditure of money or lost opportunity costs for that money, the Court should reject that argument because such claims typically are not recoverable against the Government since the Federal Government has not waived its sovereign immunity for such claims. See, e.g., Town of Grantwood Village v. United States, 55 Fed. Cl. 481 (2003); see Castle v. United States, 48 Fed. Cl. 187, 216-17 (2000), aff'd on other grounds, 301 F.3d 1328 (Fed. Cir. 2002) ("prohibition extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on"). Even if the Court were to permit TVA to recover the

---

[16] Even if TVA could establish that the two-part requirement that it has identified for SNF acceptance – that is, a rate equal to the annual SNF generation rate plus an additional amount that allows for removal of some backlog – is a contractual requirement, TVA cannot establish that its proposed 3,000 MTU rate is necessary to satisfy that purported requirement. As the evidence at trial will establish, the annual SNF generation rate in the nuclear industry is approximately 2,000 MTUs. We expect to establish that an annual SNF acceptance rate of 2,100 MTUs would have satisfied all of the purported requirements that TVA has identified in its pretrial brief.

time value of these early expenditures, the total amount that TVA could recover would be from $11.50 million to $17.38 million.

## III. OTHER COSTS CLAIMED BY TVA WERE NOT CAUSED BY DOE'S DELAY IN ACCEPTING SNF

As with the dry cask storage systems themselves, TVA cannot meet its burden of proving that certain other aspects of its damages were caused by the Government's delay in accepting its spent nuclear fuel. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)). For instance, as the Government will show at trial, TVA would have incurred the costs associated with certain analyses included in its claim even had DOE commenced acceptance of SNF in 1998. TVA's claim includes an analysis that it had performed of the existing railroad bay floor at its Sequoyah plant in order to determine whether the existing structure was sufficient to support the substantial weight that would be placed on it while fuel was being transferred to the ISFSI. However, TVA cannot show that its need for this analysis was caused by DOE's delay because DOE may have also used large casks to accept TVA's fuel, and given the TVA contractor finding that the floor was grossly inadequate, it is unreasonable to believe that the use of any of the large capacity railroad casks would not require a similar analysis. Although TVA contends that Holtec cask impose special loads or conditions, Pl.'s Br. at 25-26, it cannot show that similar cask-specific conditions would not exist for the cask brought by DOE. Each cask will have its own unique features and for that reason some analysis would be required. If the floor analysis was avoided by the used of such

smaller railroad casks, the $100,000 for the analysis would be more than offset by an increase in the cost of fuel loading because of having to handle many more casks

TVA's analysis of the existing spent fuel racks for the Browns Ferry pools analyzed the potential for rack-to-rack impact among the existing racks during an earthquake. As this analysis has no relationship to the construction of dry cask storage, TVA cannot show that it would not have conducted this analysis regardless of DOE's delay.[17] Costs claimed for a Design Basis Thermal Analysis, a Design Basis Criticality Analysis, a Cask Tipover Analysis, a Cask Carry Height Analysis, a Transfer Cask Analysis, a Storage Overpack Blocked Duct Analysis, a Buried Storage Overpack Analysis, an MPC Lid Brittle Fracture Analysis, and an MPC analysis are also not required to design construct or operate the Browns Ferry ISFSI. This fact is evident in the fact that no similar studies were conducted for the Sequoyah site. To the extent that these analyses are required to license a cask, they are performed by the vendor. Although they could be required to obtain a license amendment, the Government will show that none of these analyses resulted in a change to the certificate of compliance for the Hi-Storm casks being used by TVA.

With regard to the Design Basis Thermal Analysis specifically, TVA has argued that the analysis was required because the arrays covered by the Holtec license was 2 x N arrangement. Pl.'s Br. at 26. The thermal analysis states that at the time of the analysis, the ISFSI arrangement was not finalized and thus, whether the analysis actually captured or bounded the final arrangement, the study was not conducted for a known final arrangement.

