IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY<br>Plaintiff<br><br>v.<br><br>UNITED STATES<br>Defendant | No. 01-249-C<br>(Judge Lettow) |

**TVA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DAMAGES**

Electronically filed:
September 16, 2005

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Maureen H. Dunn
General Counsel

Edwin W. Small
Assistant General Counsel

Peter K. Shea
Senior Attorney/Attorney of Record
Telephone 865-632-7319

Attorneys for Tennessee Valley Authority

## TABLE OF CONTENTS

**Page**

PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW ......................1

FINDINGS OF FACT AS TO TVA'S STORAGE CAPACITY FOR SPENT NUCLEAR FUEL..........................................................................................4

FINDINGS OF FACT AS TO DOE'S ACCEPTANCE RATE OBLIGATION ................8

CONCLUSIONS OF LAW AS TO DOE'S ACCEPTANCE RATE OBLIGATION......18

FINDINGS OF FACT AS TO THE QUANTUM OF TVA'S DAMAGES .....................23

A. TVA's Claimed Damages.................................................................23

B. Defendant's Challenges to TVA's Claimed Damages ..................................24

C. Challenged TVA Labor Charges ..........................................................25

D. Challenged Internal Chargebacks........................................................26

E. Challenged Overhead Costs...............................................................29

AFUDC...........................................................................................29

Other Challenged Overheads.............................................................30

F. Challenged Contract Services and Procurement Charges ..............................31

Technical Studies...............................................................................31

G. Offset for Delayed Loading Costs ..........................................................33

H. Summary of Damages Findings of Fact .......................................................35

CONCLUSIONS OF LAW AS TO THE QUANTUM OF TVA'S DAMAGES.............35

A. General Principles...........................................................................35

B. TVA Labor and Internal Chargebacks........................................................36

C. AFUDC and Other Overhead Costs ..........................................................43

D. Technical Studies Costs......................................................................46

CONCLUSION........................................................................................48

# TABLE OF AUTHORITIES

**Cases:** **Page**

*AES Tech. Sys., Inc. v. Coherent Radiation*,
583 F.2d 933 (7th Cir. 1978)....................41

*Autotrol Corp. v. Continental Water Sys. Corp.*,
918 F.2d 689 (1990)....................42

*Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*,
674 F.2d 1001 (3d Cir. 1982)....................20

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
266 F.3d 1348 (Fed Cir. 2001)....................44

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
339 F.3d 1341 (Fed Cir. 2003)....................44

*Boyajian v. United States*,
423 F.2d 1231 (Ct. Cl. 1970)....................40

*Centex Corp. v. United States*,
55 Fed. Cl. 381 (2003)....................44

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003)....................19

*Convoy Co. v. Sperry Rand Corp.*,
672 F.2d 781 (9th Cir. 1982)....................38

*David Nassif Assocs. v. United States*,
644 F.2d 4 (Ct. Cl. 1981)....................19

*Dep't of Water & Power of Los Angeles v. United States*,
131 F. Supp. 329 (S.D. Cal. 1955)....................37

*Dunn Appraisal Co. v. Honeywell Information Sys. Inc.*,
687 F.2d 877 (6th Cir. 1982)....................38

*Essex Electro Eng'rs, Inc. v. Danzig*,
224 F.3d 1283 (Fed. Cir. 2000)....................21

*Freeport Sulphur Co. v. S/S Hermosa*,
526 F.2d 300 (5th Cir. 1976)....................36-37

**Cases:** **Page**

*Globe Savings Bank, F.S.B. v. United States*,
65 Fed. Cl. 330 (2005) ....................47

*Howell v. United States*,
51 Fed. Cl. 516 (2002) ....................19

*Ill. Cent. R.R. v. TVA*,
445 F.2d 308 (6th Cir. 1971)....................45-46

*Ind. Mich. Power Co. v. United States*,
57 Fed. Cl. 88 (2003) ....................19, 20

*Ind. Mich. Power Co. v. United States,*
___ F.3d ___, No. 04-5122, 2005 WL 2173563
(Fed Cir. Sept. 9, 2005)....................35-36, 47

*Jessup & Moore Paper Co. v. Bryant Paper Co.*,
147 A. 519 (Pa. 1929) ....................41

*LaSalle Talman Bank, F.S.B. v. United States*,
317 F.3d 1363 (Fed. Cir. 2003)....................44-45

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000)....................9

*Precision Pine & Timber, Inc. v. United States*,
63 Fed. Cl. 122 (2004) ....................45

*TVA v. United States*,
51 Fed. Cl. 284 (2001) ....................1

*TVA v. United States*,
60 Fed. Cl. 665 (2004) ....................2, 3

*United States ex rel. TVA v. An Easement & Right-of-Way, Etc.*,
246 F. Supp. 263 (W.D. Ky. 1965) ....................46

*United States v. Commercial Am. Barge Line Co.*,
424 F. Supp. 453 (E.D. Mo. 1977)....................37

*United States v. New England S.S. Co.*,
297 F. 651 (S.D.N.Y. 1923)....................37-38

**Cases:** **Page**

*United States v. The John R. Williams*,
144 F.2d 451 (2d Cir. 1944)....................37

*Westfed Holdings, Inc. v. United States*,
52 Fed. Cl. 135 (2002)....................45

*Wickham Contracting Co. v. United States*,
12 F.3d 1574 (Fed. Cir. 1994)....................39, 40

*Wilner v. United States*,
23 Cl. Ct. 241 (1991)....................40-41

*Wilson v. Marquette Elecs. Inc*,
630 F.2d 575 (8th Cir. 1980)....................41

**Statutes:**

16 U.S.C. §§ 831-831ee (2000 & Supp. II 2002)....................1
16 U.S.C. § 831h(a) (2000)....................46
42 U.S.C. § 10222(a)(4) (2000)....................11
42 U.S.C. § 10222(a)(5) (2000)....................17-18
42 U.S.C. § 10222(a)(5)(A) (2000)....................17-18
42 U.S.C. § 10222(b) (2000)....................8
42 U.S.C. § 10224 (2000)....................9

**Miscellaneous:**

48 C.F.R. § 52.216-7(b)(ii)(C), (E), (F) (2005)....................43
48 Fed. Reg. 5458 (Feb. 4, 1983)....................1
48 Fed. Reg. 16,590 (Apr. 18, 1983)....................1
Restatement (Second) of Contracts § 204 (1981)....................18
Restatement (Second) of Contracts § 204 cmt. d (1981)....................19, 21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY<br>Plaintiff<br><br>v.<br><br>UNITED STATES<br>Defendant | No. 01-249-C<br>(Judge Lettow) |

**TVA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DAMAGES**

**PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. The Tennessee Valley Authority (TVA) is a corporate agency and instrumentality of the United States, created by and existing pursuant to the Tennessee Valley Authority Act of 1933, *as amended*, 16 U.S.C. §§ 831-831ee (2000 & Supp. II 2002). This action arises out of a Standard Contract (Contract) entered into on June 28, 1983, between TVA and the United States in which the United States, acting by and through the Department of Energy (DOE), agreed to pick up all spent nuclear fuel (SNF) from TVA's domestic nuclear plants, to transport it from TVA's plants, and to dispose of it as DOE saw fit, in return for a fee to be paid by TVA (Jt. Ex. 1 at 6, 17).[1]

2. This Court previously has ruled that it has jurisdiction over this case, *TVA v. United States*, 51 Fed. Cl. 284 (2001) (*TVA I*), and that DOE breached the Contract by failing to act on TVA's submitted delivery commitment schedules (DCSs)

---

[1] In February 1983, DOE published a proposed standardized contract for comment (48 Fed. Reg. 5458 (Feb. 4, 1983)); and in April 1983, DOE published the standardized contract in final form (48 Fed. Reg. 16,590 (Apr. 18, 1983)).

and by failing to accept, transport, and dispose of TVA's SNF, *TVA v. United States*, 60 Fed. Cl. 665, 674 (2004) (*TVA II*). TVA has performed its obligations under the Contract (Hayslett Tr. at 80), including making fee payments to DOE of approximately $40 million annually (Hayslett Tr. at 73) which total over $700 million to date (Holton Tr. at 209-10) and submitting DCSs in accordance with DOE's instructions (PX-58; PX-17).[2] Defendant has not answered the Complaint in this action; and accordingly, no affirmative defenses are at issue while all averments in TVA's Complaint are admitted except those as to the quantum of damages. Rules of the Court of Federal Claims, 8(c) and (d).

3. The Contract required acceptance operations to begin not later than January 31, 1998, and for purposes of this action, DOE's minimum obligations for the first ten years of acceptance operations (1998-2007) are to be determined by reference to the reduced acceptance rates and allocations for TVA contained in DOE's March 1995 Annual Capacity Report and Acceptance Priority Ranking which provided TVA the following allocations:

[2] The designations "PX-" and "DX-" refer, respectively, to the trial exhibit numbers of TVA and the United States. A witness's name followed by the designation "Tr." identifies a citation to the trial transcript. The designation "Jt. Stip." refers to the joint stipulations filed by the parties on June 18, 2005; the designation "AFUDC Stipulations" refers to the stipulations filed by the parties on June 23, 2005.

| Acceptance Year | Calendar Year | Reduced-Rate Acceptance Schedule (MTU) | TVA's Reduced-Rate Allocations (MTU) |
|---|---|---|---|
| 1 | 1998 | 400 | 0.0 |
| 2 | 1999 | 600 | 0.0 |
| 3 | 2000 | 900 | 0.0 |
| 4 | 2001 | 900 | 0.0 |
| 5 | 2002 | 900 | 58.7 |
| 6 | 2003 | 900 | 5.5 |
| 7 | 2004 | 900 | 115.6 |
| 8 | 2005 | 900 | 66.0 |
| 9 | 2006 | 900 | 116.2 |
| 10 | 2007 | 900 | 52.4 |
| Totals | | 8,200 | 414.4 |

(*TVA II*, 60 Fed. Cl. at 673; PX-19.) DOE has not formally identified a rate at which it is obligated to pick up SNF after year ten (that is, for 2008 and subsequent years); TVA's position is that DOE is obligated to pick up after year ten at a rate of 3,000 metric tons annually, the steady-state rate the utilities have paid for since the inception of the program (PX-96 at 3; Kouts Tr. at 1570).

4. Trial of this matter was held on June 21-24 and June 27, 2005 in Chattanooga, Tennessee, and on July 11-15, 2005 in Washington, D.C. The purpose of the trial was to determine the quantum of TVA's damages through fiscal year 2004, TVA's most recently closed fiscal year. *TVA II* at 678.

5. It is TVA's position that if DOE had picked up at its reduced rate acceptance schedule for the first ten years and 3,000 metric tons annually thereafter, TVA would not have had to build dry storage facilities a/k/a independent spent fuel storage installations (ISFSIs) at its Sequoyah and Browns Ferry Nuclear Plants, and that because of DOE's breach Defendant is responsible for over $35 million of the costs that TVA incurred through its 2004 fiscal year (which ended September 30, 2004) in building and operating those facilities.

6. In general, it is Defendant's position that TVA is not entitled to the full amount claimed because (1) TVA would have had to build ISFSIs in the future even if DOE had not breached the Contract, and (2) some of the costs claimed by TVA are not recoverable in any event.

**FINDINGS OF FACT AS TO TVA'S STORAGE CAPACITY FOR SPENT NUCLEAR FUEL**

7. As of the end of fiscal year 2004, TVA had completed construction of an ISFSI at Sequoyah and was completing construction of an ISFSI at the Browns Ferry (PX-43 *passim*). The parties have stipulated to the following technical details:

(a) The Browns Ferry Reactors are Boiling Water Reactors; the Sequoyah reactors are Pressurized Water Reactors;

(b) A Browns Ferry reactor has a core load of 764 fuel assemblies;

(c) A Sequoyah reactor has a core load of 193 fuel assemblies;

(d) The Browns Ferry Unit 1 and 2 reactors have an interconnected fuel pool which has combined storage space for 6,942 spent fuel assemblies;

(e) The Browns Ferry Unit 3 reactor has storage space in its fuel pool for 3,471 spent fuel assemblies;

(f) The Sequoyah Unit 1 and 2 reactors have a single, shared fuel pool which has a storage capacity of 2,091 assemblies;

(g) The actual and projected cumulative discharges and pickups under various acceptance rate schedules and projected discharge rates used by TVA and DOE, respectively, are accurately set out in PX-85 and PX-86 for the Browns Ferry and Sequoyah reactors; and

(h) the Browns Ferry Unit 1 reactor is scheduled to restart in 2007; the other reactor units at Browns Ferry and Sequoyah are operational.

(Jt. Stip. Nos. 1-2, 4-10, 18-24.)

8. The storage capacity of any given spent fuel pool may be reduced because some cells are unusable for various reasons (e.g., deformity, piping interferences); at Sequoyah, there are two unusable cells; at Browns Ferry Units 1 and 2, there are eleven unusable cells; and at Browns Ferry 3, there are thirty unusable cells (DX-311; Holton Tr. at 211). Each spent fuel assembly requires one spent fuel pool cell for storage (DX-311). The Browns Ferry fuel assemblies, which weigh approximately .18 kgU, are significantly lighter than those used at Sequoyah which weigh approximately .46 kgU.

9. TVA has storage capacity in the aggregate (that is, using all the space available in the Browns Ferry and Sequoyah spent fuel pools) to store 2,500 metric tons of uranium in the form of spent fuel assemblies (Hayslett Tr. at 61; Holton Tr. at 210; PX-88). The 2,500 metric ton figure does not include space in unusable cells or in cells required for a full-core reserve (Hayslett Tr. at 61). The term "full-core reserve" refers to an industry practice of maintaining sufficient space in a spent fuel pool to offload the entire core of a reactor; however, there is no Nuclear Regulatory Commission (NRC) requirement that TVA maintain a full-core reserve at Browns Ferry or Sequoyah (*id.*).

10. DOE's annual capacity reports and acceptance priority rankings routinely use metric tons of uranium as the unit of measurement for defining spent nuclear fuel allocations (e.g., PX-19; PX-36). As shown in PX-85 through PX-88, regardless of whether one uses DOE's or TVA's projections for SNF discharges, TVA had sufficient storage capacity in terms of metric tons of uranium to avoid building dry storage at the Browns Ferry and Sequoyah nuclear plants had Defendant performed at

the acceptance rates set forth in the 1995 ACR for the first ten years of pickups and at a 3,000 metric ton steady-state rate thereafter. Although Defendant asserts that an analysis which compares the number of discharged spent nuclear fuel assemblies with the individual slots available in spent nuclear fuel racks more accurately measures storage capacity (e.g., Brewer Tr. at 1941-42), there is no significant difference in storage capacity whether one analyzes that capacity in terms of metric tons or spent fuel assemblies (Hayslett Tr. at 60). Thus, an analysis of TVA's storage capacity in terms of the number of fuel assemblies that can be stored in individual cells at the Browns Ferry and Sequoyah sites, also shows that TVA would not have had to build dry storage facilities at its Browns Ferry and Sequoyah nuclear plants had DOE performed at the acceptance rates used in the 1995 ACR and at a 3,000 metric ton steady-state rate thereafter (DX-311; see also Holton Tr. at 1211-14).

11. For SNF planning purposes, TVA projects a maximum reasonable discharge rate for SNF (i.e., an entirely optimistic discharge scenario) to ensure that TVA will have adequate storage space (Holton Tr. at 218-19). Thus, TVA's discharge forecasts assume a high capacity factor, short refueling outages, the use of BLEU (blended enriched uranium), an extended power uprate for all Browns Ferry units starting in 2007, license extensions for the nuclear plants, and the restart of Browns Ferry Unit 1 in 2007 (Hayslett Tr. at 70; Holton Tr. at 218, DX-212(b) at attach. B). Had DOE begun picking up SNF from the domestic nuclear industry in 1998, picked up at its reduced rate allocations through 2007, and picked up at a rate of 3,000 metric tons annually beginning in 2008 (that is, after the tenth year of removal

operations), TVA would not have had to build dry storage facilities at Browns Ferry or Sequoyah (Hayslett Tr. at 73, 96; PX-85; PX-86; DX-311).

12. Also as shown in DX-311, TVA might have had to impinge temporarily upon full-core reserve at its nuclear plants for some period of time during certain calendar years in the "but for" world if DOE had not picked up TVA's SNF allocation prior to the TVA refueling outages in those years, thereby resulting in a potential business risk for TVA (Brewer Tr. at 1942). Although the possibility of temporary impingement would have existed in the "but for" world, such an occurrence would have been highly unlikely for the following reasons. First, as DOE's contracting officer has acknowledged, DOE would work to accommodate a utility's proposed schedule for a pickup (Zabransky Tr. at 1773). Second, under the Contract, utilities may submit a Final Delivery Schedule (FDS) any time after receiving an approved DCS (but no later than a year prior to the delivery date requested) (Jt. Ex. 1 at 11-12; Zabransky Tr. at 1777). Among other things (such as identifying more specifically the fuel to be picked up), the FDS requests a specified date range for the pickup; and DOE must approve or disapprove an FDS within 45 days (Jt. Ex. 1 at 12). Obviously, if DOE performed as requested by TVA in its FDS submittals, no temporary impingement upon full-core reserve would be necessary. In this regard, there is little reason to believe DOE would not have been able to accommodate TVA in the "but for" world, given that the program already would have been in operation for at least twelve years prior to TVA's facing any risk of temporary impingement upon a full-core reserve (DX-311).

13. Moreover, even if TVA and DOE could not have agreed upon a pickup date that would permit TVA to avoid impinging temporarily upon full-core reserve, TVA still would have had available to it the contractual right of exchanging pickup dates with other utilities, a practice DOE has encouraged and which DOE expected to work well in a mature market (Zabransky Tr. at 921, 926-27; Jt. Ex. 1 at 12-13); or of increasing earlier allocations by twenty percent, or even of seeking an emergency delivery (Jt. Ex. 1 at 11-12). Moreover, in view of the relatively small amounts of SNF at issue, TVA could have considered transshipment. Finally, given the limited time frames at issue, TVA could simply have elected to take the business risk. There is no NRC requirement that a full-core reserve be maintained (Hayslett Tr. at 61; Brewer Tr. at 1942); and TVA now is impinging upon its full-core reserve at Sequoyah (Holton Tr. at 1233). Under the circumstances and given the options available, it is more likely than not that, had DOE performed, TVA either would have been able to avoid impinging upon full-core reserve or would have decided to take that risk rather than build dry storage at its Browns Ferry and Sequoyah nuclear plants.

## FINDINGS OF FACT AS TO DOE'S ACCEPTANCE RATE OBLIGATION

14. The Nuclear Waste Policy Act (NWPA) required the Nation's nuclear utilities to enter into the Contract with DOE not later than June 30, 1983, or face severe consequences (s*ee* 42 U.S.C. § 10222(b) (2000); PX-3). Although many utilities (including TVA — PX-1 at Bates TVA000019) requested that an acceptance rate be included in the Contract, DOE chose not to provide one (Jt. Ex. 1). Despite the absence of an acceptance rate, however, TVA and other utilities signed the Contract because, as DOE's Robert Morgan and TVA's Thomas Hayslett (the former manager

of TVA's Nuclear Fuels organization) testified, as a practical matter utilities had no choice but to sign if they wished to continue in operation (Morgan Tr. at 2238; Hayslett Tr. at 64). In sum, as this Court put it in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000) (Judge Merow), "[t]he Act effectively made entry into such contracts mandatory for the utilities."

15. From the very outset of the DOE program, DOE's management recognized (a) that one goal of the NWPA was to avoid the need for additional storage at nuclear plant sites after 1998, the date on which DOE was obliged to begin pickups from the contract holders; and (b) that a 3,000 metric ton annual acceptance rate was the appropriate steady-state rate for the program. At a December 12-15, 1983, Information Meeting sponsored by DOE's Office of Civilian Radioactive Waste Management (OCRWM),[3] Robert Morgan, then Acting Director of OCRWM explained:

> **I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998.** Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, **if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site.** During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.[4]

---

[3] The OCRWM was created by statute to carry out DOE's functions under the NWPA. 42 U.S.C. § 10224 (2000).

[4] Emphasis added unless otherwise noted.

(Proceedings of the 1983 Civilian Radioactive Waste Management Information Management Meeting at 11, DX-37 at Bates No. SN069599.) More specifically as to the acceptance rate, the concurrent December 1983 Draft Civilian Radioactive Waste Management Program Mission Plan distributed by DOE for comment identified a 3,000 metric ton annual steady-state rate after a five-year ramp up as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998" (PX-7 at 2-2).

16. The domestic nuclear industry discharges approximately 2,000 metric tons of SNF annually (PX-36 at Appendix A), and there is now a backlog at nuclear plants of approximately 50,000 tons (Hayslett Tr. at 97). At a 3,000 ton steady-state rate, DOE is able not only to keep up with current SNF discharges but also to work off the backlog at plant sites as "as soon as practicable" (Barrett Tr. at 834-35).

17. The reasonableness of a 3,000 ton steady-state acceptance rate cannot be disputed. Indeed, that rate is consistently identified as the desired steady-state rate in a wide variety of DOE programmatic documents that span the life of the program (e.g., PX-7 at 2-3 (Bates No. SN45174) (December 20, 1983 Draft Mission Plan); PX-96 at 3 (Bates No. EX-000126) (1985 fee adequacy study); PX-20 at 8 (Bates No. PA-176217) (1995 total system life cycle cost study); PX-36 at 2 (2004 ACR/APR)). Thus, in June 1985 when DOE submitted the formal Mission Plan for the Civilian Radioactive Waste Management Program to Congress, DOE identified a 3,000 ton annual steady-state acceptance rate after a five-year ramp up period (as well as an enhanced performance system with a higher acceptance rate) (PX-11 at 26 (Bates No. HQ0005306)). Testimony by DOE officials and agents confirms the reasonableness of

that rate. Susan Klein a Senior Policy Advisor and 30(b)(6) witness specifically testified to that effect in her deposition (Tr. at 873-74); Ronald A. Milner, the Chief Operating Officer of OCRWM testified that the 3,000 ton rate was reasonable and was the constant steady-state, design-receipt rate over the life of the program (*id*. at 866-67); Thomas Pollog testified in a prior trial that no one at DOE disagreed today that 3,000 tons should be the steady-state rate (*id*. at 912, 915); and Lake Barrett, who had been at DOE's OCRWM since 1985 and who was Deputy Director at the time of his deposition, acknowledged that the 3,000 ton rate was consistent with the intent of the NWPA (*id*. at 819), reflected the proper balance among total life cycle cost, near term cash flow requirements and performance (*id.* at 837) and was, in fact, the rate that DOE would have used in the non-breach world after a five-year ramp up (*id*. at 857).

18. Additionally in this regard, the NWPA requires DOE to review annually the adequacy of the ongoing Contract fees initially set by statute (42 U.S.C. § 10222(a)(4) (2000)). To this end, DOE repeatedly has used a 3,000 ton rate for determining projected total system life cycle costs against which the adequacy of the fees paid by the utility Contract holders is measured (e.g., PX-94 (1986); PX-20 (1995); PX-25 (1998)). And, of course, as TVA's Hayslett testified, TVA and the other nuclear utilities are paying for a 3,000 metric ton steady-state acceptance rate (Tr. at 74-75).

19. The 3,000 ton rate also furthers the NWPA's environmental and public safety goals. See Mission Plan for the Civilian Radioactive Waste Management Program at 6 ("The protection of public health and safety and environmental acceptability are of paramount importance.") (PX-11 (Bates No. HQ0005287)). DOE used the 3,000 ton rate for evaluating the environmental risks and consequences of transporting

70,000 tons of SNF from the various nuclear plants around the nation to DOE's proposed repository in Nevada (Barrett Tr. at 831-32). In evaluating potential transportation impacts in chapter 6 of its Final Environmental Impact Statement, DOE repeatedly notes that the planned duration of the transportation program is 24 years and that potential transportation impacts will therefore be limited in time (PX-32 *passim*). In addition, the 3,000 ton rate reflects the NWPA's goal of reducing, starting in 1998, the amount of SNF in temporary storage at utility plant sites because of potential health and safety problems. See Mission Plan for the Civilian Radioactive Waste Management Program at 4 ("The growing accumulation of this waste in temporary storage poses potential health and safety problems for the public.") (PX-11 (Bates No. HQ0005285)).

20. Beginning in about 1986, however, Congress cut DOE's budget requests, with the result that the spent nuclear fuel program was deleteriously affected (Kouts Tr. at 1520-21).[5] Subsequently, to meet its contractual obligation to begin pickups by January 31, 1998, DOE proposed that SNF initially be transported to a monitored retrievable storage facility (MRS) with a repository to open five years later in 2003

(DX-48). Congress then authorized DOE to build an MRS, provided certain conditions were met (Kouts Tr. at 1442). Before the MRS could be built, for example, the repository had to have received a construction license from the NRC (*id*. at 1450). In addition, Congress placed a cap of 10,000 metric tons on the amount of SNF that could be stored at the MRS prior to the operation of the repository and a 15,000 metric ton

---

**5** Congress may have been motivated in part by a desire to reduce the deficit because the Nuclear Waste Trust Fund in effect shows up as a surplus on the Government's books (Kouts Tr. at 1542).

limitation after the repository began operations (*id.*). DOE never met the preconditions for building an MRS and, by 1995, had abandoned the MRS concept.

21. Nevertheless, DOE assumed the construction of an MRS in publishing reduced-rate acceptance schedules in 1991 and 1992 (and even as late as 1995) for the first ten years of acceptance operations, namely, 400 tons for year one, 600 tons for year two, and 900 tons for years three through ten (Kouts Tr. at 1478, 1481; DX-76; DX-84; PX-19). Indeed, the March 1995 ACR (PX-19) was based on 1993 data and thus already outdated when published (Zabransky Tr. at 1729). Although DOE acknowledged in the September 1995 life cycle cost study (PX-20) that no MRS would be built, DOE's decision not to build an MRS obviously was reached at some earlier point. In this regard, DOE's David Zabransky, the person in charge of issuing the 1995 ACR, would testify only that the decision came after completion of the March 1995 ACR, "maybe prior to publication, but sometime between the '94 ACR and September of '95" (Tr. at 1743). DOE nevertheless used the reduced rate schedule based on an MRS in the 1995 ACR because DOE was attempting to limit its obligations to contract holders (Tr. at 926). And, although DOE had a contractual obligation to issue ACRs annually (Jt. Ex. 1 at 10; Kouts Tr. at 1552), DOE did not publish any ACRs from March 1995 until July 2004 because the DOE office of General Counsel would not approve publication (Pollog Tr. at 1660-61). Regardless of the 1987 amendments to the NWPA and the reduced rate acceptance schedules published by DOE, the fee charged to utilities has remained the same since 1983 (Kouts Tr. at 1570).

22. TVA's position is that DOE had an obligation to begin picking up SNF in 1998 and to ramp up to a 3,000 metric ton steady-state rate no later than six

years after 1998 (DX-176 at answer to Interrog. No 1(a)). TVA planned its nuclear fuel storage capability such that TVA had no need for additional fuel pool storage space for the first ten years of DOE program operation and beyond, even at the reduced rate schedule adopted by DOE (Hayslett Tr. at 69; DX-311; PX-85; PX-86). As TVA's Don Hutson explained, TVA used the 1995 ACR as a planning document for the first ten years of program operation (Tr. at 1056).

23. At trial, none of the DOE officers, employees, or experts stated when performance will begin under the Contract or identified the acceptance rate that would have been used after year ten, although in 2004 DOE indicated that its contractual commitment was to ramp up to a 3,000 ton rate after five years (PX-36 at 2, July 2004 ACR/APR; Kouts Tr. at 886-87). The closest DOE came at trial to positing an acceptance rate for any period after year ten came in the context of an expert report by Raymond S. Hartman, the bounds of which were carefully limited by Department of Justice (DOJ) attorneys. First, Dr. Hartman was instructed by DOJ attorneys to examine the impact upon TVA's SNF storage capacity of three different acceptance rate schedules (none of them ever published by DOE), each of which began with the reduced-rate schedule set forth in the 1995 ACR for the first ten years and then continued as follows:

| **Year** | **Schedule 1** | **Schedule 2** | **Schedule 3** |
|---|---|---|---|
| 2008 | 900 | 900 | 900 |
| 2009 | 900 | 900 | 900 |
| 2010 | 900 | 1800 | 1800 |
| 2011 | 900 | 1800 | 1800 |
| 2012 | 900 | 1800 | 1800 |
| 2013 | 900 | 1800 | 1800 |
| 2014 | 900 | 1800 | 1800 |
| 2015 et seq. | 900 | 2100 | 3000 |

(DX-217 at 12; Hartman Tr. at 2318-19).[6] Thus, Dr. Hartman did not examine the impact upon TVA of the acceptance rate schedule TVA contends is DOE's minimum obligation (i.e., the 1995 ACR reduced rates through year ten, followed by a 3,000 ton steady-state acceptance rate). Under that schedule, of course, there would have been no impact as TVA would not have had to build dry storage facilities. Second, Dr. Hartman was told by DOJ to assume that any given allocation had to be used in the year in which it was allocated; in other words, Dr. Hartman was instructed to ignore the Contract provisions (e.g., exchanges) that had an impact on how allocations could be managed by utilities (Hartman Tr. at 2312-13). Thus, as Dr. Hartman acknowledged, economic inefficiency is built into his modeling of TVA's SNF storage because in most years full casks are not loaded for transport to the repository (*id.*).

24. Each of the acceptance rates Dr. Hartman was mandated to use assumes that an MRS would have been constructed and then operated for ten years with a ramp-up that comports with the acceptance rates in the 1991, 1992, and 1995 ACRs and that the MRS would then continue to operate for two additional years at the ramped-up rate of 900 metric tons (DX-217 at 12). Only after year twelve of program operations would a repository have come on line. At that point, the pickup rate under the 900 metric ton steady-state rate schedule would never change; however, under the steady-state rate schedules for 2,100 and 3,000 metric tons, a second ramp-up of five years would then

---

6 Under the scenarios mandated by the DOJ, Dr. Hartman found that TVA would have had to build dry storage facilities and that TVA's damages should be reduced (for the time value of money) to a range between $12.48 and $18.52 million (DX-217A at Adjusted Table 9; Hartman Tr. at 2339).

begin at the repository with the result being that the repository would not achieve a steady-state rate until seventeen years after the opening of the MRS (*id.*).

25. Dr. Hartman's model further assumes that the MRS and a repository would not have operated in tandem, although concurrent operation is more efficient because, among other things, the MRS's capacity limitation would rise to 15,000 tons as opposed to 10,000 tons when a repository is not operational (Kouts Tr. at 1456). And, again contrary to Dr. Hartman's assumptions, when DOE was planning for an MRS, DOE planned for such a simultaneous operation with shipments to the MRS beginning in 1998 and then to the repository beginning in 2003 (see, e.g., DX-51 at HQ5810; Kouts Tr. at 1432). And, of course, by 1995, the MRS was no longer an option (Zabransky Tr. at 1743). Finally, DOE's Kouts testified (1) that an MRS and a repository may operate in tandem rather than sequentially (Tr. at 1567); (2) that DOE had not looked at an option whereby a repository would come on line only after ten years of MRS operation (*id.*); and (3) that DOE had never used either a 900 or a 2,100 metric ton steady-state acceptance rate (Tr. at 1579).

26. Although DOE has suggested that a 900 ton acceptance rate would in the aggregate allow nuclear utilities starting in 1998 to avoid the need for new SNF storage on site (DX 78 at 2), TVA's Thomas Hayslett explained that such an outcome was highly unlikely given the approximately 50,000 metric ton backlog at plant sites and an annual utility SNF discharge rate of 2,100 or 2,200 metric tons (Tr. at 97). As DOE's expert, Dr. Hartman, further elucidated, at a 900-ton pickup rate the SNF at TVA sites would not be removed until the middle of the next century (Tr. at 2349-50). At a 2,100 metric ton rate SNF discharges by utilities will be in equilibrium with pickups

by DOE, and, more likely than not, utilities would be able to use the Contract's exchange provision (or other mechanisms) to avoid the need for additional nuclear plant site storage (e.g., Hayslett Tr. at 97-100). Nevertheless, a rate of 2,100 metric tons exhibits the same infirmity as a 900 metric ton rate in that a 2,100 rate also will stretch out the program, in the latter case for an additional twenty years or so (or approximately double the twenty-four years necessary under a 3,000 metric ton acceptance rate as shown in PX-32 *passim*). This is so because with a 2,100 ton acceptance rate and an annual industry SNF discharge rate of 2,000 metric tons, the industry backlog of 50,000 metric tons will not be significantly reduced for many years because only 100 metric tons of backlog annually will be worked off. Of course, any unwarranted extension of the program necessarily would entail greater costs for DOE (and thus for the utilities) and would be a breach of DOE's acknowledged fiduciary duty to use the Nuclear Waste Trust Fund responsibly (Kouts Tr. at 1408-09) as well as the "federal government's responsibility to prepare a cost-effective system to minimize the cost on the waste generators for society's good" (Barrett Tr. at 861). In this regard, DOJ's insistence that Dr. Hartman incorporate an imaginary MRS and three unrealistic acceptance rate schedules makes the model clearly inconsistent with DOE's acknowledged obligations.

27. Most significantly, however, any acceptance rate schedule that uses a steady-state rate of less than 3,000 tons following the opening of a repository clearly conflicts with the NWPA's mandate that "following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel." NWPA, 42 U.S.C. § 10222(a)(5)(A) (2000). Indeed,

the NWPA required that a provision to this effect be inserted into each SNF contract (42 U.S.C. § 10222(a)(5)), and DOE acknowledges that it has this responsibility in the Contract (Jt. Ex. 1 at 1).

28. Accordingly, DOE cannot satisfy its contractual obligation (mandated by the NWPA) to take SNF "as expeditiously as practicable" (42 U.S.C. § 10222(a)(5)(A) (2000)); Jt. Ex. 1 at 1) at any steady-state rate less than 3,000 tons annually once a repository is opened. Moreover, if the pickup program were extended for an additional century by a 900 metric ton rate or even for an additional twenty years by a 2,100 metric rate (a rate that is one-third less than that for which the utilities are being billed by DOE as well as being one-third lower than the design basis rate for the repository), DOE also would breach its fiduciary obligation to effectively use the funds provided by utilities for permanent disposal of SNF. In sum, no factual or statutory basis exists which would justify the use of a steady-state rate of less than 3,000 metric tons annually.

## CONCLUSIONS OF LAW AS TO DOE'S ACCEPTANCE RATE OBLIGATION

29. When parties to a contract in a commercial setting fail to specify a term that is essential to a determination of their respective legal obligations, the missing term is supplied by the court based on standards of fairness and policy. The Restatement (Second) of Contracts § 204 (1981) sets out this fundamental legal principle:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

And Comment d specifies that principles of fairness and policy are to be used to establish the term:

> [T]he court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.

*See also Howell v. United States*, 51 Fed. Cl. 516, 523 (2002) (Where the Government's minimum order obligation under a contract was not expressly stated, this Court, quoting and relying on the above-quoted Restatement provisions, supplied a reasonable minimum order amount.); *David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) (Where the contract did not specify the size of a cafeteria that the building owner was required to furnish the Government, this Court determined the required size based on considerations of fairness.); *Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("Determination of what is a reasonable time requires an inquiry into the circumstances surrounding the formation of the contract, its purpose, community standards of fairness, and public policy.").

30. This Court already has twice held that because there is no Contract term specifying the rate of performance, the Restatement (Second) of Contracts § 204 is applicable and the Court should supply an acceptance rate term which comports with standards of fairness and policy. *Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 96 (2003) (Judge Hodges) ("Here, the contract term is missing entirely."); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003) (Judge Hewitt) ("The court will, as it is required to do, *see David Nassif Assocs.*, 557 F.2d at 258, determine the missing acceptance rate term in further proceedings for that purpose.").

31. In *Indiana Michigan*, 57 Fed. Cl. 88, the Court determined under Restatement § 204 principles that the Contract required an acceptance rate of 400 metric tons in 1998, a ramp-up to an acceptance rate of 3,000 tons not later than the end of 2002, and a minimum rate of 3,000 tons annually thereafter:

> Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials. We have not attempted to discuss here the entire record support for DOE's intended 3,000-ton annual rate of delivery, but the evidence shows clearly that such a rate was the minimum needed to meet those objectives. . . .
>
> [U]tilities produce 2,000 metric tons of new waste per year. That is a generally accepted minimum quantity. A 3,000-ton acceptance rate would permit efficient reduction of the backlog as Congress intended. Defendant's 900-ton rate would cause the Department of Energy to fall farther behind each year. While the 3,000-ton rate has substantial support in the record, the 900-ton rate has none.
>
> Defendant argues that the 3,000-ton rate was a goal or a target, not a contract term. If so, it is the number used most often by Congress and by parties to the Standard Contract. It is a reasonable and responsible rate that represents the parties' intent. It accomplishes the purposes of the Nuclear Waste Policy Act and the Contract authorized by that statute.
>
> The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract. The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued performance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter.
>
> . . . .
>
> Utilities produce 2,000 metric tons of nuclear waste per year. Removing that amount would maintain waste accumulation at its current level. Congress and the parties intended that the Department of Energy would eliminate the backlog by removing an amount in excess of the 2,000-ton maintenance level. Plaintiff's share of a 3,000-ton annual rate of removal would dispose of [its] waste production and eliminate its backlog within a reasonable time.

*Id*. at 99-100.

32. In addition, a steady-state rate of not less than 3,000 tons annually beginning not later than 2008 is required by DOE's implied obligation to carry out its contractual duties within a reasonable time (i.e., implicit in DOE's express obligation to remove all SNF from TVA's plants is the obligation to do so within a reasonable time). As stated in *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000):

> The government has an "ever-present obligation to carry out its contractual duties within a reasonable time." . . . When the contract does not specify the period in which the government must respond, "the law imposes an obligation to act within a reasonable period of time.". . . That period is determined by "the reasonable expectations of the parties in the special circumstances in which they contracted."

*See also* Restatement (Second) of Contracts § 204 cmt. d ("[I]f no time is specified, a term calling for performance within a reasonable time is supplied.").

33. Here, DOE's compliance with its reduced-rate schedule from 1998 through 2007, and its compliance with a steady-state 3,000 ton rate in 2008 and the years thereafter would have eliminated any reasonably possible need for out-of-pool storage by TVA during the entire anticipated lives of the Browns Ferry and Sequoyah nuclear plants. No acceptance rate of less than 3,000 tons annually in 2008 and the years thereafter (i.e., following the acceptance rate obligations set forth in DOE's March 1995 reduced-rate schedule for the years 1998 through 2007) would comply with DOE's statutory and contractual obligations or comport with standards of fairness and policy for numerous reasons identified by DOE in its programmatic documents and in testimony by its officers and by this Court in prior decisions in SNF cases. In sum, as set forth above:

- An express acceptance rate obligation is missing from the Contract only because, under the NWPA, TVA and other utilities had no choice but to enter into the Contract or lose their operating licenses, a situation which allowed DOE to ignore utility requests (including TVA's) for insertion of such a rate.

- DOE documents, as well as the testimony of DOE officers and agents, confirm that an acceptance rate of 3,000 tons annually after a short ramp-up period beginning in 1998 is the steady-state rate that DOE itself determined was the rate necessary to fulfill the purposes of the NWPA and the Contract.

- DOE's fee adequacy assessments and Total System Life Cycle Cost analyses further verify that a 3,000 ton steady-state rate is at the heart of the contractual bargain between DOE and the utilities (including TVA) because DOE has required utilities to pay a fee (unchanged over the life of the program) to support operation at a 3,000 metric ton rate.

- A steady-state rate of 3,000 tons annually after a short ramp-up period beginning in 1998 would have avoided significant economic waste by eliminating the need for interim storage facilities at nuclear sites such as TVA's. Given the nature of the utilities' full-cost payment obligation under the Contract, the massive sums already paid, and DOE's fiduciary obligation regarding use of the Nuclear Waste Fund, it would be unfair and contrary to public policy to interpret DOE's contractual obligation as one that engenders economic waste.

- DOE used a steady-state rate of 3,000 tons annually in its Final Environmental Impact Statement (EIS) for Yucca Mountain. For EIS purposes, DOE assumed 70,000 tons of SNF would be transported over a period of 24 years. Throughout the EIS, DOE emphasizes that because the transportation program only extends for 24 years, environmental risks and impacts are limited.

- As shown by DOE's repeated use of the 3,000 rate in its analysis and planning for all aspects of the SNF removal program and in all publications in which an MRS is not part of the consideration, a 3,000 ton steady-state rate after a short ramp-up period is a reasonable rate.

- The NWPA's statutory mandate that DOE accept waste "as expeditiously as possible" after the opening of a repository cannot be satisfied by any steady-state rate of less than 3,000 tons annually.

Accordingly, because 3,000 tons annually in 2008 and the years thereafter is clearly the acceptance rate against which to evaluate the impact of DOE's breach in this case, there is no basis for reducing TVA's damages based on DOE's speculation about other rates at

which TVA might have had to build dry storage facilities sometime in the future in a non-breach world.

## FINDINGS OF FACT AS TO THE QUANTUM OF TVA'S DAMAGES

### A. TVA's Claimed Damages

34. In pretrial submittals, TVA claimed mitigation damages totaling $35,752,512.11 for costs incurred through FY2004 as a result of Defendant's breach of contract:

| | |
|---|---|
| (a) TVA Labor | $ 1,401,283.44 |
| (b) Contracts | $28,632,647.13 |
| (c) Internal Chargebacks | $ 2,975,750.34 |
| (d) Overhead/AFUDC | $ 2,690,404.07 |
| (e) Travel | $ 52,427.13 |

(PX-34; PX-35; PX-43; PX-72; PX-73). However, prior to and at trial, TVA removed from its claim two amounts challenged by Defendant—a $48,000 reracking study at Browns Ferry (Chapman Tr. at 628-29), and $21,074 in charges for crane modifications at Sequoyah (Walker Tr. at 501-02). Accordingly, at trial, TVA sought damages of $35,683,438.11. Also at trial, TVA did not challenge Defendant's entitlement to an offset for the time value of money associated with delayed loading costs. TVA's position, however, is that Defendant is entitled to an offset of $331,748 rather than the $353,000 sought by Defendant. The above concessions reduced TVA's net damages claim to $35,351,690.11; and that is the amount which TVA contends the Court should award as damages incurred by TVA through fiscal year 2004.

**B. Defendant's Challenges to TVA's Claimed Damages**

35. As shown by DX-218A at Exhibit 1 (Adj.), Defendant has challenged TVA claims totaling $6,135,235 as nonrecoverable:

> $669,841 for TVA labor (i.e., charges by TVA salaried employees working at the Browns Ferry and Sequoyah ISFSI sites);
>
> $2,304,508 for internal TVA chargebacks (i.e., charges to the ISFSI projects made by other TVA organizations for engineering, inspection services, surveys, heavy equipment use, etc.);
>
> $2,690,404 in overheads, of which $2,342,581.07 is based upon an Allowance for Funds Used During Construction (AFUDC); and
>
> $470,483 in contract services and procurement charges, of which $328,000 relates to technical studies performed by Holtec International, Inc. (Holtec).

With the exception of $328,000 in technical studies challenged as unnecessary ($48,000 of which TVA has conceded) and of $21,074 in crane repair charges (all of which TVA has conceded), Defendant argues the above claim amounts are not recoverable because they represent fixed costs which would have been incurred by TVA regardless of the breach.

36. There are no material disputes regarding the mathematical calculations underlying TVA's claim. (See, e.g., Defendant's reconciliation of TVA's Integrated Business Systems (IBS) general ledger with TVA's claim documents (DX-218 at Exhibits 1.1 and 1.2) and AFUDC Stipulations.) Moreover, with the exception of the $328,000 in technical studies challenged by Defendant's nuclear engineering expert, Warren K. Brewer, and the $21,074 in misallocated costs challenged by Defendant's accounting expert, Stephen J. Kiraly, Defendant identified no unreasonable costs associated with TVA's claim. In fact. Mr. Brewer agreed no justification or supportable

reason existed to challenge any of TVA's other claim costs; and neither his expert report nor trial testimony raises any such issue (Brewer Tr. at 1950; DX-216). Thus, Defendant has not questioned whether the ISFSI work was performed or whether the costs incurred were reasonable for the work performed.

### C. Challenged TVA Labor Charges

37. Defendant has challenged $669,841 (approximately 48 percent) of TVA's claimed labor charges of $1,401,283.40 for work performed by TVA salaried employees at the Browns Ferry and Sequoyah ISFSI sites, including the project managers and site engineers (PX-34; PX-35; PX-43; Walker Tr. at 533-35). Defendant's argument rests wholly upon Mr. Kiraly's view that the salary costs are fixed rather than incremental, that is, they are costs TVA would have incurred regardless of whether or not DOE had breached the Contract. Essentially, Mr. Kiraly reasoned that a salaried person had to have spent more than fifty percent of his or her time on the ISFSI projects over the course of their five-year construction before that person's work could be considered an incremental cost and that any person who spent less than twelve weeks on the ISFSI projects was de facto not incremental to the projects (Kiraly Tr. at 2146-47, 2164).[7] No accounting or auditing principles compel such a conclusion; nor has any court adopted the tests proposed by Mr. Kiraly (Tr. at 2147-48). Mr. Kiraly's view also ignores the reality of work on a construction project which begins with design and procurement work, proceeds through actual construction, and ends with detail finish work. At all stages of a construction project, different disciplines necessarily are involved and, of

---

[7] Mr. Kiraly did make an exception for Judith Border at Browns Ferry (Kiraly Tr. at 2146.

necessity, different craft workers. (See, e.g., Walker Tr. at 531-35; and TVA's claim reports, PX-34, PX-35, and PX-43.) Thus, in the context of a construction project, Mr. Kiraly's fifty-percent rule generally would exclude all but a handful of persons (such as a project manager or lead engineer), just as Mr. Kiraly's twelve-week rule would exclude the majority of any specialized engineering or craft worker charges. Defendant has not challenged the identical costs incurred by TVA for such work by the employees of contractors; nor has Defendant challenged the reasonableness of the costs. Moreover, all of these salary costs are real costs TVA incurred for work which directly benefited the projects and which required the time of employees who could otherwise have been performing other work for TVA.

**D. Challenged Internal Chargebacks**

38. Defendant challenges $2,304,508 (approximately 77 percent) of internal TVA chargebacks of $2,975,750.34, relying again upon the rationale that these costs are fixed rather than incremental, particularly given the salaried nature of the employees at issue (Kiraly Tr. at 2106). As to the specific costs involved, Defendant questioned:

(a) $1,813,175 in TVA Nuclear corporate engineering charges (cost class 73n);

(b) $277,530 in TVA Nuclear Inspection Services Organization (ISO) charges (cost class 73j);

(c) $174,893 in Heavy Equipment Division (HED) charges (DX-218 at Exhibits 4.1.1 (Adj) and 4.2.1 (Adj)); and

(d) $38,910 in surveying charges from TVA's Transmission Internal Services organization (cost class 73t).

(DX-218 and 218A at Exhibits 4.1, 4.1 (Adj.) and 4.2 (Adj.). After fiscal year 2000, the work of these organizations was not allocated to a project on a pro rata basis; rather, the organizations billed directly to the particular project upon which work was being performed (PX-34 at 8; PX-25; PX-68; PX-69; DX-218 at Exhibit 4; Walker Tr. at 557; Chapman Tr. at 613). More specifically, as to these organizations:

(a) TVA's Nuclear corporate engineering group operates on a zero-based budget (Bailey Tr. at 765). Thus, TVA does not put a set amount in the engineering corporate budget to cover the salaries or overheads for the group; rather, the engineering group contracts with TVA operational organizations such as the nuclear plant sites to meet its budget (*id.*). Accordingly, either there is sufficient work to support the group or the staffing is reduced (*id.* at 766; Davis Tr. at 330). The group uses contract engineers to facilitate the expansion and reduction of the group to match the volume of work (Bailey Tr. at 765). For projects such as the ISFSI projects, the nuclear sites entered into formal agreements with the engineering group (Davis Tr. at 331; Chapman Tr. at 613-14). The project managers then monitored charges to the project and the project budget (Davis Tr. at 331-32; Chapman Tr. at 613-14). The cost for the engineering group is a fixed hourly amount designed to recover engineering costs and overheads (but no profit) which varies from year to year but ranged from $52-$57 per hour for the ISFSI projects (Walker Tr. at 529). This charge compares very favorably with the hourly cost of outside engineering firms such as Sergeant & Lundy ($87.50) and Bechtel Corporation ($75) (Walker Tr. at 530).

(b) The ISO group provides quality control inspection services (Chapman Tr. at 615). As with the Nuclear corporate engineering group, ISO relies on contractors

to supplement its work force and match the work force to the amount of work, and the majority of the individuals who performed ISO services for the ISFSI projects were contractors (Walker Tr. at 539-40; Chapman Tr. at 615).

(c) HED is the TVA organization that provides equipment rental and, in some cases, operator services to TVA organizations (Galyon Tr. at 726, 744). HED has a fleet which consists of both TVA-owned and rented equipment (*id*. at 725-26), and HED has both permanent and contractor employees (*id*. at 724-25). Rental equipment is leased to TVA organizations on a pass-through basis (*id*. at 728-29). As a zero-based budget organization which pays for its employees and equipment through revenue from TVA organizations to which the equipment is rented (*id*. at 727-28), HED would cease to exist if TVA organizations to which the equipment was rented did not pay HED's charges, (*id*. at 745). HED's goal is to start off and end the year with a zero dollar balance in its accounts; in fiscal year 2004, HED had revenues of approximately $80 million and wound up approximately $125,000 in the black (*id*. at 727-28). HED's rental rates for TVA equipment are approximately 70 percent of the market rates for similar equipment; this percentage has been verified by HED benchmarking against industry rates and by a TVA Inspector General audit (*id*. at 730-31). Defendant has challenged only those HED costs associated with the rental of TVA-owned equipment (Kiraly Tr. at 2104-05, 2107, 2111).

(d) The Transmission Internal Services organization provided surveying services to the project sites (Kiraly Tr. at 2105). Again, the organization supplements its work force with contractors to facilitate matching the work force to the amount of work (Davis Tr. at 333).

**E. Challenged Overhead Costs**

39. Defendant challenges all $2,690,404.07 claimed as overhead costs by TVA, including AFUDC allocations; Stone & Webster core team overhead, capital support distributions, and miscellaneous charges (DX-218 at Exhibit 1). The most significant of these claims is the $2,342,581.07 cost associated with AFUDC allocations (AFUDC Stipulation No. 1).

**AFUDC**

40. AFUDC is a standard utility industry accounting practice that recognizes interest associated with financing long-term construction work as part of the cost incurred by a capital project; and the Federal Energy Regulatory Commission's Uniform System of Accounts has long provided for the inclusion of AFUDC in a utility's capital cost — *see* 18 C.F.R. pt. 101 Electric Plant Instructions § 3 (17) (2004). Accordingly, no AFUDC has been allocated to that portion of TVA's claim that represents operation and maintenance costs (Kiraly Tr. at 2136). The AFUDC stipulations filed by the parties establish the factual background against which the claim is to be evaluated. Each month, TVA calculates the cumulative cost of construction work in progress (the AFUDC base) and the average monthly interest rate on all the long- and short-term debt issued by TVA to finance its capital expenditures and operating costs; TVA then applies the monthly interest rate to the AFUDC base to determine the monthly amount of AFUDC (AFUDC Stipulation Nos. 1-5). This amount is, in turn, allocated pro rata to all TVA organizations with capital projects; those organizations, such as TVA nuclear, then allocate their respective shares pro rata to their capital projects (AFUDC Stipulation Nos. 5-6). TVA's calculation of AFUDC is in accordance with Generally

Accepted Accounting Principles (AFUDC Stipulation No. 14); TVA does not issue debt to raise proceeds for any specific capital project; and TVA funds all its expenditures from operating revenues, debt issuance, or lease financing as opposed to raising capital through the issuance of stock (AFUDC Stipulation Nos. 7-9). TVA is a profit-neutral organization, meaning that all net revenues must be reinvested in operations or used to pay down debt; at all times relevant to this lawsuit, TVA issued short- and long-term debt on a regular basis (AFUDC Stipulation Nos. 10-12). If TVA had not had to expend funds for the dry storage projects, TVA's debt would have been lower and would be lower today (Holmes Tr. at 700).

**Other Challenged Overheads**

41. Defendant's remaining challenges to overhead costs include: (a) $246,020 for Stone & Webster core team allocations at Sequoyah; (b) $99,484 for capital support (cost classes 82z, 84x, & Adj. 2); and (c) $2,318 in miscellaneous charges, including information technology charges, printing and equipment charges, etc. (DX-218 at Exhibits 5.1 and 5.2.). The Stone & Webster core team is comprised of support personnel who oversee and otherwise administer TVA's contract with Stone and Webster (Walker Tr. at 526-27; Kiraly Tr. at 2100). Under the Stone and Webster contract, the cost of the core team is allocated pro rata to all projects in which Stone & Webster provides services (Walker Tr. 527-28). The capital support allocations represent TVA management allocations (Kiraly Tr. at 2114); the miscellaneous costs are self-explanatory. All are real costs incurred and paid by TVA.

**F. Challenged Contract Services and Procurement Charges**

42. Defendant also challenged $470,483 in miscellaneous contract services and procurement claims (DX-218 at Exhibit 1). Specifically, these challenges are comprised of:

> $328,000 in technical studies at Sequoyah and Browns Ferry (cost class 27e);
>
> $7,094 in auxiliary crane materials at Sequoyah (cost class 27g);
>
> $3,876 in Stone & Webster award fees for auxiliary crane work at Sequoyah (cost class 26a);
>
> $52,318 for an owner-controlled insurance program (cost class 27a);
>
> $601 for tuition (cost class 25g);
>
> $68,537 for core team overhead at Browns Ferry (cost class 27f); and
>
> $10,057 in Stone & Webster award fees (cost class 27g).

(DX-218 at Exhibits 3.1 and 3.2.) TVA agrees that the two items for auxiliary crane work should be removed from TVA's claim (see proposed finding 34, *supra*). With the exception of the $328,000 for technical studies, the basis for Defendant's position regarding the remaining items is that the costs are fixed rather than incremental (Kiraly Tr. at 2054). Again, however, all are real costs that had to be borne by TVA in connection with the services of employees or contractors.

**Technical Studies**

43. As to the technical studies, Defendant challenges $228,000 in studies at Browns Ferry and $100,000 for a rail bay floor study at Sequoyah, primarily contending that the studies were not required for licensing and that the lack of a license amendment proves this point (DX-216). Of those amounts, TVA has agreed that $48,000

for a reracking study at Browns Ferry should be removed from the claim (see proposed finding 34, *supra*).

44. At trial, TVA's Alan Chapman testified at length as to the reasons why TVA considered the challenged technical studies that were performed for Browns Ferry to be necessary (Tr. 629-41). As shown by his testimony, environmental and safety concerns underlie all the studies, and all have a rational basis. Mr. Chapman pointed out that a Design Basis Thermal Analysis ($10,000) was conducted because the cask arrays covered by the Holtec license (a "2 x n" and a square array) differed from the design at BFN which is a "4 x 26" array; that the study was necessary to insure that TVA's cask spacing and unique pitch were adequate to maintain regulatory limits for fuel peak cladding temperatures; and that the Holtec calculations were used in the ultimate design of the cask pad and will be used in TVA's presentations to the NRC before casks are loaded (Tr. at 629-30). The Design Basis Criticality Analysis ($5,000) was conducted to insure that the fuel characteristics limitations listed in Appendix B to the Holtec overpack Certificate of Compliance would not be exceeded (Tr. at 632). The Cask Tipover Analysis ($5,000) and Cask Carry-Height Analysis ($5,000) were performed because the Holtec Final Safety Analysis Reviews at the time had not yet incorporated the "Version B Hi-Storm" selected by BFN (Tr. at 632-33). The Transfer Cask Analysis ($85,000) specifically evaluated the suitability of the equipment at various locations for seismic conditions unique to BFN and also evaluated potential hazards within the BFN reactor building (Tr. at 635-36). The Storage Overpack Blocked Duct Analysis ($20,000) and Buried Storage Overpack Analysis ($15,000) evaluated the potential impact of air duct blockages as a result of switchyard structural debris accumulating following tornadic

or other high-wind conditions and provided TVA assurance regarding the amount of time TVA would have to clear blockages in an emergency (Tr. at 637-38). The MPC [multipurpose canister] Lid Brittle Fracture Analysis ($10,000) was performed to confirm that the lid-to-shell weld would not fail during lifting and handling (Tr. at 639); and the MPC Analysis ($25,000) was prudent to ensure, to the extent possible given the absence of any DOE transportation package criteria, that the canisters would achieve compliance with anticipated transport requirements and thus not require that TVA go through another operation of removing fuel from one canister to place it into another for shipping (Tr. at 640-41).

45. At Sequoyah, the rail bay floor analysis was necessary because of the weight of the Holtec canister/cask/overpack system (Davis Tr. at 324-25). The railroad bay floor was designed to hold weights of up to 100 tons (Davis Tr. at 324). No one knows what sort of transportation system DOE would have brought to Sequoyah or what cask would have been used (Brewer Tr. at 1968-69; Dx-216 at 4). Had a truck system been used, analysis of the floor would presumably have been unnecessary given highway restrictions on truck weights; had DOE brought a rail cask, it would have been brought directly into the rail bay via a rail spur and tracks (removed after 1998 when DOE did not perform) (Davis Tr. at 408, 415-16, 423; Brewer Tr. at 1961). Had DOE performed by bringing a rail cask, its weight would have been distributed over the entire length of a rail car.

**G. Offset for Delayed Loading Costs**

46. Defendant has sought an offset for the time value of money for loading costs that would have been incurred by TVA had DOE performed the Contract,

or, in other words an expenses-saved adjustment. At trial, the Government's economic expert, Roy M. Hartman, presented evidence that the offset should be $353,000 through FY2004, representing the time value of money for the costs TVA would have incurred in loading large casks at Sequoyah had DOE performed (Hartman Tr. at 2362-63; DX-217A at Adj. Table 10).

47. Because the Hartman model does not accurately evaluate events over time in that the model does not use reasonable acceptance rate scenarios and does not take into account certain contractual rights such as exchanges or the twenty-percent flexibility provision, the specific $353,000 credit sought by the Government here for TVA's postponed loading costs through fiscal year 2004 is overstated. Had DOE begun performance in 1998, TVA, as a matter of economic efficiency, would have exercised its contractual right to exchange with another utility the small, partial-cask allocation (5.5 MTU) TVA had for a calendar year 2003 pickup (Jt. Ex. 1 at 12-13). (In this regard, Dr. Hartman (Tr. at 2312-13) has acknowledged that his model is inefficient in that in most years partial casks will be loaded for shipment to the ISFSI.) Alternatively, TVA could have added the 5.5 metric ton amount to a later TVA allocation under the plus or minus twenty percent provision of the Contract, or simply have asked DOE to agree to include the small allocation in a later pickup to save both parties money (Jt. Ex. 1 at 11). TVA's cost for loading one cask in calendar year 2003 would have been $484,071 (DX-216 at 11). Using Dr. Hartman's escalation rate of seven percent and his discount factor of two-and-one-half percent (DX-217 at 19), the $484,071 in loading costs that would have been incurred by TVA for its 2003 allocation are accorded a time value of money of $21,252: $484,071 times 1.07 equals $517,956 (escalation); $517,956 divided

by 1.025 equals $505,323 (discount); and $505,323 less $484,071 equals $21,252 (interest). Accordingly, Defendant may be credited no more than $331,748 ($353,000 less $21,252 in interest).

**H. Summary of Damages Findings of Fact**

48. The Court finds that TVA is entitled to recover the full cost of mitigating the damages caused by DOE's breach of contract. The test for entitlement is whether the costs were reasonably incurred under the circumstances and whether an award of those costs would provide TVA a windfall as opposed to compensating TVA for costs that are directly related to DOE's breach. Having scrutinized TVA's costs at length, the Court finds that TVA should recover $35,683,438.11 less a $331,748 offset for a total recovery of $35,351,690.11.

## CONCLUSIONS OF LAW AS TO THE QUANTUM OF TVA'S DAMAGES

**A. General Principles**

49. The Federal Circuit recently has set forth the general principles regarding damages in the context of the spent nuclear fuel cases:

> The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. *San Carlos Irrigation & Drainage Dist. v. United States*, 11 F.3d 1557, 1562 (Fed. Cir. 1997). "[T]he general principle is that all losses, however described, are recoverable." Restatement (Second) of Contracts § 347 cmt. c (1981). Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002). While the amount of damages need not be "ascertainable with absolute exactness or mathematical precision[,]" recovery for speculative damages is precluded.

*Ind. Mich. Power Co. v. United States*, ___ F.3d. ___, No. 04-5122,

2005 WL 2173563, at *2 (Fed. Cir. Sept. 9, 2005).

**B. TVA Labor and Internal Chargebacks**

50. TVA seeks to recover the cost of work performed by salaried employees (including contractors) working at the plant sites as well as the cost to the dry storage projects of "contracting" with TVA organizations for engineering design work, quality control inspections, surveying, and heavy equipment rental. These direct labor and internal chargeback costs all benefited the dry storage projects, and all were specifically charged to those projects (PX-68; PX-68A; PX-69; DX-218 at Exhibits 2 through 2.2.3.1; DX-218A at Exhibits 2.1.3 and 2.2.3 (Adj.)). In the most fundamental cost accounting sense, then, TVA would not have incurred charges for these particular work items had there been no dry storage projects, thereby rendering these costs incremental by definition.

51. Moreover, as TVA pointed out in its pretrial brief (at 27-30), Federal courts allow the recovery of in-house costs where services are performed by a party in the absence of a contractual relationship that otherwise might define the recovery amount. In *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976), for example, the Fifth Circuit responded to an argument identical to that raised by Defendant here:

> Freeport has arranged with an independent engineering concern to be furnished supplemental personnel when its own salaried engineering staff is overworked. Because Freeport found it unnecessary to tap this outside [firm] during the period of the engineering work on the dock, Pansuiza contends that, were it not for the dock work, Freeport's engineers would have been idle or engaged in essentially nonproductive work. Pansuiza argues, therefore, that the engineering work was performed without any additional expense or overhead. We reject this argument as being wholly based on speculation. It is at least as plausible that there

> were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.

526 F.2d at 303-04. Similarly, in *Dep't of Water & Power of Los Angeles v. United States*, 131 F. Supp. 329, 332 (S.D. Cal. 1955), the court rejected the Government's argument that the indirect charges for superintendence of direct labor, tool expense, two truck rentals, and administrative and general expense were not recoverable, finding that the charges were based on accepted accounting principles, were reasonable in amount, and were factually related to the repair work.

52. Indeed, the Government itself routinely has sought successfully to recover in-house costs indistinguishable from those incurred and claimed by TVA. Thus, in *United States v. The John R. Williams*, 144 F.2d 451 (2d Cir. 1944), the court (Judge Augustus Hand) affirmed a damages award to the Government based on the Government's in-house costs:

> The [defendant] contends . . . that these expenses during the period of the repair work were a necessary cost of maintaining a vessel which [the Government] regularly kept for repairing cables. The [defendant] showed that the repairing of the cable . . . did not prevent the use of the vessel for other repair work and, therefore added nothing to the [Government's] necessary outlay. But, if the government had not maintained such a vessel it would have had to employ an outside contractor to make the repairs. We can see so reason why the [defendant], who caused the damage to the government's cable, should not pay the expense of the repairs while they were being made.

*Id*. at 452-53. *See also United States v. Commercial Am. Barge Line Co*., 424 F. Supp. 453, 456 (E.D. Mo. 1977) (awarding damages to United States for repairs to a lock, including in-house expenses for damage examination by Army Corps of Engineers and overhead, because "[i]t is clear than plaintiff may recover indirect expenses . . . and the costs incurred by its own personnel"); *United States v. New England S.S. Co*., 297 F. 651

(S.D.N.Y. 1923) (awarding damages to the United States for the use of a Government dry dock to make repairs to a Government vessel).

53. The damages principle allowing recovery of in-house costs applied in the above tort cases also is directly applicable to contract cases. As held in *Convoy Co. v. Sperry Rand Corp*., 672 F.2d 781, 785-86 (9th Cir. 1982), in affirming an award of breach of contract damages for a defective computer system:

> The issue is not whether Convoy would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for. . . .
>
> In *Clements Auto Supply* [298 F. Supp. 115, 134 (D. Minn. 1969), *aff'd in relevant part*, 444 F.2d 169 (8th Cir. 1971)], the court found that the supervisors' services were effectively lost to the plaintiff during the time they supervised a system which was of little benefit to the company. In relying on *Clements Auto Supply*, the district court implicitly found that Convoy had lost the benefit of its supervisors' services for the time they spent supervising the computer system.

*See also Dunn Appraisal Co. v. Honeywell Information Sys. Inc*., 687 F.2d 877 (6th Cir. 1982) (affirming award of damages for management time spent in resolving problems with defective computer system because the loss of that time deprived the plaintiff of services it paid for).

54. Although Defendant's accountant, Mr. Kiraly testified that TVA's salaried labor costs are not recoverable under his incremental cost test for salaried employees (i.e., individuals must devote more than fifty percent of their time to a project over the life of the project (Kiraly Tr. at 2146-48), Mr. Kiraly was unable to point to any authority to support application of his test (*id*.); and Mr. Kiraly's work has not been subject to peer review in the context of any publications (*id*. at 2156). And, as Mr. Kiraly

ultimately agreed, to the extent TVA employees were working on the dry storage projects, they were not available to perform other tasks (*id*. at 2154).

55. Defendant's pretrial brief (at 46-50) essentially ignores the context of the cases cited by TVA, pointing by and large to cases where plaintiffs sought additional compensation under contracts in which those plaintiffs (rather than the defendants) had contracted to provide the services or goods. Generally speaking, in these cases, as in *Wickham Contracting Co. v. United States*, 12 F.3d 1574 (Fed. Cir. 1994), the contractor to the Government sought an equitable adjustment. There is no such contractual mechanism for defining a recovery in the context of this action since TVA did not contract to provide services or goods to the Government. This distinguishing factor is crucial because the underlying assumption in the equitable adjustment cases is that the contract price already covers fixed costs (regardless of whether those costs are direct or indirect). As a result, courts exercise great care to avoid a double recovery by determining whether certain costs already would be included in the contract price. For example, in *Wickham*, the Federal Circuit expressly noted:

> Wickham has already been partially compensated for overhead costs because the original contract price included a markup for overhead. In addition, when GSA issued change orders to pay Wickham for additional work, almost all of the orders included a markup of 10% for overhead.

12 F. 3d at 1576 n.2. Defendant's accounting expert, Mr. Kiraly has acknowledged that companies typically build their overheads into the contract price for the work that is to be performed and that TVA has no contract here under which those costs could be included

in contract pricing (Kiraly Tr. at 2149).[8] Thus, in stark contrast to the plaintiffs in cases proffered by Defendant, TVA has received no compensation under the contract for such costs (rather, TVA has paid DOE over $700 million); and TVA seeks only to be made whole by recovering those costs it incurred to mitigate its damages.

56. Moreover, Defendant's citations, while enunciating various legal platitudes, generally do not address the issues in this case. Thus, Defendant points to *Boyajian v. United States*, 423 Fed. 2d 1231, 1236 (Ct. Cl. 1970), which cites *Saddler v. United States* (287 F.2d 411, 415) for the proposition that a contractor is not entitled to recover costs it would have incurred anyway. Defendant posits (without any authority other than Mr. Kiraly) that any salaried person who does not work more than fifty percent of his or her time on a project represents a cost that would have been incurred regardless of the breach. However, neither *Boyajian* nor any of the cases cited by Defendant provides support for that proposition; if anything, the cases indicate that, where evidence exists of costs incurred for work performed directly on a project, those costs are recoverable. For example, in *Boyajian*, a total cost case, no recovery was allowed because no credible evidence of damage was adduced while *Saddler* supports TVA's position, stating that "labor, travel, and engineering expenses appearing in plaintiff's evidentiary records were chargeable." 287 F.2d at 415. *Wilner v. United States*, 23 Cl. Ct. 241 (1991), is equally inapposite in that it simply confirms that the work of hourly

---

8 The *Eichleay* formula is designed to reimburse contractors for unabsorbed overheads (*i.e.*, indirect costs) in a classic delay situation but that formula is inapplicable here because TVA is not in the business of contracting to build facilities for others, because there is no delay associated with the construction, and because costs which are directly allocable to a contract are not governed by *Eichleay*. *Wickham*, 12 F.3d at 1577-778.

employees is recoverable, and Defendant has in fact already conceded annual trades and labor costs in TVA's claim (Kiraly 2059-60; DX-218A at Exhibit 2.1 (Adj.). Moreover, a reading of *Wilner* further emphasizes the difference between the cases relied upon by Defendant and the circumstances present in this action in that *Wilner* specifically references the contract's equitable adjustment clause as the mechanism by which an aggrieved party may seek reimbursement for reasonable costs (including hourly labor, overheads, and a profit) associated with a delay. Here, of course, there is no such contractual mechanism because TVA did not contract to perform services for the Defendant.

57. Defendant's reliance on *Wilson v. Marquette Elecs. Inc*, 630 F.2d 575 (8th Cir. 1980), and *AES Tech. Sys., Inc. v. Coherent Radiation*, 583 F.2d 933 (7th Cir. 1978), as a basis for denying TVA's claims is equally unavailing because literally no extra work was performed in those situations. For example, in *Wilson*, there was no recovery because no proof was offered that Mr. Wilson had to spend extra time on a project, that he was paid for any alleged extra time, or that he even requested payment. That is simply not the case here. Similarly in *AES Tech*, a consequential damages case brought under the Uniform Commercial Code, the Seventh Circuit held the breach of a warranty did not make defendant liable for plaintiff's payroll when the evidence suggested plaintiff could have mitigated its damages and when no delay impact on salary costs occurred because there were workarounds for the project as well as for other projects. Finally, *Jessup & Moore Paper Co. v. Bryant Paper Co.*, 147 A. 519, 524 (Pa. 1929), also militates against Defendant's position. In *Jessup*, another sales case, the issue was whether certain expenses in the manufacture of paper were saved by virtue of a

breach. The court found only that, on the facts of the case, the plaintiff/seller would not have had to incur additional labor in the paper manufacturing process but that where additional labor was involved (for example, in preparing ingredients for manufacture of the paper) that labor constituted an additional cost to be credited to defendant.[9] Here, of course, TVA did incur extra labor in performing the engineering work, etc. for the dry storage projects.

58. In sum, it is irrelevant that TVA had salaried employees — the real issue is whether those employees performed work that otherwise would not have had to be performed as opposed to whether the employees would have remained in TVA's employ. In fact, as the Seventh Circuit noted in *Autotrol Corp. v. Continental Water Sys. Corp.*, 918 F.2d 689, 693 (1990), even in cases where there is a contract if plaintiff is not "able to slash its overhead expenses; and if it did not do so because they were necessary to the performance of the contract, and now it is left holding the bag . . . then those expenses are a loss caused by the breach and are recoverable as contract damages."

59. Finally, it is clear that TVA's claim costs would be allowed under the Government's standard cost reimbursable contract, a contract which closely parallels in its design the fundamental damages principle applicable here: placing TVA in as good a position as it would have been in had the Contract been performed by compensating TVA for its mitigation costs. The Federal Acquisition Regulations specifically provide that all direct in-house costs and properly allocable and allowable indirect costs are to be paid under such cost reimbursable contracts. Thus, in addition to

---

9 Defendant's brief confuses the positions of plaintiff and defendant; plaintiff did not seek damages for hiring extra labor; rather, defendant sought an offset for costs plaintiff would have incurred in the manufacturing process.

supplies and services purchased for a contract and materials issued from the contractor's inventory, the Federal Acquisition Regulations provide a recovery for: "(C) Direct labor; . . . (E) Other direct in-house costs; and (F) Properly allocable and allowable indirect costs, as shown in the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts" (48 C.F.R. § 52.216-7(b)(ii)(C), (E), (F) (2005)). In this regard, moreover, it is noteworthy that the Contract itself defines full cost recovery (for DOE) as recoupment "of all direct costs, indirect costs, and all allocable overhead" in the Article I definitions (Jt. Ex. 1 at 2).

**C. AFUDC and Other Overhead Costs**

60. Defendant has challenged $2,690,404 in overheads, a figure which is comprised of $2,342,581.07 in AFUDC allocations (AFUDC Stipulation No. 1) and $347,822.93 in miscellaneous overheads, primarily Stone & Webster core team overhead at Sequoyah ($246,020) and indirect capital support distributions ($99,484) (DX-218 at Exhibit 5.1 and 5.2).

61. As to the miscellaneous overheads, the same compelling rationale for recovery applies as in the case of TVA labor and internal chargebacks, with the further point that TVA has a contractual obligation to pay Stone & Webster core team overhead (Kiraly Tr. at 2138). The State-law delay cases cited by Defendant as to "overhead items allocated as a bookkeeping matter" (pretrial br. at 47) are all inapposite because the plaintiffs were in the business of performing the work involved and thus were required to show that the unabsorbed overheads at issue would have been recovered in a substitute contract. This factual circumstance is not applicable to TVA.

62. Defendant's challenge to TVA's AFUDC claim rests upon the assertions that TVA is, in effect, seeking prejudgment interest and that TVA's failure to have borrowed specifically for the projects is a fatal flaw because the borrowing is thus not directly related to the projects (Kiraly Tr. at 2116, 2176). Because AFUDC represents, in effect, capitalized interest, it is true that TVA is seeking reimbursement for interest costs. However, TVA's claim differs from prejudgment interest in several significant ways. First, TVA does not seek to recover for a classic opportunity cost, i.e., money that would have accrued on capital; rather, TVA is seeking to recoup interest actually paid because of the capital projects. In that regard, this Court previously has distinguished between interest "on a claim" (e.g., prejudgment interest which begins accruing when a claim arises and continues to accrue during the entire pendency of the claim on the entire amount of the claim) and interest "*as* a claim" which implicates financing costs that represent a claim in themselves. *Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003) (emphasis in original). Second, all TVA capital projects bear AFUDC expense (Walker Tr. at 528; Kiraly Tr. at 2116), and TVA accounts for AFUDC in accordance with traditional, widely accepted utility principles. It also is clear that TVA ratepayers will bear this expense if the Government does not. As the Federal Circuit recently held, capital is not costless. *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1374-75 (Fed. Cir. 2003). In such circumstances, the Federal Circuit has held that such financing costs are recoverable so long as they are foreseeable. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1354-58 (Fed Cir. 2001); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344 (Fed Cir. 2003);

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363. As the Court stated in *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002):

> The court agrees that the 'interest' Westfed seeks to recover is not prejudgment interest. Westfed seeks to recover a cost expended in reliance on the contract in the form of interest. Such a characterization has been accepted by recent case law in this court. In *Bank United of Tex. v. United States*, 50 Fed. Cl. 645 (Fed. Cl. 2001), the court permitted interest paid on a loan and senior notes because the "plaintiff would not have incurred such added *interest cost* had defendant not breached."

*Id*. at 665; emphasis in original.

63. Unlike the situation in *Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122, 137 (2004), upon which Defendant relies, the interest payments incurred by TVA resulted directly from the need to construct dry storage. Moreover, the costs were not incurred solely on outstanding debt but rather on an ever-changing mix of short- and long-term debt (AFUDC Stipulation Nos. 11-12). Here, too, unlike the situation in *Precision Pine*, the interest payments (which were entirely foreseeable given the limited alternatives available in the event of DOE's breach) were incurred by TVA as part of its mitigation efforts. Although Mr. Kiraly testified he expected that debt levels and capital project spending would move in lockstep (Kiraly Tr. at 2139), there is no reason to believe that is so. For one thing, as Mr. Kiraly acknowledged, were a capital expense eliminated, debt could be reduced (*id*. at 2140). Indeed, in the case of TVA, it is clear that TVA had a strategic objective of reducing debt and that over the period 1997-2002, TVA reduced debt by almost $2.5 billion dollars (e.g., Tennessee Valley Authority 2002 Annual Report at 7, 10).[10] Accordingly, TVA is entitled to recover for AFUDC.

---

**10** TVA's annual reports are judicially noticeable. *See Ill. Cent. R.R. v. TVA*, 445 F.2d 308, 310 n.4 (6th Cir. 1971) (noting that TVA's annual reports of its activities to

### D. Technical Studies Costs

64. Defendant's expert has questioned the necessity of certain technical studies, contending these particular studies were not necessary for the design, construction, and operation of an ISFSI (DX-216 at 14). The premise upon which Defendant's expert relies is that, were the reports necessary, TVA would have had to seek license amendments (e.g., Brewer Tr. at 1907, 1909). TVA counters this is simply not so and that the studies were either required or prudent in any event (Chapman Tr. at 627-41). There is, however, no disagreement that the studies were performed by a third party, that TVA paid for the studies, and that TVA thought them necessary. In fact, the necessity for the majority of these studies (among other items) was specifically raised within TVA as an issue prior to the Holtec contract's being amended to include Browns Ferry as well as Sequoyah (see DX-270, an October 10, 2001 e-mail with memorandum attachment at Bates Nos. 28078-79); and TVA determined that the studies were needed. (By the fall of 2001, moreover, TVA had already filed suit against DOE; thus, TVA clearly understood that DOE would not agree, short of a court judgment, to pay any of TVA's mitigation expenses and that the risk of recovering for expenditures fell upon TVA.) Given these circumstances, even were the Court to find that Defendant's expert were correct in hindsight (which he is not), the Court should nevertheless allow a recovery for TVA because:

---

(. . . continued)
Congress required by 16 U.S.C. § 831h(a) (2000) are subject to judicial notice); *United States ex rel. TVA v. An Easement & Right-of-Way, Etc*., 246 F. Supp. 263, 269 (W.D. Ky. 1965) ("The basic facts as to the activities of TVA . . . are matters of public record and common knowledge; they are contained in TVA's annual reports to Congress and are judicially known to the Court.").

> "When mitigating damages from a breach, a party 'must only make those efforts that are fair and reasonable under the circumstances.' "*Home Sav.,* 399 F.3d at 1353 (quoting *Robinson v. United States,* 305 F.3d 1330, 1333 (Fed. Cir. 2002)). Importantly, for mitigation the burdens of proof and persuasion shift from the plaintiff to the defendant. The burden is on the breaching party to show that the injured party's efforts at mitigation were unreasonable. *See, e.g., Franconia Assocs. v. United States,* 61 Fed. Cl. 718, 741 (2004) (citing *T.C. Bateson Constr. Co. v. United States,* 162 Ct. Cl. 145, 319 F.2d 135, 160 (1963)).

*Globe Savings Bank, F.S.B. v. United States,* 65 Fed. Cl. 330, 348 (2005). Here, Defendant ultimately has been able to show no more than a difference of engineering judgment about the necessity for the studies and has made no showing that TVA's decision to have the studies performed was unreasonable under the circumstances.[11] Rather, the evidence shows that TVA's actions were entirely prudent because, as the Federal Circuit recently stated, the utilities were obligated not merely to mitigate pecuniary losses: "Having been placed in a position where they are required to find alternate storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF." *Indiana Michigan*, 2005 WL 2173563 at *4. In sum, the studies all were conducted because TVA decided to be safe rather than potentially sorry, and that decision was entirely justified.

---

[11] In this regard, it also is noteworthy that of the $35.63 million in damages claims presented at trial by TVA, Defendant after extensive (and expensive) analysis of TVA's claims has challenged for cause $328,000 in technical studies and $21,074 in misallocated costs, or less than one percent of the total claim.

## CONCLUSION

The Court should award breach of contract damages to TVA in the amount of $35,351,690.11.

Respectfully submitted,

September 16, 2005

Maureen H. Dunn
General Counsel

Edwin W. Small
Assistant General Counsel

s/Peter K. Shea

Peter K. Shea
Senior Attorney/Attorney of Record
Telephone 865-632-7319

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Attorneys for Tennessee Valley Authority

003745191