No. 01-249C
(Judge Lettow)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

# DEFENDANT'S INITIAL POST-TRIAL BRIEF

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0534
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Civil Division
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

KEVIN B. CRAWFORD
SHARON A. SNYDER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

September 21, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

STATEMENT OF FACTS ADDUCED AT TRIAL . . . . . 1

ARGUMENT . . . . . 6

I. TVA BEARS THE BURDEN OF PROVING EVERY ELEMENT OF ITS DAMAGES CLAIMS, INCLUDING LIABILITY, CAUSATION, AND RESULTANT DAMAGE . . . . . 6

A. TVA Bears The Burden Of Proving All Elements Of Its Damages, Including The Fact Of Damage, By Preponderant Evidence . . . . . 6

B. TVA Cannot Establish Causation Or Resultant Damage Through Speculation . . . . . 6

II. TVA HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT ITS COSTS WERE CAUSED BY THE GOVERNMENT'S DELAY . . . . . 7

A. TVA's Basic Claims Regarding Causation and Rate Have No Basis in the Standard Contract . . . . . 7

B. TVA's Basic Claims Regarding Causation and Rate Are Inconsistent With Its Own Documents . . . . . 15

C. TVA Has Failed To Meet Its Burden With Respect To Its Alternative Argument That It Could Have Bridged Its Storage Gap Absent Dry Storage . . . . . 18

1. Exchanges . . . . . 20

2. The "Plus or Minus 20 Percent" Contract Provision . . . . . 24

3. Emergency Acceptance . . . . . 25

4. Transhipment . . . . . 25

5. Private Fuel Storage . . . . . 27

6. Cask Pit Rack . . . . . 28

7. Operating Without Full Core Reserve . . . . . 30

III. TVA Should Be Denied Recovery Of Any Damages Because Its Damages Are Indistinguishable From Interest Which May Not Be Awarded Against the Government . . . . . 32

IV. Alternatively, Any Award of Damages To TVA Must Be Reduced Because Of Its Failure To Properly Model Its "But For" World Costs . . . . . 33

A. TVA's Damages Claim Should Be Reduced By At Least $6,135,235 Relating To Actual Costs That Were Incurred Unnecessarily Or That Would Have Been Incurred In The "But For" World . . . . . 34

1. TVA's Damages Claim Should Be Reduced By At Least $2,974,349 Relating To Certain Non-Incremental TVA Labor and Internal Chargeback Costs . . . . . 34

a. TVA's Damages Claim Should Be Reduced By At Least $2,799,278 Relating To Certain Non-Incremental TVA Labor and Internal Chargeback Costs . . . . . 35

b. TVA's Damages Claim Should Be Reduced By At Least $175,071 Relating To Certain Additional Non-Incremental Internal Chargeback Costs For Owned Equipment . . . . . 37

2. TVA's Damages Claim Should Be Reduced By At Least $470,483 Relating To Certain Non-Incremental Or Unnecessary Contract Services & Procurement Costs . . . . . 38

a. TVA's Damages Claim For Contract Services & Procurement Costs Should Be Reduced By $328,000 Relating To Non-Incremental Or Unnecessary Technical Studies . . . . . 39

i. $180,000 In Costs Relating To The Browns Ferry Studies At Issue Is Not Recoverable . . . . . 39

ii. $100,000 In Non-Incremental Costs Relating To The Qualification Of The Railroad Bay Floor At Sequoyah Is Not Recoverable . . . . . 40

b. TVA's Damages Claim For Contract Services & Procurement Costs Should Be Reduced By At Least An Additional $131,512 Relating To Certain Fixed, Non-

Incremental Core Team Overhead Costs At Its Browns Ferry Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

3. TVA's Damages Claim Should Be Reduced By At Least $2,690,404 Because Its Claimed Overhead Costs Are Non-Incremental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

a. TVA's Damages Claim Should Be Reduced By At Least $246,020 Relating To Fixed, Non-Incremental Core Team Overhead Costs At Its Sequoyah Facility . . . 42

b. TVA's Damages Claim Should Be Reduced By At Least $101,803 Relating To Certain Additional Miscellaneous Non-Incremental Overhead Costs . . . . . . 42

c. TVA's Damages Claim Should Be Reduced By At Least $2,342,581 Relating To Non-Incremental Overhead Costs Based Upon The Allocation of AFUDC . . . . . . . . . . . . . 43

B. TVA's Damages Claim Should Be Reduced Based Upon Deferred "But For" Dry Storage Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C. TVA's Damages Claim Should Be Reduced By An Additional $353,00 - $430,000 Based Upon Avoided "But For" Costs of Loading Fuel to DOE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

## CASES

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 6

Bank of America F.S.B. v. United States,
No. 95-660(C), 95-797C, 95-7971C,
2005 WL 1792182 (Fed. Cl. July 21, 2005) . . . . . . . . . . 48

Bennett v. United States,
200 Ct.Cl. 635 (1973) . . . . . . . . . . 17

Bluebonnet Sav. Bank F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 23

Calhoun v. United States,
591 F.2d 1243 (9th Cir. 1978) . . . . . . . . . . 18

Castle v. United States,
48 Fed. Cl. 187 (2000) . . . . . . . . . . 33

Cavalier Clothes, Inc. v. United States,
51 Fed. Cl. 399 (2001) . . . . . . . . . . 17

Citizens Federal Bank v. United States,
59 Fed. Cl. 507 (2004) . . . . . . . . . . 48

Convoy v. Sperry Rand Corp.,
672 F.2d 781 (9th Cir. 1982) . . . . . . . . . . 36

Cucuras v. Secretary of HHS,
993 F.2d 1525 (Fed. Cir. 1993) . . . . . . . . . . 17, 21

Hybritech Incorporated v. Monoclonal Antibodies, Inc.,
802 F.2d 1367 (Fed. Cir. 1986) . . . . . . . . . . 17

Indiana Michigan Power Co. v. United States,
No. 04-5122,
2005 WL 2173563 (Fed. Cir. Sept. 9, 2005) . . . . . . . . . . 6, 7

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied,
464 U.S. 814 (1983) . . . . . . . . . . 18

LaSalle Talman Bank, F.S.B. v. United States,
317 F.3d 1363 (2003) . . . . . . . . . . 48

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . 33

Long Island Savings Bank, FSB, et al. v. United States,
No. 92-517C (September 15, 2005) . . . . . . . . . . 49

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 8

Margo v. Weiss,
213 F.3d 55 (2nd Cir. 2000) . . . . . . . . . . 18

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . 6

Missouri Housing Development Commission v. Brice,
919 F.2d 1306 (8th Cir. 1990) . . . . . . . . . . 18, 21

Northern Helex Co. v. United States,
207 Ct. Cl. 862,
524 F.2d 707 (1975) . . . . . . . . . . 7

Pacific Gas & Electric v. United States,
58 Fed. Cl. 1 (2003) . . . . . . . . . . 33

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd,
178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . 7

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . 6, 21

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 27

Standard Havens Prods., Inc. v. Gencor Indus., Inc.,
953 F.2d 1360 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Story Parchment Co. v. Paterson Parchment Paper Co.,
282 U.S. 555 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

TVA v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Town of Grantwood v United States,
55 Fed. Cl. 481 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996), cert. denied,
520 U.S. 1116 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wickham Contracting Co. v. Fischer,
12 F.3d 1574 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360,
295 F.2d 822 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Yankee Atomic Electric Co. v. United States,
No. 98-126C,
2004 WL 1535686 (Fed. Cl. June 28, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**STATUTES**

42 U.S.C. § 10101 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 10161 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 10168(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 10222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 10222(a)(1) (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

48 Fed. Reg. 5458 (Feb. 4, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

10 C.F.R. § 961.11, Art. I.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23, 25

**MISCELLANEOUS**

Restatement (Second) of Contracts § 352 cmt. a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-249C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S INITIAL POST-TRIAL BRIEF

Pursuant to this Court's order dated June 13, 2005, defendant, the United States, respectfully submits the following initial post-trial brief.

STATEMENT OF FACTS ADDUCED AT TRIAL

1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 (“NWPA”), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted.

2. The NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF and HLW]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures."

3. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983).

4. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

5. The proposed rule requested that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458. One of the comments that DOE received in response to the proposed Standard Contract in the Federal Register came from TVA. TVA stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." PX1 at 5. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE could add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear

power plants covered by contracts . . . ." Id. Other utility and industry commenters also requested that DOE insert a minimum rate obligation into the Standard Contract, each suggesting various requirements to which DOE should obligate itself. DX 5.

6. On April 18, 1983, DOE issued the terms of the Standard Contract as a final rule. In the final Standard Contract terms, DOE did not adopt TVA's request that DOE add a provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." DX 5; JX1; PX1; Tr. 64:12-65:1 (Hayslett). Further, DOE denied the request of several other utilities to include a minimum rate obligation in the Standard Contract because, as of 1983, DOE did not know what its capabilities would be in 1998 and was unwilling to commit to the minimum rate obligations that the utilities proposed. Tr. 2212:15-2213:3 (Morgan); 2198:9-2199:3 (Morgan); 2209:5-20 (Morgan). In May 1983, TVA subsequently acknowledged that "no substantive dates or rates of removal of SNF are established" in the Standard Contract "beyond the requirement of the Act which requires DOE to start accepting SNF by 1998," DX 28, at TV 1469, and that DOE "did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole." DX 28, at TV 1471; see Tr. 122:10-123:4 (Hayslett).

7. In the final rule, DOE also modified the definition of the "facility" to which SNF could be delivered beginning in 1998. Although the proposed rule would have required delivery to a repository in 1998, the final rule provided that DOE could deliver SNF in 1998 either to a

repository or to "such other facility(ies) to which [SNF and/or HLW] may be shipped by DOE prior to its transportation to a" permanent repository. 10 C.F.R. § 961.11, Art. I.10.

8. Starting in 1983, TVA repeatedly recognized that, even if DOE began accepting SNF in 1998, there was a significant possibility that TVA would need additional storage for its SNF. DX 20 at 4; DX 141 at 9; DX 62 at 3-5; DX 92 at 1.

9. DOE's planning for implementing the Standard Contract has proceeded through three broad phases. At the outset, it looked at the possibility of accepting fuel at one or two repositories. Tr. 1397:12-1398:6 (Kouts); 1411:2-10 (Kouts); 1421:15-19 (Kouts). By 1987, DOE had refocused its planning on acceptance in 1998 at an MRS. DX 48 at 312; DX 50; DX 51 at HQ5810; DX 292 at A-1; Tr. 1425:1-1426:5 (Kouts); 1591:5-15 (Kouts); 1450:23-1451:16 (Kouts); 1453:7-1454:3 (Kouts); 1591:9-15 (Kouts). This thinking continued until approximately September 1995 when the program's planning started to shift back to acceptance directly at a repository, but with a later SNF acceptance start date. Tr. 1308:22-1309:4 (Klein counterdesignation); 1731:22-1732:7 (Zabransky); 1743:13-25 (Zabransky). The 1995 ACR reflects the second phase in DOE's planning. PX 19; Tr. 1306:1-3 (Klein counterdesignation);1489:22-1490-8 (Kouts).

10. TVA would have required additional storage even if DOE had begun accepting fuel at any of the rates presented by the parties in this litigation. Tr. 1231:22-1232:24 (Holton); 1238:20-1239:4 (Holton); 1239:10-15 (Holton); 1240:22-1241:8 (Holton); 1241:9-23 (Holton); 1242:3-8 (Holton).

11. TVA would not have been able to address its need for storage through any mechanism other than dry storage. Not only has TVA disclaimed any reliance upon exchanges, but a market

might not arise, TVA might not choose to participate, and DOE might not approve such participation. DX 176; DX 312; Tr. 2408:14-18 (Hartman); 1752:2-25 (Zabransky); 1377:23-1380:20 (Zabransky counterdesignation); 1754:8-11 (Zabransky); 1375:4-1376:4 (Zabransky counterdesginaton). Likewise, DOE was not required to approve a request that it accept additional fuel under the "plus or minus 20 percent" provision or the "emergency" provision of the Standard Contract, particularly since emergency acceptance is not intended to be available in these circumstances. DX 50; Tr. 1511:5-13 (Kouts); 1513:6-11 (Kouts); 2244:5-6 (Morgan); 2447:12-14 (Zabransky). TVA would not have chosen to tranship its fuel because of the difficulty of obtaining necessary approvals, the effect upon its other reactor pools, and the cost. Tr. 793:15-22 (Bailey); 1288:15-1289:1 (Green); 793:22-794:14 (Bailey); 799:1-5 (Bailey). TVA would not have been able to use private fuel storage because it did not exist, and, even if it had existed, it would likely have been costly. Tr. 796:21-798:25 (Bailey). TVA would not have used a cask pit rack because it poses operational problems, is inconsistent with tritium production, and would have been costly. Tr. 770:5-8 (Bailey); 1946:18-23 (Brewer); 771:15-21 (Bailey); 1947:9-11 (Brewer); 182:8-16 (Hayslett); 1947:2-6 (Brewer). TVA would not have foregone full core reserve because of the financial and safety risks it would face. Tr. 1235:17-22 (Holton); Tr. 1283:1-5 (Green); 1283:6-1284:13 (Green); 791:24-25 (Bailey); 1943:9-1944:12 (Brewer).

12. TVA's damages submission includes costs that are not incremental to the breach. See section IV.A, infra. The costs that TVA would have incurred for ISFSI construction and loading in the but for world can be ascertained, by subtracting these non-incremental costs from TVA's claim and then dividing the remaining actual costs into their fixed and variable components. Tr. 1890:9-15 (Brewer); 1862:6-21 (Brewer). These components, along with projections of TVA's

future discharges, may be used to show that, at most, TVA incurred between 12.1 and 18.2 million dollars in costs, depending upon the acceptance rate and the projections used, to build its dry storage facility earlier than it would have in the but for world. Tr. 2283:15-2286:3 (Hartman).

## ARGUMENT

### I. TVA BEARS THE BURDEN OF PROVING EVERY ELEMENT OF ITS DAMAGES CLAIMS, INCLUDING LIABILITY, CAUSATION, AND RESULTANT DAMAGE

#### A. TVA Bears The Burden Of Proving All Elements Of Its Damages, Including The Fact Of Damage, By Preponderant Evidence

As the United States Court of Appeals for the Federal Circuit has recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563, at *5 (Fed. Cir. Sept. 9, 2005), and it must prove these elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, TVA bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

#### B. TVA Cannot Establish Causation Or Resultant Damage Through Speculation

In analyzing whether TVA has met its burden of proof, this Court is guided by the well-

established rule that damages claims must be certain and not speculative to warrant a remedy. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); see also Standard Havens Prods., Inc. v. Gencor Indus., Inc., 953 F.2d 1360, 1375 (Fed. Cir. 1992). The principles disallowing the award of speculative damages are "especially true in suits against the United States for the recovery of common-law damages." Northern Helex Co. v. United States, 207 Ct. Cl. 862, 886, 524 F.2d 707, 720 (1975); accord Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1020 (Fed. Cir. 1996), cert. denied, 520 U.S. 1116 (1997) (quoting Northern Helex).

TVA bears the burden of establishing that its claimed damages are not speculative, remote, or unforeseeable. Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). It further bears the burden of establishing reasonable certainty as to each item within its damages claims. Wells Fargo Bank, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). In this case, TVA has failed to carry these burdens. Thus, TVA is not entitled to a damages award.

## II. TVA HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT ITS COSTS WERE CAUSED BY THE GOVERNMENT'S DELAY

### A. TVA's Basic Claims Regarding Causation and Rate Have No Basis in the Standard Contract

To meet its burden with respect to causation, TVA must show that it would not have been required to build dry storage in the "but for" world – that is, the world in which DOE timely accepted SNF in accordance with its contract obligations. See Indiana Michigan, 2005 WL 2173563, at *5. Whether TVA would have required dry storage in the "but for" world depends

upon two factors: the date at which the Government was required to begin accepting SNF and the rate at which (and schedule upon which) DOE was obligated to continue accepting SNF. Based upon the Federal Circuit's decision in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), DOE was obligated to start accepting SNF from the industry by January 31, 1998, and there is no dispute that, under the "oldest fuel first" ("OFF") scheduling requirement in the Standard Contract, TVA's first acceptance allocation was in 2002. In fact, this Court has already resolved the acceptance rate, as well as TVA's allocations within that rate, for the first 10 years of SNF acceptance. TVA v. United States, 60 Fed. Cl. 665, 673 (2004). The critical dispute in this case is the rate that DOE was obligated to follow after the first ten years of SNF acceptance.

The Standard Contract does not obligate DOE to accept SNF at any particular rate. Tr. 66:18-22 (Hayslett); 1568:19-1569:3 (Kouts). The administrative record of the rulemaking process, through which the terms of the Standard Contract were developed, makes this fact absolutely clear. During the rulemaking process, many utilities and industry organizations, including TVA, asked DOE to add a provision to the Standard Contract that would obligate DOE to accept SNF at a rate that satisfied certain requirements. Tr. 2194:23-2195:10 (Morgan); 2206:22-2209:4 (Morgan); Tr. 64:12-65:1 (Hayslett); PX 1; DX 5. DOE specifically and intentionally declined the utilities' requests, finding that there were too many unknowns about DOE's capabilities in 1998 to create such commitments:

> The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from NRC, what would be the characterization requirements of a repository, and that there was the potential interventions by some stakeholders.

> But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I would agree to an acceptance rate with all these unknowns. I felt that would be just absolutely inappropriate.

Tr. 2198:15-2199:3 (Morgan); see Tr. 2209:5-20, 2212:15-19 (Morgan). "It would be unconscionable," Mr. Morgan explained, for him "as a program director to make commitments that held the government responsible for things that I was not sure that we could meet because of the uncertainties of the program . . . ." Tr. 2212:21-25 (Morgan). To include firm minimum acceptance obligations in the Standard Contract, DOE "would have had to have all the information down [regarding] the repository to make sure it was an acceptable location for spent fuel, [it would] need a crystal ball." Tr. 2221:5-17 (Morgan). TVA internally acknowledged soon after the Standard Contract terms were published that its request to include a minimum rate obligation was rejected. DX 28 at 3; Tr. 122:10-123:4 (Hayslett). Accordingly, there is no basis for TVA's request that this Court impose an obligation upon DOE that would have required DOE to accept SNF at any particular rate, let alone a rate greater than the annual generation rate, given that DOE specifically declined to agree to any such obligation when it executed the Standard Contract and that no such language appears in the Standard Contract.

However, the Court need not decide whether DOE created an obligation to satisfy TVA's purported acceptance requirement because, even assuming that it did, TVA would have been required to construct dry storage regardless of any delay by DOE. As the evidence at trial showed, DOE determined that its 900 MTU rate was "theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998." DX 78; Tr. 1662:8-1664:9 (Pollog). Further, an acceptance rate of 2100 MTU per year in the aggregate is "sufficient to keep

up with the discharge rate of utilities and begin to work off the backlog at the utilities," in the aggregate. Tr. 1655:11-1656:15 (Pollog). Either of these rates would be sufficient to satisfy the minimum rate obligation that TVA, in varying language during the course of these proceedings, has alleged that DOE should be obligated to satisfy. Yet, as will be discussed below, neither of these acceptance rates, nor the higher rate modeled by the Government, had DOE satisfied them, would have precluded TVA's need to build dry storage in the "but for" world.

Accordingly, to establish that it would not have to had to build dry storage in the "but for" world, TVA has concocted an acceptance rate that is wholly unsupported by any planning document that DOE has ever issued, much less by the terms of the Standard Contract. Specifically, although TVA admits that DOE was only obligated to accept SNF during the first 10 years of SNF acceptance at a rate of 900 MTUs annually, it claims that DOE was obligated immediately to increase that rate, or "would have" immediately increased that rate, to 3000 MTUs in Year 11, or in 2008.[1] TVA's theory is completely inconsistent with the 900 MTU rate that the Court has already adopted for the first 10 years of program SNF acceptance set forth in the 1991 Annual Capacity Report ("ACR"). TVA v. United States, 60 Fed. Cl. 665, 669, 673 (2004). The SNF acceptance schedule identified in the 1991 ACR was developed with the understanding that SNF acceptance would continue at a rate of 900 MTUs a year beyond 2007 and through at least 2010.

As the Government established at trial, DOE's planning proceeded through three broad phases. When the Nuclear Waste Policy Act was passed in 1982, "[t]here was no authorization for MRS. There was only direction to the Department to develop a proposal . . . . At that time,

[1] We will refer to this rate as the "TVA 3000 rate."

when the act was passed, only geologic repositories were authorized," Tr. 1397:12-1398:6 (Kouts); see Tr. 1411:2-10 (Kouts); 1421:15-19 (Kouts), even though an MRS was contemplated. 42 U.S.C. § 10161 (1983).

In 1987, DOE submitted a proposal to Congress seeking authorization for DOE to begin accepting fuel in 1998 at an MRS with a 15,000 MTU capacity (at an annual rate of 1200 MTUs) and delaying the start of repository operations until 2003. DX 48 at 312; DX 51 at HQ5810; Tr. 1425:1-1426:5 (Kouts); 1431:24-1432:12 (Kouts); 1437:16-1438:5 (Kouts); 1591:5-8 (Kouts); see DX 50. Under this proposal, the acceptance rates at which DOE could accept SNF before a repository was operational "were totally dependent on what [DOE] could do at an MRS facility." Tr. 1427:11-22 (Kouts). At that time, DOE also warned that "the waste acceptance schedule may still need to be revised if the repository does not begin operations by 2003." DX 51 at HQ5866. Tr. 1438:11-1439:9 (Kouts).

Congress acted upon DOE's proposal by expanding the authorizations for an MRS from the original NWPA language, but placing restrictions upon the operation and capacity of the MRS. Tr. 1442:11-13 (Kouts). Specifically, Congress mandated that the MRS "could not receive more than 10,000 tons until the repository was operational and no more than 15,000 tons overall while the repository was in operation," Tr. 1450:8-12 (Kouts), limiting even further the rate at which waste could be accepted. Tr. 1450:13-22 (Kouts); see 42 U.S.C. § 10168(d)(3); Tr. 1-58:15-1059:5 (Hutson). Subsequently, DOE reassessed the program, determining that the repository would not open until 2010. DX 292 at III; Tr. 1055:5-1056:8 (Hutson); 1450:23-16 (Kouts); 1453:7-1454:3 (Kouts); 1591:9-15 (Kouts). DOE also determined that it "probably couldn't build the entire facility that [it] had in [its] proposal in 1987 by 1998, but [it] could build

a smaller facility that could just receive materials and store them, and then the larger facility, the integrated facility would come later . . . ." Tr. 1454:7-14 (Kouts). Under this plan, DOE would accept 400 MTU in each of the first two years of operation (1998 and 1999) and 900 MTU per year for the next ten years (2000 through 2010), so as not to exceed the new 10,000 MTU limit upon acceptance prior to repository operations. DX 292 at A-1; Tr. 1460:2-25 (Kouts); 1462:12-19 (Kouts); 1608:9-1609:4 (Pollog); 1612:15-23 (Pollog). DOE projected that, after the commencement of repository operations in 2010, the rate could ramp up to 1800 for five years, after which time it would reach a steady state of 3000 MTU per year. DX 292 at A-1; Tr. 1461:1-1462:11 (Kouts).

It was this MRS scenario, and this nearly identical rate, that DOE identified in the December 1991 ACR. DX 76; Tr. 1481:8-22 (Kouts).[2] That document explicitly explains that "[t]he projected waste acceptance rates for SNF presented in table 2.1 assume: A site for a monitored retrievable storage (MRS) facility will be obtained, and the facility will initiate operations in 1998." DX 76 at HQ2360; Tr. 1479:13-22 (Kouts); see Tr. 1609:5-1610:8 (Pollog). It further indicates that, "[d]uring the first 10 years following projected commencement of Federal Waste Management System (FWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU. This is consistent with the annual capacity licensing conditions imposed on an MRS facility by the NWPA." DX 76 at HQ2360; Tr. 1480:12-23 (Kouts). The rationale behind the 1991 ACR is corroborated by contemporaneous internal DOE memoranda. PX 78; Tr. 1611:19-1612:5 (Pollog).

---

[2] During the second year of operation the rate in the ACR is 600 MTU rather than 400 MTU, but the rates are otherwise the same.

This same scenario and the same rates were also carried over into the Annual Capacity Report and Acceptance Priority Ranking ("ACR/APR") dated March 1995. PX 19; Tr. 1489:22-1490-8 (Kouts); 1620:15-1621:13 (Pollog); 1060:19-22 (Hutson). This report was originally to be issued in 1993, and "[t]he information from the 1993 ACR/APR is combined in this report." PX 19 at 2; see Tr. 1486:10-1487:20 (Kouts); 1619:19-1620:14 (Pollog); 1729:10-25 (Zabransky). During that time period, "the Department was still banking on the fact that the negotiator was going to be successful in trying to identify a host state, and a benefits agreement would be submitted to the Congress through which the linkages could be broken and the Department could initiate development of the facility." Tr. 1488:5-11 (Kouts); 1489:10-18 (Kouts); see 1741:15-17 (Zabransky). Thus, like the 1991 ACR, the rates reflected in the 1995 ACR/APR are "still holding to the deployment of an MRS, . . . substantially in advance of a repository. . . ," Tr. 1488:21-1489:1 (Kouts), explicitly stating that "[t]he projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such storage facility prior to repository operations." PX 19 as 3-4; see also Tr. 1621:14-1622:11 (Pollog); 1730:14-21 (Zabransky); 1306:1-3 (Klein counterdesignation); 1342:4-14 (Milner counterdesignation).

Only in September 1995 did the program's planning start to shift back to a repository-only system, anticipating first SNF acceptance in 2010. Tr. 1308:22-1309:4 (Klein counter-designation); 1731:22-1732:7 (Zabransky); 1743:13-25 (Zabransky). This transition can be seen in the Analysis of the Total Systems Life Cycle Cost of the Civilian Radioactive Waste Management Program dated September 1995. PX 20 at PA-176210; Tr. 1732:8-1733:23 (Zabransky); 1491:2-14 (Kouts); 1491:24-1492:4 (Kouts). Moreover, the cost estimates for the program no longer contained an interim storage facility in advance of the repository, and the rate

reflected the fact that acceptance would begin at a repository allowing a ramp up to 3000 by 2014, Tr. 1492:5-1493:1 (Kouts), as "the repository rates were unconstrained" by the 10,000 MTU limit. Tr.1592:1-1593:10 (Kouts); see Tr. 1733:9-1734:19 (Zabransky). This shift from acceptance at an MRS to acceptance at a repository continued to be reflected in later program documents. See e.g. PX 25; PX 29: PX 32; PX 36; Tr. 1494:19-1505:10 (Kouts).

Even with a repository, however, DOE "realized it couldn't go from zero to the maximum amount in one year." Tr. 1362:3-7 (Pollog counterdesignation). "It was envisioned that, from an engineering perspective, you would not want to try to operate at maximum capacity on day one." Tr. 1403:5-8 (Kouts). "[W]hen you're starting a new nuclear facility, you like to walk before – actually crawl before you can walk and then before you can run, so you want to start with small steps, small capabilities, especially since these operations were first of a kind in terms of emplacing these materials into a repository." Tr. 1437:6-12 (Kouts); 1362:7-12 (Pollog counterdesignation). For this reason, DOE has never published a rate at which a repository started accepting fuel at 3000 MTU on the first day of operation. Tr. 1594:1-8 (Kouts).

Similarly, throughout the entire time that DOE has been examining how to accept SNF, DOE has never considered accepting 3000 MTU of fuel in the Year 11 of acceptance at an MRS. Tr. 1593:16-1594:9 (Kouts). As Mr. Kouts explained, such acceptance would not be possible because "you would still be operating under the constraint, you'd be waiting for the repository to open, and you would bust the cap, if you will, on the 10,000 metric ton storage limit that Congress had placed on the facility." Tr. 1593:21-25 (Kouts). Viewed in this context, TVA's assertion that, after DOE accepted SNF at the 1991 ACR rate of 400, 600, and 900 MTUs for a ten-year

period, DOE would immediately have begun accepting 3,000 MTUs at the MRS in Year 11 is simply unsupported by any program planning documents or contract requirements.

### B. TVA's Basic Claims Regarding Causation and Rate Are Inconsistent With Its Own Documents

TVA's broad claim that it was required to build ISFSIs at its Browns Ferry and Sequoyah sites because of the Government's delay in accepting its SNF and its specific claim regarding the rate at which DOE would have accepted SNF are both directly contradicted by TVA's own prior statements. Even before entering into the Standard Contract, TVA anticipated that it would need additional SNF storage concurrent with DOE's acceptance of SNF if no rate was inserted into the final contract. For instance, in an internal memorandum dated March 2, 1983, TVA stated that

> Both the Browns Ferry and Sequoyah Nuclear Plants and probably the Watts Bar Nuclear Plant will have utilized all presently available spent fuel pool storage capacity before 1998. Also as mentioned previously, DOE's draft contract commitment is merely to start accepting SNF and HLW no later than January 31, 1998. There are no stipulations as to rate of acceptance in the draft, and there may not be any in the final contract which is offered for execution. For these reasons we plan to continue our interim onsite spent fuel storage project activities.

DX 20 at 4. TVA has repeatedly acknowledged that the Standard Contract did not provide a specific rate of acceptance, and, thus, TVA's concerns in this regard were never alleviated. DX 28 at 3; Tr. 66:18-22 (Hayslett); 125:14-25 (Hayslett); 127:12-16 (Hayslett); 136:5-6 (Hayslett); 779:13-21 (Bailey).

By 1984, TVA had actually started to quantify the likelihood that it would need additional storage concurrent with DOE's acceptance of its SNF. Specifically, it determined that, "[i]f one were 100 percent certain that DOE would meet our needs by 1998, there is about a 50-percent

chance that we might get by without doing anything." DX 141 at 9. Moreover, TVA indicated that it could still face this need even if it took interim measures which increased its storage capacity substantially. Id. However, TVA's interim measures never increased its storage to that extent, leaving a significant probability that it would need additional storage, by TVA's own measure. Tr. 1947:16-1949:16 (Brewer).

TVA's concern that it would need additional storage in conjunction with DOE acceptance continued to be reflected in its documents in 1989. At that time, TVA not only anticipated that it would require additional storage by 1999, even while taking interim measures such as reracking, but it expressed a preference for onsite storage over DOE acceptance, recognizing the risk posed to its plant should DOE acceptance start and then stall. DX 62 at 3-5.

The same concern is seen in an internal TVA memorandum drafted at the end of 1996. That memorandum indicated that TVA understood DOE to be "under court order to begin accepting spent fuel by January 31, 1998." DX 92 at 1. Under those circumstances, TVA still believed that "a limited quantity of on-site dry cask storage may be needed to store spent fuel generated after the fuel pools are full and until TVA's disposal allocation matches spent fuel generation." Id.

Finally, even after it began litigating this case, TVA's response to an interrogatory regarding rate implicitly indicated that it would have required dry cask storage even had DOE started accepting SNF in 1998. Specifically, TVA stated that, prior to DOE's breach, TVA had estimated that DOE would take possession of SNF from TVA based upon the 1990 PETSC and the 1995 ACR/APR. DX 176 at 9a; Tr. 1004:9-19 (Hutson). The documents to which TVA referred both show the same rate for the first ten years that the Court has found applicable here,

with the exception of the second year, where the 1990 PETSC shows acceptance of 400 MTU for a second year rather than jumping to 600 MTU. Compare PX 19 at 4 with DX 292 at A-1. For Years 11 and 12, the ACR/APR implies, and the PETSC explicitly states, that acceptance will continue at 900 MTU. PX 19 at 3-4; DX 292 at A-1. The PETSC then reflects that DOE would accept SNF at the rate of 1800 MTU annually for the next five years (Years 13 through 17), and only reach a rate of 3000 MTU annually thereafter. DX 292 at A-1. As TVA's own analyses now show, had DOE accepted its SNF at this rate, TVA would have required additional storage. Tr. 169:11-171:2 (Hayslett).

Like TVA's broad statements about causation, TVA's statements about rate at trial are explicitly contradicted by TVA's interrogatory response. Compare DX 176 at 9a with Pl.'s Pre-Trial Br. at 6-13. TVA's arguments on causation generally, as well as the rate at which DOE would have accepted SNF in the "but for" world should be rejected upon this basis alone. See Cucuras v. Secretary of HHS, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("oral testimony in conflict with contemporaneous documentary evidence deserves little weight."); Hybritech Incorporated v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir. 1986) ("if documents or objective evidence contradict the witness's story, clear error may be found even in a finding purportedly based on a credibility determination."); Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 413 (2001) (finding "testimony . . . incredible . . . particularly because it is inconsistent with the available contemporaneous documentation . . . ."); Bennett v. United States, 200 Ct.Cl. 635 (1973) (conclusions directly contradicted by earlier documents "are of little value.").

Moreover, to the extent that the documents at issue are interrogatory responses, their import is even greater. "As a rule, '[a]dmissions in the pleadings. . . are in the nature of judicial

admissions binding upon the parties, unless withdrawn or amended.'" Missouri Housing Development Commission v. Brice, 919 F.2d 1306, 1314 (8th Cir. 1990); see Calhoun v. United States, 591 F.2d 1243, 1246 (9th Cir. 1978) ("the Government is bound by the lower figure for 1961 unexplained bank deposits, which lower figure is in its answers to interrogatories."); Margo v. Weiss, 213 F.3d 55, 60-61 (2nd Cir. 2000) ("the plaintiffs cannot defeat a motion for summary judgment with. . . supplemental answers to interrogatories."). As TVA has made no effort to amend its response, it should be bound by that response.

Finally, to the extent that TVA's earlier statements can be viewed as interpreting the contract, these interpretations should be given more weight than TVA's interpretation at trial. "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983).

### C. TVA Has Failed To Meet Its Burden With Respect To Its Alternative Argument That It Could Have Bridged Its Storage Gap Absent Dry Storage

TVA argued, in the alternative, that even if the Government had accepted SNF at the rates provided by the Government, TVA would have bridged its storage gap by some mechanism other than going dry. Specifically, TVA contended that it would have met its storage needs, either through the use of exchanges, by asking DOE to accept 20 percent more fuel each year, asking DOE to accept fuel on an emergency basis pursuant to the Standard Contract, or by transhipment to Watts Bar, Private Fuel Storage, or another utility. As we showed at trial, and will explain below, not only could TVA not bridge the gap at any rate below the specific one that TVA proposes, it could not bridge the gap that would have existed even at its own proposed rate.

After TVA rested its case, the Government demonstrated that TVA would have experienced a storage gap even at the rate it proposes. Although Mr. Holton prepared an analysis that purported to show how, assuming TVA's rate, TVA would have distributed its allocations among its reactor units in an effort to avoid dry storage, DX 311; Tr. 1211:14-1213:23 (Holton), as Mr. Holton explained, TVA's analysis "didn't look at it on that much of a fine mesh grid. . . ." Tr. 1233:6-11 (Holton). Rather, as the Government showed at trial, TVA's analysis improperly assumes that an allocation in a particular year resolves a storage need in that year, even though the storage need could arise early in the year, but DOE might not pick up until December 31. See Tr. 1234:9-12 (Holton); 1151:23-1153:16 (Hutson). If this erroneous assumption is corrected, TVA's analysis actually shows that it would have required additional storage during portions of many years, even at the rate that it advocates.

As Mr. Holton testified, under TVA's own analysis, TVA would have only had 46 spaces in its Sequoyah pool at the beginning of 2015, but would have generated an additional 162 fuel assemblies that it needed to store. Tr. 1231:22-1232:24 (Holton). In 2016, TVA would begin with 14 available cells, but would have discharged 80 SNF assemblies. Tr. 1238:20-1239:4 (Holton). In 2017, TVA would have started the year with 19 spaces in its pool and would have discharged 80 assemblies. Tr. 1239:1239:10-15 (Holton). In 2018, TVA would have started the year with 44 spaces in its pool and would have discharged 162 assemblies. Tr. 1240:22-1241:8 (Holton). Similarly, at Browns Ferry Units 1 and 2, TVA would have started in 2013 with 285 cells but would have generated 368 assemblies and would have continued running a storage deficit for portions of each year through 2020. Tr. 1241:9-23 (Holton). Likewise, at Browns

Ferry Unit 3, in 2016, TVA would have started the year with 151 spaces available and would have generated 328 SNF assemblies. Tr. 1242:3-8 (Holton).

Confronted with these storage gaps, Mr. Holton, on the witness stand, invoked two new methods by which TVA could allegedly bridge the gaps, in addition to those methods previously discussed. Specifically, he claimed that TVA could meet its storage needs (1) by use of a cask pit rack or (2) by encroaching upon its full core reserve. Tr. 1233:13-17; 1237:14-19 (Holton). As set forth below, the evidence does not support any of TVA's claims that it could have resolved its storage needs through any mechanism, either those mentioned in its opening argument or those identified post hoc on the witness stand.

1. Exchanges

TVA cannot claim that it would have bridged its storage gap through the use of exchanges, first, because, during discovery, TVA repeatedly advised the Government that it was not pursuing an exchange theory. In response to the Government's interrogatory asking TVA to "[d]escribe in detail the schedule of SNF and HLW acceptance which you contend the Court should adopt, or to which you contend that the Court should refer, for purposes of assessing damages in this case as applied to you making sure to . . . identify any exchanges of acceptance slots assumed under each schedule or scenario. . . ," TVA stated that "TVA has not assumed any exchanges of acceptance slots." DX 176 at 2-2a; DX 312. Likewise, when asked "[d]o you intend to rely upon exchanges . . . to support your contentions regarding the overall order of priority ranking for the initial allocation of SNF and/or HLW acceptance positions among the various Standard Contract holders," TVA responded that it did not so intend. DX 312 at 61; see Tr. 1143:18-1144:1 (Shea). TVA also admitted that it had "not entered into any agreement with any other contract holder to

exchange a DOE-approved DCS," nor had it even had "discussions or other communications . . . with other Standard Contract holders regarding the exchange of SNF acceptance slots and/or approved delivery commitment schedules." DX 312 at 29; see Tr. 1143:7-15 (Shea); DX 176 at 29; Tr. 186:8-12 (Hayslett). TVA also stated that it had "not submitted any exchange request to DOE for approval," nor had it even had any "discussions or other communications . . . with DOE regarding the exchange or possible exchange of SNF acceptance slots and/or approved delivery commitment schedules." DX 312 at 30; Tr. 1143:16-18 (Hutson); DX 176 at 32; Tr. at 185:14-186:1 (Hayslett). Ultimately, TVA acknowledged, both during discovery and at trial, that it had never performed any analyses or studies having to do with exchanges, including the manner in which it would have accomplished any exchange, the cost of an exchange to TVA, or the Standard Contract holders with which TVA would have exchanged DCSs. DX 176 at 30, 33; Tr. 186:13-187:7 (Hayslett); 189:4-10 (Hayslett).

Given TVA's repeated denial that it was pursuing an exchange theory during discovery, it should not be permitted to advance such a theory now. As TVA's claim at trial conflicts with these earlier documents, it "deserves little weight." See Cucuras v. Secretary of HHS, 993 F.2d 1525, 1528 (Fed. Cir. 1993). In addition, as the documents at issue are discovery responses, TVA should be bound by those responses. See Missouri Housing Development Commission, 919 F.2d at 1314.

Moreover, TVA cannot prevail upon this theory because it is entirely speculative. "[C]ontract law precludes recovery for speculative damages." San Carlos Irrig., 111 F.3d at 1563 (citing Roseburg Lumber, 978 F.2d at 667 (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931)). The right to recovery should not be confused with

concerns regarding the difficulty in ascertaining the amount of damages once the right is established. Story Parchment, 188 U.S. at 562-63. While the quantum of damages may be an approximation, the fact of damage must be shown with certainty. Id.

Here, TVA has utterly failed to show that it has incurred damage because it would have engaged in exchanges. As Dr. Hartman, the Government's economics expert, testified, the creation of an exchange market would be highly speculative and would require the analysis of distinct characteristics, which TVA has failed to do here. Tr. at 2408:14-18 (Hartman); 2407:21-2408:25 (Hartman); 2409:25-2410:9 (Hartman); 2412:3-10 (Hartman); 1302:2-1303:6 (Barrett counterdesignation); 2409:6-14 (Hartman); 2410:11-13 (Hartman).

DOE personnel also identified factors that make exchanges uncertain. Mr. Zabransky testified that he believed exchanges might occur in a mature situation, i.e., when "its gone on for years, maybe 5, 10, 15," and it has become routine. Tr. 1379:17-1380:20 (Zabransky counterdesignation). Tr. 1752:2-11 (Zabransky). However, he indicated that he did not believe it would happen before then, because of the uncertainties surrounding it. Tr. 1379:17-1380:20 (Zabransky counterdesignation); 1752:12-25 (Zabransky); 1355:16-1356:15 (Zabransky counterdesignation).

Moreover, even if trading became established, there are reasons that utilities might choose not to participate. As Mr. Zabransky noted, a utility might not pursue an exchange because of political reasons or the costs of the exchange. Tr. 1377:23-1378:19 (Zabransky counterdesignation); 1378:24-1379:14 (Zabransky counterdesignation); 1754:8-11 (Zabransky).

Exchange requests would have to be approved by DOE, which would approve or disapprove those requests "in its sole discretion." 10 C.F.R. § 961.11, Art. V.E; Tr. 1372:19 (Zabransky counterdesignation). While it is not now known precisely what criteria would be used by DOE to evaluate such a request, as no request has ever been submitted, see Tr. 1370:13-1371:2 (Zabransky counterdesignation), DOE personnel reviewed a number of issues that would necessarily be of concern to DOE. Tr. 1352:25-1354:10 (Milner counterdesignation); 1373:10-1375:1 (Zabransky counterdesignation). Moreover, DOE indicated that it would only approve exchanges that it could reasonably accommodate and that did not adversely affect other utilities. Tr. 1375:4-1376:4 (Zabransky counterdesignation).

Accordingly, it is far from clear that exchanges would ever proceed, that TVA would have chosen to pursue them, that TVA would have found like-minded utilities with which to exchange in the precise amounts that TVA needed to exchange, or that TVA's proposed exchanges would have been approved. Indeed, even Mr. Holton acknowledged that he did not know for certain that TVA would be able to trade allocations with another utility. Tr. 1238:10-16 (Holton).[3] Further, TVA has not taken any steps whatsoever toward modeling exchanges, or the costs thereof. Compare Yankee Atomic Electric Co. v. United States, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004) with Tr.189:4-10 (Hayslett); see Bluebonnet Sav. Bank F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) ("[t]o derive the proper amount for the damages award the

---

[3] Further, TVA could exchange only "approved delivery commitment schedules," 10 C.F.R. § 961.11, Art. V.E, further reducing the pool of potential exchange partners. Given that the ACR announcing allocations to which DOE could commit itself only extends ten years, id., Art. IV.B.5, the ability to find appropriate exchanges is even more difficult.

costs resulting from the breach must be reduced by the costs, if any that the plaintiffs would have experienced absent a breach.").

2. The "Plus or Minus 20 Percent" Contract Provision

TVA's claims that it would have avoided dry storage through the use of the "plus or minus 20 percent" provision of the Standard Contract suffers from some of the same deficiencies. First, a request under the "plus or minus 20 percent" provision would be subject to DOE's approval when the utility submitted its Final Delivery Schedule. Tr. 1381:3-1382:21 (Zabransky counterdesignation); 1510:8-23 (Kouts); 1713:14-1714:25 (Zabransky); 1235:8-16 (Holton); 1236:7-11 (Holton). In reviewing such a request, DOE "would have to look to see whether or not it could adjust other purchasers downward in order to meet this increase in request, and that's essentially because the facilities only have so much capacity, and they can only operate at a certain level." Tr. 1511:5-13 (Kouts); 1513:6-11 (Kouts). In fact, in the 1987 ACR, DOE explicitly stated that "[t]he acceptance capacity available for allocation to the purchaser will equal the system operating capacity, unless part of that operating capacity is used to accommodate contingencies, e.g., emergencies, the contract's 20 percent adjustment provision and cask loading considerations." DX 50 at 2717. As Mr. Kouts explained, this was "more or less, informing the world that if someone comes in for a 20 percent adjustment, that it's going to have to come out of somebody else's hide . . . ." Tr. 1515:7-11 (Kouts); see also 1706:10-1708:4 (Zabransky). Moreover, "[t]he Department's position is consistent. It has not changed since this point." Tr. 1515:15-16; 1708:5-7 (Zabransky). Acknowledging these circumstances, during the ACR resolution process, the industry determined that utilities "all wouldn't [seek to increase their allocation by 20 percent] because if anyone did, it obviously, with a finite system, it would have to

come out of somebody else's quantity. . . ." Tr. 1705:11-14 (Zabransky); see Tr. 1708:8-1711:21 (Zabransky); DX 65 at NEI 702.

3. Emergency Acceptance

The emergency provision would likewise require DOE approval. 10 C.F.R. § 961.11, Art. V.D. As Mr. Morgan stated, "of course, we'd have to approve acceptance of fuel. They couldn't just bring it to the door." Tr. 2244:5-6 (Morgan). In addition, the scope of circumstances that would likely be considered emergencies is narrow. As Mr. Zabransky testified, during the ACR issue resolution process, the industry concluded that "the emergency deliveries clause in the contract should be reserved for . . . emergencies, and as we defined emergencies, they were truly issues of public health and safety only." Tr. 2446:24-2447:3 (Zabransky); DX 235. Such emergencies did not include encroachment upon a utility's full core reserve. "It was an economic issue, it was a planning issue, but it wasn't an emergency." Tr. 2447:12-14 (Zabransky). "[I]f someone didn't plan ahead and didn't add reracks or didn't do what was ever necessary to add more storage, those who did didn't want that utility calling up and saying, but we had a line. They shouldn't be rewarded for their poor planning." Tr. 2455:4-16 (Zabransky).

The position espoused by the industry has remained consistent over time. Tr. 2453:17-2455:1 (Zabransky). Moreover, as Mr. Zabransky testified, in his current capacity as the contracting officer for DOE, his view of the emergency provision has remained the same: "that it should be used when there's truly a health and safety emergency that might affect the public, and that's the view I've had for 15 or more years." Tr. 2455:20-2456:6 (Zabransky).

4. Transhipment

TVA's claim that it would have bridged the gap through the use of transhipment was also

flatly contradicted by the evidence at trial. TVA's SNF assessment team originally considered the option of transhipping fuel between the Sequoyah and Watts Bar sites. Tr. 1288:8-11 (Green). However, the team's report, as well the testimony given by Mr. Green, the team leader, and Mr. Bailey, the site vice president of engineering and technical services, indicate that transhipment was flatly rejected by management for a variety of reasons that would have also been concerns in the "but for" world. DX 120 at 7, 11, Figure III-2, Figure III-3; Tr. 794:15-796:3 (Bailey); 1289:9-11 (Green); see 1097:25-1098:18 (Hutson). TVA determined that it would be very costly to tranship its fuel – in the range of "10 million or more." Tr. 793:15-22 (Bailey); see Tr. 1288:15-17 (Green); DX 120 at 37. In addition, it concluded that it was undesirable because it would fill up the Watts Bar pool more quickly, potentially driving Watts Bar to dry storage. Tr. 1288:18-22 (Green). TVA also decided against transhipment because of the difficulty of obtaining approval to transport the fuel. Tr. 1288:23-1289:1 (Green); 793:22-794:10 (Bailey). TVA determined that it would require approval from both the NRC and the State of Tennessee to ship fuel and concluded that it would be very difficult to obtain those approvals. Tr. 1288:23-1289:8 (Green). As Mr. Bailey testified at trial, "you can see that by the public opposition to Yucca Mountain. . . . I mean it would have been . . . a public battle it would have had to fight if we were trying to do that option." Tr. 794:10-14 (Bailey).

No evidence was adduced at trial as to why this analysis would change in the "but for" world. In fact, Mr. Bailey, the highest ranking management official to testify at trial, explicitly stated that TVA's decision on transhipment would not have been any different had DOE started to pick up fuel in 1998. Tr. 799:1-5 (Bailey). Moreover, Mr. Hayslett, the key proponent of transhipment, admitted that he had not performed any analysis of transhipment whatsoever,

including any analysis of the issues that originally led TVA to reject the option -- cost, licensing, and political fall-out. Tr. at 198:25-200:17 (Hayslett). Thus, TVA's bald assertion that it would have changed its position on transhipment had DOE started accepting SNF should be rejected.

Moreover, as with its exchanges argument, TVA's claim that it was damaged because it would have used transhipment in the "but for" world is too speculative. See San Carlos Irrig., 111 F.3d at 1563. TVA has not demonstrated that it would have been permitted to tranship or presented any model as to how it would have met its needs with transhipment. In addition, TVA has not performed any analysis of the cost it would have incurred to tranship, since abandoning this idea after making preliminary estimates. See 778:19-779:2. Without a known cost for this approach, TVA can not demonstrate that it was damaged or the extent of that damage.

5. Private Fuel Storage

TVA has also failed to meet its burden with respect to its argument that it would have bridged its storage gap through use of Private Fuel Storage ("PFS") or a similar arrangement. The Spent Fuel Assessment Team originally considered PFS under the umbrella of transhipment, which TVA chose to forego for all of the reasons set forth above. See DX 120 at 6, 7, 11. With regard to PFS specifically, however, Mr. Bailey testified that TVA is neither a member of the PFS consortium, nor had it investigated the availability of space at any private fuel storage facility. Tr. 796:10-17 (Bailey). Mr. Bailey acknowledged that TVA would have to pay PFS to store its fuel. Tr. 796:18-21 (Bailey). He also indicated that these costs would include both the cost of shipment and casks. Tr. 797:14-24 (Bailey). However, Mr. Bailey indicated that he had no idea what the costs would be and that no one at TVA had compared the cost of PFS to the cost of dry storage. Tr. 797:4-13 (Bailey). Most importantly, Mr. Bailey noted that there is no PFS yet. Tr. 796:21-

797:3 (Bailey). He indicated that he did not know whether PFS would have existed in the "but for" world, but noted that the demand would have been pretty low if DOE were accepting SNF. Tr. 797:25-798:25 (Bailey).

Mr. Hayslett, himself, admitted that he had not performed any specific analysis of whether TVA would have been able to use PFS in the "but for" world, Tr. 189:21-24 (Hayslett), and had not identified any other specific facilities that have licenses to accept TVA's fuel. Tr. 191:20-24 (Hayslett). He had not performed any analysis of PFS or of other utilities accepting TVA's SNF, including any economic analysis. Tr. 189:21-24; 190:22-191:6 (Hayslett). Nor had he considered the associated licensing issues, such as whether TVA could have obtained a license to ship SNF to PFS or to another utility. Tr. 191:10-19 (Hayslett). Moreover, he had not even looked at the cost that would be associated with using PFS. Tr. 191:7-9 (Hayslett).

As TVA cannot show that either PFS or any similar enterprise was in existence at the time it needed dry storage, TVA's argument on this point is beyond speculative. As Mr. Bailey acknowledged, it is even less likely that such an enterprise would have come about with the significantly smaller demand for it that would have existed had DOE begun accepting SNF in 1998. Tr. 797:25-798:7 (Bailey). Moreover, as Mr. Bailey also acknowledged that the cost associated with storing fuel at PFS would include both transportation costs, which TVA had previously found prohibitive, and cask costs. Tr. 797:14-24 (Bailey). As TVA has not quantified these costs, it cannot show that it was damaged by the Government's delay. Tr. 191:7-9 (Hayslett); 797:4-13 (Bailey).

6. Cask Pit Rack

With regard to employing a cask pit rack, Mr. Bailey and the Government's technical

expert, Mr. Brewer, each identified several concerns with this approach. First, both gentlemen noted that a cask pit rack poses real operational problems. As Mr. Bailey stated, "[t]he problem is you can't keep fuel assemblies there forever, you can't ever load casks, so eventually, you have to have enough space to not use that cask pit rack. . . ." Tr. 770:5-8 (Bailey). Mr. Brewer further explained "it's not clear how I ever can really make use of [the rack] because, unless I have room in the reactor to put that fuel back in, I'm going to be stuck with fuel left in that cask pit rack, and while I've got fuel in that cask pit rack, I'm not transferring fuel out of the pool." Tr. 1946:18-23 (Brewer).

Likewise, Mr. Bailey and Mr. Brewer both indicated that TVA cannot use a cask pit rack while standing ready to produce tritium. Tr. 771:15-21 (Bailey); 1947:9-11 (Brewer). In fact, in conjuction with its contract to produce tritium, TVA has submitted, and the NRC has approved, an amendment to its license to remove the provision that would have allowed them to use a cask pit rack. Tr. 1945:19-1946:4 (Brewer). These circumstances would not have been different in the "but for" world, as Mr. Hayslett testified that there was no reason that TVA would not have agreed to produce tritium had DOE started accepting SNF in 1998. Tr. 181:2-9 (Hayslett). In addition, both Mr. Bailey and Mr. Brewer noted the cost of this option. Mr. Bailey acknowledged that there would be a cost to this option, agreeing that one of the reasons that TVA had originally rejected the option was the cost. Tr. 797:18-22 (Bailey). However, as Mr. Brewer stated "I don't believe we've seen any documentation about what the cost to design, procure, and install that kind of rack would be." Tr. 1947:2-6 (Brewer). Without any development of this cost, TVA cannot demonstrate whether or to what extent it was damaged by the Government's delay in

picking up its spent nuclear fuel, even if it found a way to make use of the rack, in spite of the rack's inherent difficulties and its inconsistency with the tritium program.

### 7. Operating Without Full Core Reserve

Despite his reliance upon the option of operating without full core reserve, Mr. Holton himself acknowledged that he was not the TVA employee who decides whether TVA will encroach upon full core reserve. Tr. 1244:17-22 (Holton). He also testified that TVA has loaded casks at Sequoyah to avoid encroaching upon full core reserve, and that avoiding encroachment upon full core reserve "is the general rule, and what we try to do in all cases is to maintain the full core reserve." Tr. 1233:21-1234:1 (Holton); see also Tr. 1126:16-1127:5 (Hutson). He further acknowledged that it was a risk to encroach upon full core reserve and moved away from this option at one point, stating "I think that we really would use the 20 percent in order to not have, not incur the risk." 1235:17-22 (Holton); see also Tr. 1239:22-1240:8 (Holton).

This view is supported by TVA's prior consideration of its storage options. While the spent fuel storage assessment team apparently considered whether TVA could address its storage needs by dispensing with full core reserve, it disposed of that option so quickly that it did not make it into the list of options in its reports. Tr. 1277:19-1278:3 (Green). The greatest reduction to full core reserve that was actually reflected in its reports was the reduction to one full core reserve at Sequoyah. Tr. 1275:14-1276:12 (Green); DX 105 at 5. The spent fuel assessment team did not even propose maintaining only one full core reserve at Browns Ferry. Tr. 1281:23-1282:3 (Green).

As Mr. Green testified, there is a financial risk, even with maintaining only one full core reserve. Tr. 1283:1-5 (Green). He also indicated that maintaining only one full core reserve could

be very unsafe in the case of an emergency that requires unloading the reactor. Tr. 1283:6-14 (Green). He acknowledged that multiple reactors have been shut down simultaneously at both Sequoyah and Browns Ferry. Tr. 1283:15-25 (Green). He further indicated that having no full core reserve would be an even greater risk than having one full core reserve. Tr. 1284:11-13 (Green). Given the recognized financial and safety risks it is unlikely that TVA would have pursued this option, not just for one brief period, but for unknown portions of many years in a row.

That TVA would choose to avoid the risk associated with operating without full core reserve also finds support in the testimony of Mr. Bailey. He testified that TVA is "always concerned with safety." Tr. At 791:18-20 (Bailey). TVA was concerned about maintaining "the perception that [it is] operating its plant very conservatively and excellently. . . ," and that it is "not taking shortcuts," and "not trying to eat away at what the NRC considers to be the safety margin of the plant." Tr. 787:11-788:18 (Bailey). As he explained, "the NRC always looks very closely at utilities that try to take away margin or conservatism in the way they operate or design or engineer their plants. . . ." Tr. 785:12-15 (Bailey). "[W]hen you go back to the NRC . . . where you eat away at some of your safety margin that you built into your plant, the NRC begins to have concerns about the way you're handling the overall safety at your facility. . . ." Tr. 788:19-24 (Bailey). According to Mr. Bailey, TVA "probably has those concerns on every activity we engage in." Tr. 791:24-25 (Bailey).

Mr. Green's concern with the financial risk of operating without full core reserve was also further supported by Mr. Brewer's testimony. Mr. Brewer indicated that this decision was "all about risk management." Tr. 1942:23-24 (Brewer). Specifically, he stated that operating without

full core reserve is "a potentially more risky position that [he] would take if [he] were in charge of a facility," and could lead to a shut down and having "to pay for replacement power from somewhere." Tr. 1943:9-1944:6 (Brewer). "Replacement power is expensive. . . . on the order of a million dollars a day. . . ." Tr. 1944:6-12 (Brewer). Although Mr. Brewer acknowledged that TVA is currently operating without full core reserve, he did not believe that showed that it would have made the same decision in the "but for" world to avoid building dry storage. With an ISFSI and empty storage casks Sequoyah's risk is limited because it can load fuel to the ISFSI if necessary. Tr. 1944:16-1945:14 (Brewer). In the "but for" world, however, TVA would face the risk of paying more for replacement power than to build an ISFSI.

Finally, on the most basic level, TVA's position is contrary to the manner in which it has analyzed its need for additional storage and developed its claim for such storage. In explaining TVA's claim, Mr. Hayslett himself testified that "typical industry practice is to maintain the capability to unload the core," Tr. 57:19-58:1 (Hayslett), and that TVA evaluates usable pool storage capacity by looking at the total number of cells in the racks and subtracting the number of cells required for full core reserve. Tr. 59:18-22 (Hayslett). Moreover, TVA began constructing its ISFSI based upon avoiding the loss of full core reserve and is claiming the Government should be responsible for the cost of construction at this time, not later. See Tr. 152:13-153:22 (Hayslett). For all of these reasons, Mr Holton's strategies to avoid dry cask storage, like the other strategies proffered by TVA, are simply not credible.

## III. TVA Should Be Denied Recovery Of Any Damages Because Its Damages Are Indistinguishable From Interest Which May Not Be Awarded Against the Government

As TVA has not established either that DOE would have accepted SNF at 3000 MTU

annually starting in 2008, or that it would have been able to bridge the storage gap which it would have experienced even at that rate, TVA simply has not shown that the full cost it incurred in constructing its ISFSIs was caused by the Government's delay in accepting SNF. To the contrary, it is clear that TVA would have been required to construct additional storage even had DOE begun accepting fuel in 1998, only later in time than it would have had to build storage in the actual world. Thus, at best, TVA is left with the argument that it has been injured to the extent that it was required to build those facilities earlier than it would have otherwise needed.

This type of "time value of money" claim, however, is not a type of claim that is recoverable against the Government. "In creating the Court of Claims, Congress retained the Government's immunity from awards of interest, permitting it only where expressly agreed to under contract or statute." Library of Congress v. Shaw, 478 U.S. 310, 317 (1986). "Whether the loss to be compensated by an increase in a fee award stems from an opportunity cost or from the effects of inflation, the increase is prohibited by the no-interest rule." Id. at 322. "The prohibition extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on." Castle v. United States, 48 Fed. Cl. 187, 217 (2000); see Town of Grantwood v United States, 55 Fed. Cl. 481, 488 (2003); Pacific Gas & Electric v. United States, 58 Fed. Cl. 1, 2 (2003). As the time value of money is the only harm that TVA may have suffered, its claim cannot stand, and TVA has not identified any recoverable damages in this litigation.

## IV. Alternatively, Any Award of Damages To TVA Must Be Reduced Because Of Its Failure To Properly Model Its "But For" World Costs

Even if TVA can prove causation, TVA's damages claim suffers from a failure to properly

model the "but for" world in two ways. First, TVA failed to properly account for all of its actual costs that were unnecessary or would have been incurred in the "but for" world. The Government proved this defect at trial through the testimony of its damage claim cost analysis expert, Mr. Kiraly, and some additional supporting testimony of Mr. Brewer. Their combined testimony established that TVA's damages claim should be reduced by an amount of no less than $6,135,277. Second, TVA failed to properly estimate those additional fuel loading costs that it would have incurred "but for" the Government's delay, and those additional dry storage costs that it would have incurred at a later time "but for" the Government's delay. Making these adjustments to properly account for the costs that TVA would have incurred in the "but for" world, results in a reduction of TVA's damages claim to a range of $12.13 million to $18.16 million.

A. TVA's Damages Claim Should Be Reduced By At Least $6,135,235 Relating To Actual Costs That Were Incurred Unnecessarily Or That Would Have Been Incurred In The "But For" World

At trial, the Government established, through the testimony of Mr. Kiraly and Mr. Brewer, that TVA's damages claim should be reduced by an amount of no less than $6,135,235 relating to actual costs that were not incurred as a result of the Government's delay. As a result of this reduction, TVA's net damages claim would be $29,617,277. Tr. 2032:1-8 (Kiraly); 2134:8-23 (Kiraly); DF DEM-44.

1. TVA's Damages Claim Should Be Reduced By At Least $2,974,349 Relating To Certain Non-Incremental TVA Labor and Internal Chargeback Costs

TVA's damages claim includes $4,377,033 in the cost categories of TVA Labor and Internal Chargebacks. TVA's TVA Labor costs relate to its payments to its own salaried and

hourly employees for the work performed on the dry storage projects. TVA's Internal Chargeback costs relate to costs charged against those projects by other internal divisions within TVA. As we established at trial, TVA's claimed costs in these two categories should be reduced by no less than $2,974,349, consisting of $2,799,278 in non-incremental TVA Labor and Internal Chargeback costs based upon the payment of fixed costs for salaried employees, and $175,071 in non-incremental Internal Chargeback Costs for owned equipment.

a. TVA's Damages Claim Should Be Reduced By At Least $2,799,278 Relating To Certain Non-Incremental TVA Labor and Internal Chargeback Costs

The total amount of TVA Labor costs that TVA hopes to recover is $1,401,283. At trial, we established that TVA should not recover $669,841 of its claimed TVA Labor costs relating to its payments to its salaried employees because those costs are fixed costs that are not incremental to the breach.[4] Tr. 2057:18-2064:12 (Kiraly); DX-218, Exs. 2.1, 2.1.1, 2.2 and 2.2.1; DF DEM-45.

The total amount of Internal Chargeback costs that TVA hopes to recover is $2,975,750. The Government has challenged a total of $2,304,508 of these costs. $175,071 of these challenged costs relate to charges for heavy equipment supplied to the projects by TVA's heavy equipment division ("HED"). The remaining $2,129,437 in challenged costs relate to charges for the services provided to the projects by salaried employees from three different internal TVA organizations: Nuclear Design Internal Services, Nuclear ISO, and Transmission Internal Services. At trial, we

---

[4] $6,412 of these TVA Labor costs relating to the Sequoyah facility are part of a total of $21,074 in costs contained in its damages claim relating to the upgrade of the Aux Building crane at its Sequoyah facility that TVA has stipulated to as being non-recoverable. Tr. 2060:7-18 (Kiraly); DX-218, Ex. 2.1.1.

established that TVA should not recover those costs because they are fixed and not incremental to the breach.[5]

TVA relies upon the Ninth Circuit decision in Convoy v. Sperry Rand Corp., 672 F.2d 781, 785-86 (9th Cir. 1982), as authority for the proposition that it could recover the cost of salaried employees charged to the projects because it was deprived of the services of those employees during the time reflected in those charges. Pl. PreTr. Br. at 30. To meet the Convoy standard, TVA must show that the services of the salaried employees involved were "effectively lost" to it during the time period involved in the claim. Id. Because TVA failed to show that its salaried employees spent all of their time working on the dry storage projects and were prohibited from working on other projects, it should not be allowed recovery of the claimed costs relating to these employees.

Mr. Kiraly opined that, based upon his review of six years of data relating to the Sequoyah claim, and four years of data relating to the Browns Ferry claim, the costs of only two employees at Sequoyah and three employees at Browns Ferry should be considered as incremental costs because these employees charged a majority of their time to the dry storage projects. Tr. 2064:13-2072:8 (Kiraly); 2081:14-2091:14 (Kiraly); DX-218, Exs. 2.2, 2.2.2, 2.2.3; DX-218A, Exs. 2.1 (Adj), 2.1.2 (Adj), 2.1.3 (Adj), 2.2 (Adj), 2.2.2 (Adj), 2.2.3 (Adj); DF DEM-45, -46, -47, -48, -49, -50, -51, -52, -53, and -54. This evidence clearly establishes that TVA has not met the standard set forth in Convoy that the employees working on the dry storage project were "effectively lost"

---

[5] TVA has stipulated that $3,691 of these Internal Chargeback costs relating to charges for the Nuclear ISO division at the Sequoyah facility are part of the $21,074 in Aux Building crane costs and are, thus, non-recoverable. Tr. 2052:16-2054:8 (Kiraly); DX-218, Exs. 1.3 and 4.1.2.

to TVA. Therefore, the $669,841 in claimed TVA Labor costs relating to those employees are not incremental to the breach, and should not be recovered.

Mr. Kiraly further opined that the $2,129,437 in Internal Chargeback costs relating to charges for the services provided to the projects by the TVA salaried employees from Nuclear Design Internal Services, Nuclear ISO, and Transmission Internal Services were fixed and not incremental because TVA had not provided the Government with any data to support the incremental nature of those costs. Specifically, he testified that TVA failed to provide evidence that it was required to hire any of the people included in these charges specifically for the projects, or that it was required to "backfill" any of the positions of these people because of the work that they were performing on the projects. Mr. Kiraly also testified that TVA should have provided data in support of its claimed TVA Labor costs. Tr. 2105:22-2107:3 (Kiraly); 2108:9-2109:1 (Kiraly); DX-218, Exs. 4.1 and 4.2. At trial, TVA provided no further support for these costs. Therefore, TVA's damages claim should be reduced by at least $2,129,437.

b. TVA's Damages Claim Should Be Reduced By At Least $175,071 Relating To Certain Additional Non-Incremental Internal Chargeback Costs For Owned Equipment

The Government also challenged the other $175,071 of TVA's claimed Internal Chargeback costs relating to the charges for heavy equipment supplied to the projects by HED because those charges relate to equipment that is owned, as opposed to rented. Mr. Kiraly testified that, because the equipment was owned by TVA, these costs were not incremental to the breach. Tr. 2107:8-21 (Kiraly); 2109:2-12 (Kiraly); 2111:21-2112:3 (Kiraly); DX-218, Exs. 4.1, 4.1.1, 4.2, 4.2.1; DX-218A, Exs. 4.1 (Adj), 4.1.1 (Adj), 4.2 (Adj), 4.2.1 (Adj); DF DEM-45.

Therefore, TVA should be denied recovery of this additional $175,071 in non-incremental Internal Chargeback costs.

2. TVA's Damages Claim Should Be Reduced By At Least $470,483 Relating To Certain Non-Incremental Or Unnecessary Contract Services & Procurement Costs

TVA's damages claim includes $28,632,647 in the cost category of Contract Services & Procurement. DF DEM-45. The Contract Services portion of these costs relates to TVA's purchase of services from outside vendors, while the Procurement portion relates to TVA's purchase of materials or equipment from outside vendors. Tr. 2095:3-14 (Kiraly); 2096:9-2097:20 (Kiraly). The Government has challenged a total of only $470,483 of these claimed costs. $10,970 of these relate to the $21,074 in Aux Building crane costs at the Sequoyah facility that TVA has stipulated should be removed from its damages claim. Tr. 2052:16-2054:8 (Kiraly); 2098:5-22 (Kiraly); DX-218, Exs. 1.3, 3.1 and 3.1.2. Therefore, only $459,512 are actually in dispute. $328,000 of these challenged Contract Services & Procurement costs relate to the technical studies performed at both sites. The other $131,512[6] are Core Team Overhead costs relating to TVA's Browns Ferry facility. As we established at trial, TVA is not entitled to recover these costs because they are either non-incremental to the breach or were incurred unnecessarily.

a. TVA's Damages Claim For Contract Services & Procurement Costs Should Be Reduced By $328,000

[6] Mr. Kiraly's testimony and DF DEM-45 reflect that the total of the Government's challenge to the Contract Services & Procurement category of TVA's damages claim is $470,483. However, adding the stipulated amount of $10,970 to the Government's challenges of $328,000 relating to the technical studies and the $131,512 relating to the Browns Ferry Core Team Overhead results in a total of $470,482 – a difference of $1. This $1 difference sometimes occurs at other places in the evidence and is a result of rounding the costs as stated in cents to whole dollars.

Relating To Non-Incremental Or Unnecessary Technical Studies

$328,000 of TVA's claimed Contract Services & Procurement costs relates to the technical studies performed by Holtec, the vendor of the dry cask storage system purchased by TVA, at both sites. $100,000 of this amount relates to a study performed at the Sequoyah plant of the load-bearing capability of the floor of the railroad egress bay to the Aux Building. The other $228,000 relates to ten studies performed at the Browns Ferry plant. Tr. 2098:5-22 (Kiraly); 2100:10-13 (Kiraly); DX-218, Exs. 3.1, 3.1.1, 3.2, and 3.2.2.

i. $180,000[7] In Costs Relating To The Browns Ferry Studies At Issue Is Not Recoverable

Mr. Davis, the project manager for the ISFSI project at the Sequoyah plant, testified that, at the request of TVA management, he reviewed information relating to the Holtec Browns Ferry studies at issue in this case and concluded that those studies were "not required to design, construct, and operate a dry cask storage facility at Browns Ferry and were not contracted for at Sequoyah." Tr. 425:22-430:18 (Davis); DX-270 at TVA04-28079. This testimony alone supports a conclusion that the Holtec Browns Ferry studies at issue were unnecessary to TVA's storage of spent fuel, and that, accordingly, the $180,000 in claimed costs relating to those studies is not recoverable.

TVA attempted to extricate itself from this predicament by presenting the testimony from Mr. Chapman, the Browns Ferry ISFSI project manager, that the costs of the Holtec Browns Ferry

[7] In its pretrial brief, and again at trial, TVA stipulated that $48,000 in costs relating to one of the Browns Ferry studies – an analysis of the adequacy of the existing Browns Ferry spent fuel storage racks – should be removed from the damages claim. Pl. PreTr. Br. at 25; Tr. 628:9-629:1 (Chapman); 1903:3-20 (Brewer). Therefore, only $180,000 of the $228,000 in costs relating to the nine other Browns Ferry studies was at issue.

studies at issue were necessary for any one of the following reasons: (1) the various dry storage components that were studied were not bounded by the analyses contained in the final safety analysis report ("FSAR") relating to the license for the HI-STORM cask that TVA purchased from Holtec; (2) the study provided benefits beyond those required by the analyses in the FSAR; (3) the study would not have been required in the "but for" world; or (4) even if the study would have been required in the "but for" world, it would have to be performed again in the actual world once DOE begins acceptance. Tr. 629:2-641:10 (Chapman). However, this testimony was refuted by the expert testimony of Mr. Brewer that: (1) the study at issue was bounded by the analyses contained in the FSAR; (2) the study at issue was unnecessary for technical reasons or because it provided no practical benefit to TVA; or (3) Mr. Chapman's reasoning that the study would not have been required in the "but for" world or would have to be performed again in the actual world once DOE begins acceptance was based upon pure speculation as to what type of cask DOE would have brought or what cask-loading procedures would need to be performed. Tr. 1906:2-1933:25; DF DEM-40 and -42 (Brewer). This evidence, together with the testimony provided by Mr. Davis, supports the conclusion that the $180,000 in claimed costs relating to the Holtec Browns Ferry studies at issue is not recoverable.

ii. $100,000 In Non-Incremental Costs Relating To The Qualification Of The Railroad Bay Floor At Sequoyah Is Not Recoverable

Mr. Davis also testified that $100,000 in costs relating to a study performed by Holtec on the load-bearing capability of the floor of the railroad egress bay to the Aux Building was added to the damages claim because the floor was designed to support 100-ton weights and the weights that TVA was expecting to place upon that floor in loading HI-STORM casks for transfer to the ISFSI

was approximately 270 tons. Tr. 321:15-20 (Davis). Furthermore, in its pretrial brief, TVA argued that "given that it is unknown what type of transport cask DOE would have brought, it is impossible to state whether TVA would have had to perform a similar study had DOE performed." PreTr. Br. at 25-26.

Mr. Brewer opined that it would be logical to assume that, in order to minimize direct loading costs, DOE would have used a large rail cask to pick up fuel at the Sequoyah site in the "but for" world. Tr. 1858:15-1859:22 (Brewer); DX-216 at 6-7; DF DEM-23. Therefore, Mr. Brewer further testified that this same sort of study would have been necessary in the "but for" world because any of the large rail casks that DOE could have used to accept fuel from the Sequoyah site all weigh more than 100 tons. Tr. 1899:5-21 (Brewer); 1900:6-11 (Brewer). Therefore, the $100,000 costs for the study would have been incurred in the "but for" world. Tr. 1899:3-9 (Brewer); DX-216 at 13.

b. TVA's Damages Claim For Contract Services & Procurement Costs Should Be Reduced By At Least An Additional $131,512 Relating To Certain Fixed, Non-Incremental Core Team Overhead Costs At Its Browns Ferry Facility

The remaining $131,512 of the challenged Contract Services & Procurement costs are Core Team Overhead costs relating to TVA's Browns Ferry facility. Tr. 2100:14-21 (Kiraly); DX-218, Ex. 3.2.1. These costs represent TVA's allocation of overhead costs to the project relating to an outside management team that managed the work relating to more than just TVA's dry storage projects. Tr. 327:12-328:4 (Davis); 436:15-23 (Davis); 526:10-528:7 (Walker); 572:25-575:8 (Walker); 2100:14-2101:19 (Kiraly). Mr. Kiraly opined that these Core Team

Overhead costs for Browns Ferry are fixed costs that are non-incremental to the breach. Tr. 2101:8-9 (Kiraly).

3. TVA's Damages Claim Should Be Reduced By At Least $2,690,404 Because Its Claimed Overhead Costs Are Non-Incremental

TVA's damages claim includes $2,690,404 in the cost category of Overhead. The Government has challenged all of these costs because, as fixed costs, they are non-incremental in nature. Tr. 2113:1-11 (Kiraly); DF DEM-45.

a. TVA's Damages Claim Should Be Reduced By At Least $246,020 Relating To Fixed, Non-Incremental Core Team Overhead Costs At Its Sequoyah Facility

$246,020 of the challenged Overhead costs are Core Team Overhead costs relating to TVA's Sequoyah facility. They are the same type of allocated overhead costs that were recorded to the Contract Services & Procurement cost category at Browns Ferry. As such, Mr. Kiraly opined that these Core Team Overhead costs for Sequoyah are fixed costs that are non-incremental to the breach. Tr. Tr. 2113:12-2114:13 (Kiraly); DX-218, Ex. 5.1.

b. TVA's Damages Claim Should Be Reduced By At Least $101,803 Relating To Certain Additional Miscellaneous Non-Incremental Overhead Costs

Similar to the Core Team Overhead costs is another group of overhead costs in the amount of $96,533, that TVA has allocated to both of the dry storage projects relating to a group of TVA employees that manage all of the capital projects.[8] These costs are allocated among all of the capital projects on a pro-rata basis. Because there are many such projects at TVA, Mr. Kiraly

[8] At Sequoyah, $21,707 of these costs are allocated to Cost Class 84X, described as "Capital Support Expense Distribution." Tr. 2114:14-22 (Kiraly); 2115:3-9 (Kiraly); DX-218, Ex. 5.1. At Browns Ferry, $74,826 of these costs are allocated to Cost Class 82Z, described as "Other Transferred Costs." Tr. 2123:11-20 (Kiraly); DX-218, Ex. 5.2.

opined that these costs were non-incremental because they were not incurred as a result of the breach. Tr. 2114:23-2115:2 (Kiraly); 2123:20-2124:2 (Kiraly).

TVA's damages claim includes another $5,270 in miscellaneous overhead charges that have been allocated to both of the dry storage projects on a percentage basis, and thus, are also non-incremental. Tr. 2115:17-24 (Kiraly); 2124:3-8 (Kiraly); DX-218, Exs. 5.1 and 5.2.

c. TVA's Damages Claim Should Be Reduced By At Least $2,342,581 Relating To Non-Incremental Overhead Costs Based Upon The Allocation of AFUDC

The largest portion of the Overhead costs challenged by the Government is the $2,342,581 of interest costs denominated as costs relating to AFUDC, or Allowance for Funds Used During Construction. $1,484,453 of these costs relate to TVA's Sequoyah facility, and $858,128 of these costs relate to its Browns Ferry facility. AFUDC Stipulation No. 1; DX-218, Exs. 5.1 and 5.2.

During trial, the Court asked whether the facts of this case require any departure from the precedent set forth in Wickham Contracting Co. v. Fischer, 12 F.3d 1574 (Fed. Cir. 1994), "because the Government is providing the service to the private party, rather than the private party providing a service to the Government." Tr. 2186:12-2187:24 (Court). As we explain below, the holding in Wickham compels the conclusion that TVA's claim of $2,342,581 in AFUDC costs is not recoverable.

In Wickham the court permitted recovery of "unabsorbed overhead" because the Government had caused a compensable delay to the work performed by the Government contractor, and that, due to the uncertainty of the length of the delay, the contractor was unable to obtain any additional jobs. Wickham, 12 F.3d at 1577. Here, in contrast, because the Government's delay in accepting TVA's SNF under the terms of the Standard Contract does not

result in an interruption of payments from that or any other contract with which TVA expected to pay its overhead costs, TVA's claim for recovery of its overhead costs is not a claim for "unabsorbed overhead" like that in Wickham. It is simply a claim for consequential damages that should be required to meet the same causation standard as any similar claim.

The Wickham court further held that the plaintiff's claim for the recovery of the costs of borrowed funds required a causal link between the borrowed funds and the project or its delay.[9] Id. at 1582-83. At trial, TVA offered the testimony of Andrew Holmes in an attempt to establish a connection between the claimed AFUDC costs and the project costs. However, under cross-examination, Mr. Holmes admitted to testifying in the past that TVA's capital needs were obtained from a single portfolio of "bonds," as opposed to this broader portfolio of all of TVA's debt, including bonds and discount notes. Tr. 706:2-17 (Holmes).

Mr. Kiraly testified that, based upon the evidence provided by TVA in support of its claim, he could find no direct causal link between the claimed AFUDC costs and the projects costs that serve as the basis for their allocation to the dry storage projects. Because any connection between the two is too tenuous and remote, Mr. Kiraly opined that they should be removed from TVA's damages claim. Tr. 2116:5-2122:23 (Kiraly); DF DEM-55-58.

### B. TVA's Damages Claim Should Be Reduced Based Upon Deferred "But For" Dry Storage Costs

The largest reduction in TVA's damages claim is based upon the fact that it would still

---

[9] The Federal Circuit held that the section 2516(a) no-interest rule barred the recovery of interest cost to a government contractor for the use of equity capital to finance expenses due to government delays. Wickham, 12 F.3d at 1582. TVA has stipulated that it does not raise capital through the issuance of stock. AFUDC Stipulation No. 9. Because TVA does not use equity capital financing, the Government does not have the benefit of this per se holding in this case.

have had to build dry storage even if DOE had started accepting SNF in 1998. See DX 217:24-25 ¶ 38. TVA simply would have incurred this cost later in the "but for" world than in the actual world. Thus, TVA, at most, should be allowed the additional cost associated with building dry storage earlier due to DOE's delay. See DX 217 at 25 ¶39.

The Government demonstrated that TVA would have required dry storage anyway, and the incremental cost associated with building dry storage earlier, through the testimony of Mr. Brewer, Mr. Pollog, and Dr. Hartman. Mr. Brewer assisted in this process by developing fixed and variable costs for ISFSI construction in the "but for" world. Tr. 1890:20-1891:11 (Brewer). Mr. Brewer concluded that "if an ISFSI were needed . . . at Browns Ferry or Sequoyah in the "but for" world, the fixed costs associated with such a facility would be the same as the fixed costs that TVA incurred in actually building the ISFSIs at those two locations, and the variable costs would be the same in terms of dollars per cask . . . ." Tr. 1890:9-15 (Brewer). Thus, Mr. Brewer was able to develop ISFSI costs for the "but for" world by dividing TVA's actual ISFSI construction costs, as reduced above, into their fixed and variable components. Tr. 1896:14-1897:3 (Brewer); 1897:12-13 (Brewer). Mr. Brewer then developed a cash flow based upon the year in which TVA incurred its actual fixed costs at each site. Tr. 1895:13-1896:13; 1897:3-7 (Brewer).

Mr. Pollog assisted in this analysis by coordinating two runs of a model maintained by DOE which uses RW-859 data to "project all future discharges from all nuclear reactors going throughout the end of the license operating period for that reactor. . . ." Tr. 1638:6-19 (Pollog); see also 1629:22-1630:23 (Pollog); 1641:12-1642:17 (Pollog). For the purposes of this litigation, DOE ran this model twice. First, to project future discharges based upon its own RW-859 data, and, second, to project future discharges based upon projections provided by TVA's in its

discovery responses. Tr. 1648:13-1652:22 (Pollog); 2310:1-19 (Hartman). By those projections, TVA's acceptance allocations at a particular acceptance rate can be ascertained. Tr. 1654:6-22 (Pollog).

Mr. Brewer's fixed and variable ISFSI construction costs and Mr. Pollog's two sets of model projections, were then used as inputs to a model created by Dr. Hartman referred to as the GMA model. Tr. 2300:21-2301:11 (Hartman); 2304:13-2305:1 (Hartman). The GMA model was used to determine the most cost effective use of TVA's allocations at three different rates for both sets of projections from the DOE model. Tr. 2275:5-2276:1 (Hartman); 2283:11-2284:12 (Hartman); 2292:1-2295:2 (Hartman); 2314:3-2315:2 (Hartman); 2319:2-15 (Hartman). The first ten years of each rate was the same as the rate set forth in the1995 ACR. Starting in year eleven the first rate reached a steady state of 900 MTU. The second rate goes up to 1800 MTU from 2010 to 2014 and reaches a steady state of 2100 MTU in 2015 and the third rate differs from the second only in that it reaches a steady state of 3000 MTU in 2015. DX 217 at 12 ¶ 17, 21 ¶ 34; DF DEM-68. Even using the cost-effective SNF inventory strategies provided for in the GMA model, Dr. Hartman concluded that TVA would have needed to build dry storage in each of the six different scenarios, only later. DX 217 at 24-25 ¶ 38. Thus, Dr. Hartman calculated a range of adjustments to provide the Government with a credit for the time value benefit realized by TVA by having to build dry storage earlier. DX 217 at 25-26 ¶ 39. Those adjustments and one other reduced TVA's damages claim to a range of $12.48 million to $18.52 million.[10] Tr. 2283:15 -

---

[10] The "other" adjustment referred to is a $2.78 million credit to TVA for the actual fuel loading costs it has previously deducted from its damages claim in its flawed "but for" methodology. That credit should only be applied to avoid a double-correction if an adjustment is made to provide the Government with the credit for the "but for" fuel loading costs that TVA avoided because of DOE's delay that is described in the next section of this brief. Tr. 2285:18-

2285:12 (Hartman); DX 217a at Adjusted Table 9. Accordingly, depending upon the rate that one assumes, even if TVA were permitted to recover for building dry storage earlier than it would have, TVA's damages may not exceed this range.

The basis for finding a range was, in part, the two different runs of the DOE model. The run relying solely upon RW-859 data resulted in higher numbers than the run relying upon TVA's own discovery responses. However, significant testimony indicated that it is more appropriate to rely upon the TVA data. Mr. Pollog stated that he believed "a utility is a much better predictor of their own discharges than the Department could be. . . ." Tr. 1681:13-15 (Pollog). Dr. Hartman also stated that the TVA projection "is really getting at what's going on there, so it's a better summary of the realities on the ground for modeling a but-for world." Tr. 2315:17-20 (Hartman). Using TVA data also makes sense because, as Mr. Holton explained, "[w]hen TVA makes decisions about its spent nuclear fuel storage . . . it uses its own projected discharges." Tr. 258:8-11 (Holton). Moreover, the evidence shows that the various factors that make TVA's projections higher would have existed in the "but for" world and should be taken into account. Tr. 1649:25-1650:18 (Pollog); 2309:11-21 (Hartman); 256:24-23 (Holton); 182:17-183:21 (Hayslett); 1201:16-1203:4 (Spates).

A range, rather than a single figure, was also developed, in part, because Dr. Hartman was asked to consider three rates. As set forth above, there is a basis in the record for each of the three rates. There is extensive testimony in the record to the effect that there is no rate in the contract, see pp. 8-9, supra, making virtually any rate, and certainly one as high at the 900 MTU rate sufficient. Moreover, the 900 MTU rate should also suffice because it even meets the criteria that

---

2287:4 (Hartman).

the utilities sought but never succeeded in including in the Standard Contract. It was determined to be "theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998." DX 78; Tr. 1662:8-1664:9 (Pollog). An acceptance rate of 2100 MTU per year in the aggregate is "sufficient to keep up with the discharge rate of utilities and begin to work off the backlog at the utilities," in the aggregate. Tr. 1655:11-1656:15 (Pollog). The Government's 3000 MTU rate is even more generous than these rates and comports with a particularly relevant phase in DOE's planning. See pp. 10-14, supra.

C. TVA's Damages Claim Should Be Reduced By An Additional $353,00 - $430,000 Based Upon Avoided "But For" Costs of Loading Fuel to DOE

The development of a proper "but for" world shows not only that TVA would have incurred some of the costs that it claims, but that it experienced certain savings because of the Government's delay in accepting its SNF. Specifically, TVA would have incurred the cost associated with loading many more casks than it has recognized in its calculation. These costs, too, must be deducted from its claim. "[T]he non-breaching party is not entitled, through award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1371 (2003). "'Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff . . . which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages.'" Id. at 1372 (citation omitted); see Bank of America F.S.B. v. United States, No. 95-660(C), 95-797C, 95-7971C, 2005 WL 1792182 (Fed. Cl. July 21, 2005) (damages are generally offset by any benefit found to flow directly from the breach); Citizens Federal Bank v. United States, 59 Fed. Cl. 507, 526 (2004) ("as

a matter of law, the benefits of mitigation must be credited to Defendant. . . ."); Long Island Savings Bank, FSB, et al. v. United States, No. 92-517C, slip op. 29 (September 15, 2005).

The first step in offsetting these costs is to approximate their magnitude. The Government has demonstrated the range into which these costs would fall through the testimony of Mr. Brewer. Mr. Brewer used TVA's own assessment of loading costs in the "but for" world as a starting point. Tr. at 1855:19-1856:15 (Brewer). However, this assessment was insufficient because TVA only assumed that it would have loaded three casks or 42 MTU of fuel while the allocation in the 1995 ACR shows that it would have loaded 180 MTU of fuel. Tr. 1856:16-24 (Brewer). Mr. Brewer divided TVA's cost into fixed and variable components for large casks. Tr. 1857:19-1858:14 (Brewer); 1869:23-1870:12 (Brewer). By removing costs that were not appropriate for small casks and by scaling the time that it would take to load them, Mr. Brewer arrived at lower fixed and variable costs for small casks. Tr. 1878:13-1879:22 (Brewer).

Using these components, Mr. Brewer developed a low estimate and a high estimate that bound what could have happened the in the "but for" world. Tr. 1858:18-1859:5 (Brewer). The low estimate assumes that all of the fuel would have been picked up from one site and that the fuel transfers would have used large rail casks. Tr. 1859:6-17 (Brewer). Based upon the 1995 ACR allocations, the low estimate also assumes TVA would have loaded 13 casks. Tr. 1871:1-1872:10 (Brewer). The high estimate assumes that the fuel would have been taken from both sites and that large rail casks are used only at Sequoyah, while small truck casks are used at Browns Ferry. Tr. 1859:17-24 (Brewer). Under this scenario, TVA would have been required to load 2 large and 417 small casks in the "but for" world. Tr. 1879:23-1880:25 (Brewer); 1881:1-11 (Brewer). While Mr. Brewer testified that TVA could have avoided the high estimate by making

infrastructure improvements at Browns Ferry that would allow the use of large casks, he noted that "all of those things cost money. All of those things require design and execution, and there's nothing in any of the claimed costs or claimed expenses or anything else that would reflect what those costs would be to effectuate those changes and allow the use of a large cask at Browns Ferry. . . ." Tr. 1881:21-1882:2 (Brewer).

Using these numbers, Dr. Hartman credited DOE with the benefit of the delay. DX 217 at 26 ¶ 40, 27 ¶ 43; Tr. 2285:1-14 (Hartman); 2291:15-25 (Hartman). Dr. Hartman recognized that "[t]he size of the benefit will be determined by the date at which DOE actually does begin to accept SNF from DOE." DX 217 at 27 ¶ 44; Tr. 2362:16-19 (Hartman). As the date is currently uncertain, "it is impossible to calculate precisely the time value of postponed DOE SNF Loading costs, and by implication the financial benefit of deferring those costs." DX 217 at 28 ¶ 44. Thus, Dr. Hartman calculated the value of deferring the DOE SNF loading costs through 2004 (the end of the time span encompassed by this trial), allowing for the possibility of adjusting this credit in later damages trials. Id; Tr. 2362:25-2363:3 (Hartman). In this manner Dr. Hartman determined that the credit ranged from $353,000 to $430,000. DX 217 at 28 ¶ 45, 29 ¶ 47; Tr. 2363:3-15 (Hartman). Applying this credit to the other adjustments described above, TVA's adjusted damages claim should be in the range of $12.13 million to $18.16 million. Tr. 2285:10-2287:4 (Hartman).

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court enter judgment in the Government's favor and deny the damages sought by TVA.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester
HAROLD D. LESTER, JR.
Assistant Director

s/ Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0534
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

KEVIN B. CRAWFORD
SHARON A. SNYDER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

CERTIFICATE OF FILING

I hereby certify that, on this 21st day of September, 2005, a copy of the foregoing "Defendant's Initial Post-Trial Brief," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield