IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY<br>Plaintiff<br><br>v.<br><br>UNITED STATES<br>Defendant | No. 01-249-C |

# TVA'S RESPONSE TO DEFENDANT'S INITIAL POST-TRIAL BRIEF

Electronically filed:
October 19, 2005

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Maureen H. Dunn
General Counsel

Edwin W. Small
Assistant General Counsel

Peter K. Shea
Senior Attorney/Attorney of Record
Telephone 865-632-7319

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

Page

STATEMENT ....................................................... 1

I. TVA WOULD NOT HAVE REQUIRED DRY STORAGE HAD DOE PERFORMED THE CONTRACT ....................................................... 1

A. The Acceptance Rate Following Year Ten Must be 3,000 Metric Tons Annually. ....................................................... 2

B. The Hypothetical Rates That Underlie The Hartman Model Are Entirely Speculative, Thereby Precluding Their Adoption by The Court. ....................................................... 8

C. TVA's Storage Capacity Was Sufficient to Avoid the Need for Dry Storage. ....................................................... 9

1. TVA's analysis of capacity assumes only that DOE will fulfill its duty to cooperate with TVA. ....................................................... 9

2. Even under DOJ's hypothetical acceptance rates, TVA had options for avoiding dry storage. ....................................................... 11

II. NO LEGAL OR FACTUAL BASIS SUPPORTS A REDUCTION AS TO TVA'S COST CLAIMS. ....................................................... 15

A. Defendant's Incremental Cost Analysis Is Inapposite. ....................................................... 16

B. TVA Is Entitled to Recover for AFUDC. ....................................................... 17

C. TVA Is Entitled to Recover $280,000 for the Technical Studies. ....................................................... 18

CONCLUSION ....................................................... 20

# TABLE OF AUTHORITIES

**Cases:** **Page**

*Castle v. United States*,
48 Fed. Cl. 187 (2000) ........................................ 15

*Columbia First Bank, FSB v. United States*,
60 Fed. Cl. 97 (2004) ........................................ 9

*Franconia Assoc. v. United States*,
61 Fed. Cl. 718 (2004) ........................................ 8, 19

*H&S Mfg. Inc. v. United States*,
66 Fed. Cl. 301 (2005) ........................................ 10

*Home Sav. of Am., FSB v. United States*,
399 F.3d 1341 (Fed. Cir. 2005) ........................................ 15, 18

*Locke v. United States*,
283 F.2d 521 (Ct. Cl. 1960) ........................................ 12

*Malone v. United States*,
849 F.2d 1441 (Fed. Cir. 1988) ........................................ 10

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996) ........................................ 9

*Pac. Gas & Elec. Co. v. United States*,
58 Fed Cl. 1 (2003) ........................................ 15

*Shockly v. Arcan, Inc.*,
248 F.3d 1349 (2001) ........................................ 9

*Town of Grantwood v. United States*,
55 Fed. Cl. 481 (2003) ........................................ 15

**Statutes:**

Fed. R. Evid. 103(a)(1) ........................................ 12

**Miscellaneous:**

59 Fed. Reg. 27,008 (May 25, 1994) ........................................ 4
60 Fed. Reg. 21,797 (May 3, 1995), ........................................ 4
Restatement (Second) of Contracts § 205 cmt. a (1981) ........................................ 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TENNESSEE VALLEY AUTHORITY<br>Plaintiff<br><br>v.<br><br>UNITED STATES<br>Defendant | No. 01-249-C |

**TVA'S RESPONSE TO DEFENDANT'S**
**INITIAL POST-TRIAL BRIEF**

## STATEMENT

Pursuant to the Court's September 19, 2005 order, the Tennessee Valley Authority (TVA) hereby submits its response to Defendant's initial post-trial brief. TVA's Proposed Findings of Fact and Conclusions of Law (TVA's initial post-trial brief) covered in depth the factual and legal support for TVA's proposed acceptance rate and the quantum of TVA's damages. This response now focuses upon the principal points raised by Defendant's post-trial filing and shows that none is persuasive. Accordingly, for the reasons set forth below and in TVA's initial post-trial brief, the Court should award damages to TVA in the amount of $35,330,690.11.

## I. TVA WOULD NOT HAVE REQUIRED DRY STORAGE HAD DOE PERFORMED THE CONTRACT.

Essentially, Defendant contends that TVA would have had to build dry storage regardless of whether the Department of Energy (DOE) performed under the

standard contract with TVA (Contract), asserting: (1) the acceptance rate beginning in 2008 (i.e., the rate following year ten of pickup operations) would not have been 3,000 metric tons of uranium (the 3,000 rate) annually; and (2) even at the 3,000 rate, TVA would not have had sufficient space in its spent fuel pools to avoid building dry storage. As shown below and also in TVA's initial post-trial brief, these assertions are unfounded; and the evidence presented at trial compels a finding that the 3,000 rate should be adopted by the Court to fill in the missing term in the Contract.

### A. The Acceptance Rate Following Year Ten Must be 3,000 Metric Tons Annually.

As to the 3,000 rate, Defendant specifically argues that TVA's positions regarding causation and rate have no basis in the Contract, that a ramp-up to 3,000 tons by 2008 would be unreasonable, and that internal TVA documents contradict TVA's current positions (Def. br. at 7-18).

Undeniably, the Contract lacks an acceptance rate because DOE refused to include one. That lack, however, does not signify (as Defendant appears to imply) the result of any meeting of the minds — rather, the Contract is a classic contract of adhesion in that TVA (like all the other utilities) had no choice but to sign or lose its nuclear plant operating licenses (¶ 14).[1] In any event, it is simply incorrect to suggest that no contractual basis exists for the 3,000 rate. As shown in TVA's initial post-trial brief, TVA is paying for the 3,000 rate under the Contract (¶ 18) and has, in fact, paid more than $700 million to date (¶ 2); DOE has always designed/planned for that 3,000 rate

---

[1] References indicating a paragraph symbol and a number (e.g., "¶ 14") refer to the identically numbered paragraph(s) in TVA's initial post-trial brief filed on September 16, 2005.

(¶ 17); and both the Nuclear Waste Policy Act (NWPA) and the Contract mandate that spent nuclear fuel be accepted as expeditiously as possible following the opening of a repository (¶¶ 26-27).

Moreover, any rate less than the 3,000 rate would be economically inefficient in that the program would be stretched out significantly; and the adoption of a lower rate also would breach DOE's acknowledged fiduciary duty to use the Nuclear Waste Trust Fund wisely (¶ 26). In the case of a 900 ton steady-state rate, for example, the program would extend for over a hundred years (¶ 26).[2] Finally, Defendant's argument is wholly undercut by the admission of Christopher Kouts, DOE's Director of the Office of Systems Analysis and Strategy Development, that DOE has never published a single document showing a steady-state rate of 900 or 2,100 metric tons, let alone adopted any such rates (¶ 25).

In arguing (br. at 14-15) that TVA's proposed acceptance rate (i.e., the 1995 Annual Capacity Report schedule, followed by the 3,000 rate beginning in 2008) is wholly unsupported by any program planning documents, Defendant misses the point. DOE's program planning documents routinely show a ramp-up schedule that is far more aggressive than the one proposed by TVA for the purpose of assessing damages. That is,

---

**2** Defendant has suggested that a 900 ton steady-state rate would be sufficient "in the aggregate" to allow the utility industry to avoid additional dry storage after 1998 through exchanges (DX-78 at 2). However, Defendant offered no explanatory proof on the point; and, at trial, DOE's Pollog testified that the statement was directed only at the first ten years of pickups (Tr. at 1665). Mr. Pollog conceded as well that if pickups remained at that rate, at some point pool space would run out without shutdowns, changes to pools, etc. (*id.*). In other words, as TVA's Hayslett testified, at a 900 ton steady-state rate, the backlog "is just getting deeper" and "there will have to be a lot of dry storage facilities across the country" (Tr. at 97). Defendant's economic expert likewise testified that, as to TVA, pickup operations would not be completed under a 900 ton rate until well into the next century (¶ 19).

DOE's documents uniformly show a ramp-up to the 3,000 rate in five to six years (¶¶ 17-19) with the exception of several years during which DOE considered construction of a Monitored Retrievable Storage facility (MRS); and, even in the case of an MRS, DOE's plan as proposed to Congress included opening a repository in 2003 with a ramp-up to the 3,000 rate by 2008 (DX-51 at 61, HQ0005864), precisely the date by which TVA contends that the 3,000 rate would have been in place. After DOE recognized pickups would not begin by 1998 as required by the NWPA and the Contract (and in fact would not start for many years thereafter), DOE sought to back away from its contractual obligations and minimize any commitments to utilities through continued publication of a reduced rate in the 1995 Acceptance Capacity Report (e.g., Zabransky Tr. at 926, 930).

Thus, although by early 1995 DOE knew it would not construct an MRS (a decision formally announced in the Federal Register on May 3, 1995 (60 Fed. Reg. 21,797)),[3] DOE did not communicate any position on acceptance rates to standard contract holders from March 1995 until June 2004 because DOE's general counsel would not allow publication of a revised acceptance capacity report (Pollog Tr. at 1660-61). Throughout this same period, DOE's own documents show that DOE clearly recognized that an acceptance rate which ramped up in five or six years to a 3,000 rate was realistic and necessary, and was being planned for by DOE and paid for by utilities (e.g., PX 20; PX-21; PX-25, PX-29, PX-32). Finally, in July 2004, DOE at last acknowledged the

---

[3] One year earlier, in May 1994, DOE already had conceded that "Thus far, neither the efforts of the Department nor any other organization, including the Office of the Nuclear Waste Negotiator, have achieved the level of success needed to realize significant progress in locating and developing a site by 1998" for an MRS. 59 Fed. Reg. 27,008 (May 25, 1994).

inevitable and again identified a 3,000 steady-state acceptance rate after a brief ramp-up period (PX-36 at 2). In sum, virtually all DOE programmatic documents show a 3,000 steady-state rate by the fifth or sixth year of pickup operations, well before the 2008 date which TVA has proposed the Court adopt in this action. And, of course, DOE never informed Congress or the standard contract holders that DOE had any plans to adopt an attenuated, seventeen-year, ramp-up such as that used here by Defendant's economic expert at the behest of the Department of Justice (DOJ).

Finally, Defendant cites (at 15-17) to four internal TVA documents (dating, respectively from 1983, 1984, 1989, and 1996) and to an interrogatory answer to argue that these documents contradict TVA's current statements about causation. None of these outdated documents bolsters Defendant's argument; rather, in each instance, Defendant has omitted context essential to the points being made in the documents. Thus, the 1983 document (DX-20 at 4) states only that TVA's "**presently available**" capacity will be used up by 1998 and notes that TVA plans "to continue interim onsite spent fuel storage activities."[4] As the Court knows, these activities included extensive rerackings designed to alleviate the storage concern; moreover, Browns Ferry 1 subsequently shut down and continues in that status now, thereby further freeing up storage pool space.

The 1984 document (DX-41) stated there was a "50-percent chance" TVA could get by without any further actions if DOE were to perform (in fact, TVA did take actions (reracking) to ensure that dry storage would not be needed whereas DOE did not perform). Notably, the testimony of Warren K. Brewer (Tr. at 1947-1949) cited by

---

[4] Emphasis added unless otherwise noted.

Defendant as evidence that TVA's interim storage measures were inadequate fails to support that point; in fact, the testimony is limited to a discussion of the storage capacity at Sequoyah Nuclear Plant in the absence of a cask pit rack. As shown by DX-311 (the best evidence of TVA's current spent fuel storage capability) and by the testimony of Tom Hayslett and George Holton, TVA had ample storage space had DOE performed the Contract.

Defendant correctly notes that the 1989 document (DX-62) deals with an expressed TVA preference for onsite storage. The document also makes clear, however, that TVA proposed onsite storage only because at that time DOE was considering the construction of an MRS for interim storage prior to opening a repository and TVA thought that constructing onsite storage would prove less expensive for TVA than paying for DOE to build an MRS. In other words, as the document notes, TVA wanted any MRS to be funded wholly by those utilities that used it. Thus, the document does not acknowledge that TVA inevitably would have had to construct on-site storage but rather recognizes that such an option would be less expensive for TVA compared to funding the cost of an MRS for every utility's use.

As to the final document, Mr. Hayslett (Tr. at 149-50) and Mr. Hutson (Tr. at 1131-32) both explained that the 1996 memorandum (DX-92) did not indicate that dry storage was necessary for TVA. As is plain on the face of that document, it is premised on several assumptions that do not reflect the real-world situation; for example, the memorandum states that DOE was under a court order to pick up spent nuclear fuel and that TVA was scheduled to begin transferring fuel to DOE in 2003 rather than 2002, the correct year. As Mr. Hutson testified, the document which states in part "A limited

quantity of on-site dry cask storage may be needed to store spent fuel generated after the fuel pools are full and until TVA's disposal allocation matches spent fuel generation" reflects TVA's uncertainty as to whether or not DOE would pick up in accord with the allocations previously accorded TVA while noting that various legislative efforts to resolve the spent nuclear fuel problem were pending in Congress (Hutson Tr. at 1131-32).

With regard to the interrogatory answer, TVA was asked to describe in detail any acceptance schedules or scenarios TVA had used for any purpose (DX-176 at Interrog. No. 9). TVA responded by noting that TVA had reviewed many schedules to evaluate its storage capabilities and had projected the impact upon TVA of using a schedule contained in a 1990 preliminary estimate of total system life cycle costs and the 1995 allocations to TVA. TVA nowhere in that answer or elsewhere stated that the projection reflected TVA's view of DOE's contractual obligations. Defendant fails to reveal, moreover, that in the same set of interrogatories (Interrog. Nos. 1-2), Defendant specifically asked TVA what acceptance rate the Court should adopt in assessing damages for the standard contract holders (i.e., what TVA viewed as DOE's contractual obligation) and TVA answered that the appropriate steady-state rate was 3,000 tons annually no later than the sixth year of pickup operations.

In sum, as shown in TVA's initial post-trial brief (¶¶ 29-33) and as previously held by Judge Hodges, the 3,000 rate is the appropriate rate for filling in the missing term of the Contract (a lack occasioned solely by DOE's continuing refusal to provide such a rate); and, further, that 3,000 rate should begin by not later than 2008

because the evidence is clear that DOE would have ramped up to a 3,000 rate by the fifth or sixth year of pickup operations (i.e., by 2002 or 2003) had DOE performed.

### B. The Hypothetical Rates That Underlie The Hartman Model Are Entirely Speculative, Thereby Precluding Their Adoption by The Court.

Indisputably, Defendant has yet to adopt any particular acceptance rate that should apply beginning in year eleven (2008) of pickup operations in the "but for" or actual worlds. Instead, Defendant has invited the Court to speculate that one of three potential acceptance rate schedules its economic expert, Dr. Hartman, was told to use by DOJ could have been the schedule used by DOE in the "but for" world. None of these hypothetical rates ever was published or adopted by DOE.

In effect, under the guise of asserting that TVA has not proved causation, Defendant has attempted to "spin out a tangled web of damage-reducing hypothetical events" in hopes that TVA may fail to disprove one of them and thereby forfeit some part of its damage claims. *Franconia Assoc. v. United States*, 61 Fed. Cl. 718, 750 (2004). Not an iota of evidence supports application of the hypothetical schedules used by the economic expert;[5] and, as shown in TVA's initial post-trial brief, each of those acceptance rate schedules (and especially the proposed 900 and 2,100 steady-state rates) is unreasonable in that each is economically inefficient; each fails to fulfill the purposes of the NWPA; and each assumes the existence of an MRS, a planning option which DOE long had abandoned by 1998. In addition, the Hartman model further tilts toward a

---

5 Lake Barrett, while serving as DOE's Deputy Director, testified that DOE would have operated at a 3,000 metric ton rate after five years (Tr. at 857) and that a 2,000 metric ton steady-state rate would be inconsistent with achieving the objective of the NWPA (Tr. at 844).

desired DOJ result by disregarding contractual rights such as the right to make exchanges, the right to adjust quantities, and the right to request an emergency pickup (Hartman Tr. at 2405).

In sum, the results of the Hartman model should be disregarded because the model is not grounded in fact. The Federal Circuit's decision in *Shockly v. Arcan, Inc.*, 248 F.3d 1349 (2001), is closely on point. In *Shockley*, the Federal Circuit expressly rejected expert testimony which was based on a benchmark assumed by the expert at the direction of his employer and which did not otherwise have evidentiary support. *Id.* at 1363. This Court, too, has found expert testimony and analysis to be fundamentally flawed when based upon "but-for projections" which are not "rooted in" factual evidence presented to the Court. *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 123-24 (2004). *See also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1032 (Fed. Cir. 1996) (rejecting expert analysis that relied on faulty assumptions).

### C. TVA's Storage Capacity Was Sufficient to Avoid the Need for Dry Storage.

#### 1. TVA's analysis of capacity assumes only that DOE will fulfill its duty to cooperate with TVA.

Although Defendant does not dispute that the charts in DX-311 accurately depict TVA's spent nuclear fuel pool storage capacities, Defendant argues (br. at 18-32) that TVA would not have had sufficient space in its storage pools to avoid construction of dry storage even were the Court to adopt TVA's proposed rate (that is, the 1995 Annual Capacity Report rates followed by the 3,000 rate beginning in 2008). Defendant is incorrect. As the charts in DX-311 show and as TVA pointed out in its initial post-trial brief (¶ 12), TVA may have had to encroach upon full-core reserve from time to time at

various plants during the period 2013-2020 following a refueling outage, **but only if DOE did not pick up TVA's allocation for the year prior to the refueling outage** (DX-311; Holton Tr. at 1232-34). As TVA also pointed out (¶ 12), DOE has acknowledged it would work to accommodate a utility's proposed pickup schedule. Indeed, DOE has a duty to cooperate with and not to hinder TVA under the Contract as a matter of law. *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988); *H&S Mfg. Inc. v. United States*, 66 Fed. Cl. 301, 310-11 (2005). *See also* Restatement (Second) of Contracts § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.").

Also, by the date at which TVA might have required DOE's cooperation to avoid any impingement on full-core reserve, the pickup program would have been in operation for approximately fifteen years, more than long enough for any transportation issues to have been worked out. Moreover, even if DOE had failed to cooperate, TVA could simply have taken the business risk of impinging temporarily on full-core reserve until DOE did pick up or could have adopted another short-term solution (¶ 13).[6] Finally,

---

[6] Defendant's suggestion (br. at 31) that lack of a full-core reserve poses a safety risk is not credible. Were there any such risk, the Nuclear Regulatory Commission (NRC) surely would have imposed a full-core reserve requirement; and the NRC has not done so (Hayslett Tr. at 61). Further, the testimony of TVA's Jack Bailey relied on by Defendant (br. at 31) in no way addresses impingement on full-core reserve but rather speaks to TVA's general concern with safety and to a specific safety concern regarding the installation of additional racks at TVA's Browns Ferry Nuclear Plant. Similarly, with regard to the alleged business risk of lost revenue, impingement on full-core reserve does not carry a revenue risk during a shutdown unless there is a need to offload the reactor core. Of course, a utility can shut down a reactor and perform many different kinds of maintenance work without removing any fuel from the core (Hartman Tr. at 2404). Were

the SNF projections upon which the charts in DX-311 are based use TVA's estimate of the **maximum** reasonable discharges that could occur — a scenario that assumes the plant operation conforms totally to an aggressive performance plan (Hayslett Tr. at 70; Holton Tr. at 218-19). Conversely, were Browns Ferry 1 not to restart in 2007 or were TVA to encounter major unexpected outages over the next twelve years or so, the need for storage space would decline markedly. In sum, it clearly is more likely than not that TVA would not have needed dry storage if DOE had performed the Contract in accordance with the 1995 allocations, followed by the 3,000 rate beginning in 2008.

**2. Even under DOJ's hypothetical acceptance rates, TVA had options for avoiding dry storage.**

At trial, TVA's Thomas Hayslett and George Holton addressed the impact of the DOJ artificial acceptance rates first posited in the report of Defendant's economic expert. The thrust of their testimony was that, at a 900 ton steady-state rate, TVA would have had to build dry storage but that at a 2,100 or 3,000 ton steady-state rate, TVA most likely would not have had to resort to dry storage. They based their conclusion on the use of contractual rights (such as the right to engage in exchanges[7] or increase allocations by

(. . . continued)
a safety issue to arise, however, TVA would be entitled to seek an emergency pickup under the Contract (Jt. Ex. 1 at 12; Zabransky Tr. at 2454-55).

[7] Defendant now asserts that TVA "repeatedly advised the Government that it (sic, TVA) was not pursuing an exchange theory" and thus TVA may not rely upon exchanges (br. at 20-21). TVA disagrees. **In answer to a question specifically limited to the acceptance rate TVA contended the Court should adopt** (DX-176 at Interrog. No. 2), TVA stated only that TVA had not assumed any exchange of acceptance slots and nothing more. Defendant's assertion thus extends the scope of TVA's interrogatory answer while ignoring that TVA also stated that it would have entered into financially favorable exchanges (DX-176 at Interrog. Nos. 30 and 31) and that Mr. Hayslett and Mr. Holton were primarily addressing in rebuttal Defendant's hypothetical take rates or

up to 20 percent or seek an emergency delivery) and on extra-contractual avenues (such as the possibility of using a cask pit rack, or of making short-term transshipments to another plant or to a private fuel storage facility). Defendant finds fault with all these options and contends that all either are not permitted under the Contract or are overly speculative. To the extent that Defendant argues that the speculative nature of exercising those options should preclude their use by TVA, the Court of Claims has addressed precisely such a situation in *Locke v. United States,* 283 F.2d 521, 524 (Ct. Cl. 1960): "The defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unattainable." Here, DOE's breaches of contract and subsequent failure even to adopt a position on the acceptance rate have assured the absence of information critical to the type of analysis Defendant suggests is required. Accordingly, TVA has explained the numerous options available to TVA under the Contract and otherwise; and, more likely than not, by taking advantage of one or more of those options, TVA would not have needed dry storage even at the 2,100 and 3,000 rates proposed by DOJ. (TVA agrees that it eventually would have had to build dry storage at a 900 steady-state rate.)

As to Defendant's specific contentions about the 20 percent and emergency delivery issues, the short answer is that both options are explicit Contract

---

(. . . continued)
other issues raised by Defendant. In fact, as shown by DX-311 and the testimony of Mr. Holton, the Court need only find that, had DOE cooperated in picking up SNF from TVA, TVA would have had no need for dry storage regardless of the availability of exchanges or of any other contractual mechanism that permits some flexibility with regard to allocations. Finally, in this regard, no timely objection to the testimony of Mr. Hayslett and Mr. Holton was interposed at trial; and any such objection was thereby waived. *See* Fed. R. Evid. 103(a)(1).

rights. Mr. Zabransky's prior trial testimony in the *Yankee* cases is wholly unequivocal on the point that a party has an absolute right to the 20-percent adjustment (Zabransky Tr. at 921-23). Indeed, Mr. Zabransky testified in response to a question as to how DOE would manage if every contract holder exercised the 20-percent right: "[W]e'd work weekends, we'd park stuff, but it's our obligation to figure out when and if it happens" (*id*. at 922). Mr. Zabransky's recent "explanation" of his *Yankee* trial testimony (Tr. at 1715-19), which occurred only after consultation with counsel (Tr. at 1764-65, 1770), is simply not persuasive. Similarly, regardless of whether a group of undefined industry participants may have been willing to adopt a "statesmanlike" (Zabransky Tr. at 1772) approach in negotiating with DOE about contractual rights such as the 20-percent adjustment, there is no evidence that TVA waived any of its rights. In fact, as shown in the 1992 Annual Capacity Report (DX-84 at 9-10, HQ0002328-29), although DOE had planned to state its positions on some of the issues in a notice of proposed rulemaking in mid-1993, that intention on DOE's part obviously came to naught; and the parties are left with the explicit language of the Contract.

However, even if the hypothetical rates mandated by DOJ are applied as the primary assumption underlying an assessment of damages and even if TVA were not permitted to engage in exchanges and or exercise any contractual flexibility at all, the report of Defendant's economic expert establishes that TVA was damaged by DOE's breach. Although the report establishes a damages range of $12.48 million to $18.52 million, these amounts are themselves understated because the underlying model is constrained by the incorrect assumptions about rates and contract rights noted above and because the model also assumes that Defendant's accountant properly "adjusted"

TVA's claims downward by $6,135,235 and that Defendant's engineering expert likewise was correct in challenging $280,000 in technical studies (DX-217 at 17, ¶ 24(c); DX-218A at Exhibit 1 (Adj); DX-216 at 12-14). Accordingly, were the Court to adopt Defendant's model (which it should not), the Court also would have to increase the damages awarded to take into account the model's incorrect assumption that those deductions from TVA's cost claims were proper.

Lastly, Defendant asserts that TVA's claim is barred by the statutory prohibition against interest (br. at 33). Defendant's argument is predicated first upon the Court's making three findings, each of which is against the weight of the evidence: (1) that the 3,000 rate does not apply as of 2008, (2) that TVA could not have managed its spent nuclear fuel storage needs at a rate less than that 3,000 rate, and (3) that Defendant's model may be used as a basis for reducing the damages suffered by TVA. Even were such findings to be made, Defendant has mischaracterized as a claim for prejudgment interest what actually would be a claim for the financing cost of capital between the date upon which TVA incurred the cost and the date upon which the cost would have been incurred.

Defendant's argument (br. at 33) concedes (as it must) that TVA was forced to expend funds well in advance of the time when Defendant argues the projects would have become necessary. Such damages, then, do not represent interest on a claim against the Government but the financing cost of the capital incurred as a direct result of

the DOE's breach of contract; and is well established that, contrary to the Government's position, such a claim for the time value of money is recoverable (¶ 62).[8]

Not surprisingly, then, the cases cited by Defendant are not on point. In *Castle v. United States*, 48 Fed. Cl. 187, 216 (2000), a restitution case, the Court refused to allow interest through the date of judgment on a contribution of capital made by the plaintiffs. Similarly, in *Pac. Gas & Elec. Co. v. United States*, 58 Fed Cl. 1, 2 (2003), the court denied recovery for the lost time value of overpaid taxes prior to judgment. *Town of Grantwood v. United States*, 55 Fed. Cl. 481, 488 (2003), merely adopts the established rule that an award for attorney fees should be based on historical rates because an award of current rates would be tantamount to providing interest on the fees. In the context of this action, none of these factors is in play.

## II. NO LEGAL OR FACTUAL BASIS SUPPORTS A REDUCTION AS TO TVA'S COST CLAIMS.

The disputes between the parties as to the quantum of damages primarily center on purely legal issues such as whether an incremental cost analysis may properly be applied, whether an allowance for AFUDC is recoverable, and whether TVA may recover as mitigation damages the cost of certain technical studies which Defendant's engineering expert deemed unnecessary. As shown below and as set forth in TVA's initial post-trial brief (¶¶ 35-64), TVA is entitled to recover fully for all its currently claimed costs.

---

**8** Numerous *Winstar* cases address the time value of money issue, holding that financing costs for the early replacement of supervisory goodwill with private capital are recoverable. *See, e.g., Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005) (affirming award of damages based on weighted average cost of various types of private capital financing used to cover early replacement of supervisory goodwill).

**A. Defendant's Incremental Cost Analysis Is Inapposite.**

TVA's initial post-trial brief establishes that Defendant's incremental cost analysis is wholly inapposite in the context of this action, because TVA did not contract to perform services for DOE and because TVA incurred the costs claimed. All the TVA costs challenged by Defendant (with the minor exception of the technical studies) are questioned solely on the basis of the opinion of Defendant's accountant about what constitutes an incremental or a fixed cost. In the context of this action, no legal basis exists for applying an incremental cost analysis (let alone one that relies wholly upon the unsupported opinion of Defendant's accountant) and thereby providing Defendant a windfall at the expense of TVA's ratepayers.

TVA's salaried employees directly charged to the project only those hours which benefited the project, regardless of whether those employees worked at the nuclear plants or worked for a zero-based budget TVA organization such as Corporate Engineering, Inspection Services, or Heavy Equipment. To the extent that these employees had to perform work on the project, they were unavailable for other work during that time. It is undisputed that this work needed to be performed only because of DOE's breach and that TVA's charges for the work were reasonable. Had TVA attempted to recover all the costs associated with the employment of salaried workers or to apportion the costs of their employment to the dry storage projects on some arbitrary basis, a rationale for quarreling with TVA's costs would exist. Here, however, the evidence showed that TVA charged to the projects only those hours worked on the projects and that TVA's project managers monitored those charges to ensure their

accuracy.[9] These same points hold true with regard to the Stone & Webster "core team" overhead arguments advanced by Defendant. TVA had a contractual obligation to pay the costs involved, and Defendant should bear the share which was occasioned by DOE's breach and which, had TVA contracted out the work, would undoubtedly have been greater.

### B. TVA Is Entitled to Recover for AFUDC.

Defendant asserts TVA may not recover for AFUDC because Defendant's accountant found no causal link between TVA's borrowings and the dry storage projects and because TVA's Andrew Holmes had previously testified that TVA's capital needs were determined from a single portfolio of bonds (br. at 44). Neither position has merit. As pointed out in TVA's initial post-trial brief (¶ 40), the use of AFUDC is a well recognized accounting practice which TVA routinely and uniformly applies to capital projects; and, as to the relationship that practice bears to the borrowing of funds generally and the dry storage projects, the parties' stipulations are determinative. Thus, Defendant has stipulated as to the monthly AFUDC calculation:

> TVA's Treasurer's Office then calculates the average monthly interest rate it [TVA] has been charged **on all of the long-and short term debt it has issued** to finance the capital expenditures and operating costs of all its corporate divisions or organizations, such as TVA Nuclear (AFUDC Stip. 4 b);
>
> TVA does not raise capital through the issuance of stock (AFUDC Stip. 9);

---

9 Defendant's assertion that more data was necessary to support TVA's costs (br. at 37) is belied not only by the detailed records introduced as part of TVA's case (e.g., PX-34; PX-35; PX-43; PX-68; PX-68A; PX-69) but also by the exhaustive analyses performed by Mr. Kiraly and the tremendous volume of workpapers to which Defendant's counsel took pains to draw the Court's attention at trial.

> At all times relevant, TVA has and continues to issue short-term debt on a near-daily basis (AFUDC Stip. 11); and
>
> At all times relevant, TVA has and continues to issue new long-term debt on a regular basis (AFUDC Stip. 12).

Moreover, in closely analogous circumstances, the Federal Circuit has declined to require that the cost of capital be tied to an identification of specific debt instruments. For example, in *Home Sav.*, 399 F.3d. at 1352-54, the court affirmed an award for cost of capital based on a model which assumed all "supervisory goodwill disallowed by FIRREA was replaced by an equal amount of tangible capital" (*id.* at 1352) and which used a weighted average of the rates on various types of financing despite Government argument that plaintiff had "raised capital for a variety reasons and did not specify which portion of the capital it raised to replace supervisory goodwill" (*id.* at 1353-54). Accordingly, for these reasons and those set out in TVA's initial post-trial brief (¶¶ 40, 62-63) there is no ground for burdening TVA (and thereby TVA's ratepayers) with the cost of capital that is directly attributable to DOE's breach as there would have been no dry storage capital projects had there been no breach.

**C. TVA Is Entitled to Recover $280,000 for the Technical Studies.**

The thrust of Defendant's position (br. at 39-41) on the technical studies is that (1) as to the Browns Ferry studies, the Court should credit the testimony of Mr. Brewer as well as the opinion of TVA's Charles Davis (whose degree is in physics, not engineering — Davis Tr. at 308) regarding the need for certain studies as opposed to that of TVA's Alan Chapman who is a civil engineer (Chapman Tr. at 583); and (2) as to the Sequoyah study, TVA would have had to perform the study at some point in the future if DOE were to bring a large rail cask.

There is no basis for denying the technical studies claim based solely on the conflicting engineering opinions elicited at trial; and, even were the Court to credit Mr. Brewer's opinion (which it should not) over that of Mr. Chapman regarding the need for the Browns Ferry studies and over that of Mr. Davis as to the need for the Sequoyah study, Defendant still has made no showing that TVA's actions were unreasonable under the circumstances. Indeed, the very types of studies performed (primarily spacing, drop, and integrity analyses — see ¶ 44) reflect the reasonableness of TVA's decision. Simply put, TVA's concern that the dry storage facilities would meet all licensing requirements is inherently reasonable when viewed from the perspective of the risk of noncompliance with a licensing requirement or the potential impact of an accident. As this Court pointed out in *Franconia,* 61 Fed. Cl. at 741, the standard for determining whether a party has properly mitigated its damages is deferential:

> The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.

Regardless of the fact that the parties disagree about a matter of engineering judgment, then, the testimony of Mr. Chapman and Mr. Davis, the rationale for the studies, the nature of the dry storage projects, and Defendant's responsibility for the situation all are evidence that no reasonable ground exists for denying to TVA the costs of technical studies TVA deemed necessary for the licensing and safe operation of the projects.

## CONCLUSION

The Court should award breach of contract damages to TVA in the amount of $35,330,690.11.

Respectfully submitted,

October 19, 2005

Maureen H. Dunn
General Counsel

Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Facsimile 865-632-6718

Edwin W. Small
Assistant General Counsel

s/Peter K. Shea

Peter K. Shea
Senior Attorney/Attorney of Record
Telephone 865-632-7319

Attorneys for Tennessee Valley Authority

003746867