The Criticality Analysis was not necessary because the Holtec Certificate of Compliance ("CoC") clearly identifies the characteristics of the fuel that can be placed in the casks. TVA

---

[17] TVA concedes that this study should be removed from the claim. Pl.'s Br. at 25, 27.

should know the characteristics of its fuel and thus be able to select fuel for placement in casks that meet the requirements. If this were not the case, TVA would have also required this analysis in the but-for world, because it would have still been responsible to ensure that the assemblies being placed in the cask meet the CoC requirements.

Moreover, the criticality analysis conducted by Holtec was intended to include all of the spent fuel at BFN about 6600 assemblies) and all of the projected fuel. Evaluation of all these assemblies is not necessary in the near term to support the ISFSI. The Browns Ferry plan has been described as loading three casks initially and then five more per year. Under this plan, in the next 10 years only about 3600 assemblies would be loaded to the ISFSI. Thus, evaluation of all current spent assemblies and all projected spent fuel is not needed.

Finally, the analysis as performed was less than totally conclusive, indicating that most assemblies may be placed in the casks but some may not. In fact, for damaged fuel, it indicates that certain characteristics must be verified before loading. Given this fact, selection of assemblies for storage that simply complied with the CoC limitations would certainly have avoided the need for the study in the near term.

The Carry Height and Tip Over Analysis were needed for obtaining the CoC. TVA argues that this analysis was necessary because the Final Safety Analysis Report ("FSAR") at the time had not yet incorporated the Version B Hi-Storm. Pl.'s Br. at 26. Nevertheless, the analysis would have been needed to make the CoC valid for TVA or anyone else's use, so Holtec would have needed to conduct this analysis independently of TVA.

TVA has argued that the Transfer Cask Analysis was necessary to specifically evaluate "the suitability of the equipment at various locations for seismic conditions unique to BFN and

also evaluate[ ] potential hazards within the BFN reactor building." Pl.'s Br. at 26. However, TVA would need to evaluate the suitability of any cask brought by DOE for use in the spent fuel pool and the plant in general. Even if some analysis were performed by DOE, it would be imprudent for the utility to not perform its own evaluation as it is ultimately responsible for ensuring that activities at the plant are performed in a safe manner.

The storage overpack, blocked duct, and buried storage overpack analyses were unnecessary because licensing of a casks requires an evaluation of blocked ducts. The cask FSAR includes such analyses without regard to the source of the blockage. The technical specifications include requirements for the allowed time for correction of such blocked duct conditions to prevent exceeding limits. As long as the content of the cask met the limits of the CoC, there would be no need for an analysis to see what temperatures would be reached during the "allowed" period of blockage. If the BFN fuel were judged somehow to be more limiting than that analyzed for the CoC, then an amendment to the CoC would have been needed to cover this more limiting condition. Although TVA has argued that these were necessary to evaluate the impact of air duct blockages as a result of switchyard structural debris accumulating following torandic or other high-wind conditions, Pl.'s Br. at 26, using site-specific fuel characteristic to calculate a longer "allowed" blockage time would not be useful, unless a change to the CoC were made to reflect this, which was not done here.

TVA's stated concern regarding the MPC Lid Brittle Fracture Analysis, Pl.'s Br. at 26, is not unique to TVA and would have been done as part of licensing the canister. TVA does not contend that the MPC analysis was required for any site specific purpose. Rather, it contends that it was performed to "ensure, to the extent possible given the absence of any DOE

transportation package criteria, that the canisters would achieve compliance with anticipated transport requirements." Pl.'s Br. at 26. This purpose, however, is nonsensical. The most that Holtec could assert is that the MPC would meet transportation requirements when transported in the Holtec Hi-Star cask (which is licensed and has a CoC). This would largely repeat design characteristics of the system that would be described in numerous Holtec documents, the systems CoC and FSAR. There would be no way to provide any assurance that the MPC would be acceptable in some other undefined transportation package. In all of these respects, the Government will show that these analyses were not caused by DOE's delay.

Similarly, TVA cannot show that it would not have incurred the same amount of certain internal costs claimed for labor, internal charge backs, and overhead, had DOE commenced acceptance of spent nuclear fuel in 1998. TVA's labor data for Sequoyah and Browns Ferry for FY 1999-2004 indicates that most of the claimed labor costs are for salaried personnel who either charged few hours to the SNF project or charged a greater number of hours on a sporadic basis. Only five of the salaried personnel included in TVA's claim, Alan Chapman and Judith Border at Browns Ferry, and Charles Davis and Michael Edwards spent a majority of their time on the SNF project. Thus, the remaining labor costs were not caused by DOEs delay.

Internal charge backs are costs that TVA records to a specific project when an organization within TVA is used to perform work for that project. Costs charged by internal TVA organizations would have been incurred by TVA regardless of the SNF project. For instance, the cost associated with use of equipment owned by TVA would have been incurred whether or not that equipment was used on the DCS project. Claimed Nuclear ISO costs relate to the activities of an inspection services organization which performed field quality control for the

SNF project. TVA cannot show that it would not have maintained this organization in the absence of the delay. Nuclear Design Internal Services simply consists of personnel who are moved around to cover the workload at hand. If they were not working on the project they would be occupied with another project or would be idle. Transmission Internal Services consists of costs associated with licensed land surveyors that TVA maintains on staff. As all of these personnel came from a pool of people already in place at TVA, the costs associated with these personnel were not caused by DOE's delay.

Based largely on a line of tort cases, TVA has argued that it is entitled to damages for a portion of the salaries of employees that spent time on the dry cask storage project and for similar internal costs. Pl.'s Br. at 27-30. However, in the actual contract context of TVA's claim, it is plain that TVA may not recover these costs. "It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, TVA may only recover for labor performed by its employees to the extent that it can show it represents an incremental cost. See also Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

Consistent with this principle, salaries or wages may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee because of the breach. In this regard, the United States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties

intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980); see also AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"); Jessup & Moore Paper Co. v. Bryant Paper Co., 297 Pa. 483, 147 A. 519 (1929) (plaintiff not entitled to damages for labor because it was not required to hire additional). Here, the costs that TVA claims for employees suffer from the same defects. TVA cannot show that any overtime wages were paid, any salaries or wages increased, any additional employees were hired, or any employees were retained rather than laid-off.

Beyond situations of actual increased payment to employees, courts have generally sustained recovery for employees lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp, 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Company v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate because TVA cannot demonstrate any alternative, profitable responsibilities to which it could have allocated its employees. Cf. id. (noting that "[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .")

While there has been some recognition of the loss of services that employees would otherwise be performing, as in Convoy Co. v. Sperry Rand Corp., 672 F.2d 781, 785 (9th Cir. 1982), the contract case cited by TVA, TVA cannot even make a sufficient showing for that standard. Rather, this is a case like AES Tech. Sys., Inc., 583 F.2d at 943, distinguished by the Court in Convoy, where the breach "did not prohibit . . . employees from working on other projects." Moreover, to the extent that this standard conflicts with this Court's broad principle that a plaintiff may not recover expenses that would have been incurred in the absence of the breach, Boyajian, 423 F.2d at 1236, it should not be applied in this Court.

Portions of TVA's claimed overhead costs are also not associated with DOE's delay. Costs claimed for core team overhead consist of costs associated with a core team that manages the Stone & Webster labor force at TVA. The Government will show that even as Stone & Webster's workload fluctuates and their head count fluctuates, that team of people is on site permanently. Thus, TVA cannot demonstrate that the costs associated with the core team are caused by DOE's delay in accepting its spent nuclear fuel.

Costs claimed for Capital Support Expense Distribution and Other Transferred Costs represent a proportionate cost of corporate management that TVA allocated to the dry cask storage project. There is no evidence that these costs would not have been incurred had DOE accepted TVA's spent nuclear fuel starting in 2002.

Nor can TVA show that the costs claimed for Allowance for Funds Used During Construction or AFUDC were caused by DOE's delay. These costs represent a proportionate share of the interest expense of TVA's corporate debt. TVA did not incur any of this debt specifically for the purpose of constructing its dry cask storage. Rather, the Government will

show that the cost claimed for AFUDC is simply calculated and attributed to the project by TVA treasurer's office on a monthly basis. But for DOE's delay, TVA would still have incurred the same amount of expense for AFUDC.

Moreover, the costs claimed for AFUDC fit squarely within this Court's prohibition on awarding interest against the Government. "The no-interest rule is an aspect of the basic rule of sovereign immunity. . . . It has been construed to apply broadly to claims for interest." England v. Contel Advanced Systems, Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004). As the Supreme Court explained in Library of Congress v. Shaw, 478 U.S. 310 (1986), ""the force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: '[T]he character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it.'" Contel Advanced Systems, Inc., 384 F.3d at 1379 (citing Shaw, 478 U.S. at 321).

TVA has argued that the costs it has claimed for AFUDC are proper because they represent recoverable financing costs rather than prejudgment interest. Pl.'s Br. at 30-32. However, this Court has analyzed the very scenario that TVA describes and found such costs subject to the prohibition on interest. In Precision Pine & Timber v. United States, 63 Fed. Cl. 122 (2004), the plaintiff sought damages for increased interest payments on outstanding loans, contending, as does TVA here, "that it would have used the profits from the timber sales to pay down those debts," and citing the same line of cases. Id. at 136. As the Court held, "[t]he Winstar cases cited by plaintiff are distinguishable. In Bluebonnet, the increased financing costs resulted directly from the breach caused by the passage of FIRREA. . . . Conversely, the interest

payments incurred by Precision Pine were on outstanding debt, which was not incurred as a result of, or in connection with" the breach. Id. at 137. Because this cost "'would have been realized by the party from other independent and collateral undertakings,' . . . damages resulting from increased interest payments on collateral undertakings, i.e., outstanding debt, are likewise unrecoverable." Id.

## IV. TVA'S COSTS MUST BE REDUCED BY THE COSTS THAT IT WOULD HAVE EXPERIENCED ABSENT A BREACH

As TVA cannot establish that portions of its claim were caused by the Government's breach, its claimed damages must be reduced by those amounts. TVA has the burden of establishing that each of its claimed damages is incremental to DOE's partial breach and that, had there been no delay, TVA would not have incurred those costs. Willems Indus., 155 Ct. Cl. at 376, 295 F.2d at 831 (damages must be caused by the breach). Moreover, to the extent that TVA has experienced savings as a result of DOE's delay, these savings must be offset against its damages. As the Federal Circuit has explained, "[t]o derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet Sav. Bank, 339 F.3d at 1345.

In this regard, the $100,000 in costs that TVA incurred for analyzing the railroad bay floor MPC transfer and trailer movement scenarios at Browns Ferry, the $48,000 that TVA incurred analyzing the acceptability of the spacing between the currently installed spent fuel storage racks, and the $180,000 incurred for other analyses should be removed from TVA's claim. Likewise, an additional $5,807,235 in costs claimed for labor, contract

services/procurement, internal chargebacks, and overhead should be subtracted from the claim.[18]

Moreover, TVA must account for amounts that it saved because of the Government's delay. As the Government will show at trial, had DOE commenced acceptance of spent nuclear fuel in 1998, TVA would have incurred significantly greater loading costs, because DOE would have started loading its fuel earlier, and TVA therefore would have loaded more casks by the end of its FY 2004. As a result of DOE's delay, TVA will incur these costs later in time. As the Government's will demonstrate, postponing these costs provides a real financial benefit to TVA. Although it is not possible to fully quantify the savings associated with this delay until it become clear when in the future TVA will actually incur those costs, the value of the delay to date is substantial.

## V. TVA'S CLAIMED DAMAGES MUST ALSO BE REDUCED BY AT LEAST AN ADDITIONAL $1,402,685 BASED UPON LACK OF SUPPORT

TVA also must provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). If TVA fails to meet its burden with regard to any particular claimed damage, it cannot recover that claimed damage, and TVA cannot place upon the Government the burden of disproving a presumption that each of its damages is adequately supported and reasonably

[18] This amount also includes $21,074 in charges associated with upgrading the Sequoyah auxiliary crane that TVA concedes is non-recoverable. See Pl.'s Br. at 27.

certain. See Quiman, S.A. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). The burden of proof in this case rests squarely upon TVA.

By the time the Government served its expert reports on March 29, 2005, including the report of its accounting and damages expert, Stephen Kiraly, TVA had not provided sufficient support to allow the Government's auditors to verify payment of the costs in most of the categories of costs that TVA is claiming. This lack of support caused Mr. Kiraly to question those costs from an audit standpoint. Since that time, TVA has provided a sufficient sample to allow the Government auditors to verify payment of the costs in the Contract Services/Procurement category of TVA's claim. However, proper support for the payment of costs is still lacking for the TVA Labor and Internal Chargeback categories of TVA's damages claim.

Additionally, with regard to these costs in the TVA Labor and Internal Chargeback categories of TVA's damages claim, TVA has provided labor information, by person by day, for the short codes that were included in the claim and provided a small sample of the labor information relating to non-claimed short codes for those individuals who charged claimed short codes. These labor records are from TVA's IBS accounting system that contained both hours and dollars for each entry. Yet, as our expert witness, Stephen Kiraly, will explain, TVA has not provided the payroll registers, certified payrolls, or timecards that would allow the Government to verify payment of TVA's own employees using a non-IBS document. TVA has also not provided information sufficient to verify the labor rates used in the IBS records to determine the labor costs reflected in those records. The labor information provided by TVA did not contain position information, while the support provided for labor rates only had position information.

TVA's failure to provide this labor information has prevented the Government's auditors from verifying any labor costs in the TVA Labor and Internal Chargeback categories of TVA's damages claim.

Furthermore, TVA has not provided any documentation other than IBS printouts to support any of the costs in the Internal Chargebacks category of its claim, whether those costs were based upon labor costs or equipment supply. TVA has also failed to provide information on how the rates charged to the project by the servicing organizations for the supply of labor or equipment were calculated. For example, although TVA provided an equipment rate benchmarking study prepared by TVA's Office of Inspector General, this study did not show the exact makeup of each equipment rate, which is necessary to verify that the rates used do not include non-incremental costs such as those relating to ownership of the equipment or its use on other projects. TVA's own accounting procedures require it to maintain the documentation necessary to support the charge of costs by the TVA servicing organizations supplying labor or equipment to the dry storage projects performed at Sequoyah and Browns Ferry, including information relating to the rates charged for those services. PX-44 at 7-8, ¶ 5.2.3. That documentation was never provided to the Government, despite the Government's many requests.

These failures by TVA to support the costs in its damages claim constitute additional grounds for reduction of TVA's damages claim. Therefore, although the Government contends that a total of only $2,974,349 should be deducted from TVA's damages claim relating to those costs in the TVA Labor and Internal Chargeback categories that were not caused by the Government's delay, the Government further contends that the remaining $1,402,685 relating to

those cost categories should be deducted from TVA's damages claim based upon lack of proper support.[19]

______At trial, we will identify costs that are unsupported. Nevertheless, because it is TVA's burden to establish appropriate support for all of its claimed costs, the Court should disallow recovery for any costs that TVA fails properly to support.

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

[19] Additionally, TVA still has not provided all of the documentation necessary to support its claims for recovery of the costs relating to its HED's supply of rented equipment to the projects. Specifically, TVA has not provided the invoices documenting the amount of the rental costs that HED passed directly through to the projects. Although the Government is not requesting an adjustment of the $263,203 portion of the Internal Chargebacks category of TVA's damages claim relating to those costs based upon causation, the Government would request that those costs be deducted from TVA's damages claim based upon this lack of invoice support.

s/Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0534
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN LO RE
Senior Trial

KEVIN B. CRAWFORD
SHARON A. SNYDER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

June 10, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 10th day of June 2005, a copy of the foregoing "Defendant's Memorandum of Facts and Law," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield