No. 01-249C
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

---

# DEFENDANT'S RESPONSIVE POST-TRIAL BRIEF

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0534
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Civil Division
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

KEVIN B. CRAWFORD
SHARON A. SNYDER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

October 19, 2005

# TABLE OF CONTENTS

DISCUSSION . . . . . 1

I. THE STANDARD CONTRACT IS NOT MISSING A RATE TERM . . . . . 1

II. THE COURT HAS ALREADY FOUND THAT THE PARTIES SUFFICIENTLY DEFINITIZED THE CONTRACT WITH RESPECT TO THE FIRST TEN YEARS OF SNF ACCEPTANCE . . . . . 5

III. TO THE EXTENT THAT THE COURT CAN DEFINITIZE THE ACCEPTANCE SCHEDULE BEYOND THE 10 YEARS IN THE 1995 ACR/APR, THERE IS NO BASIS FOR THE RATE THAT TVA DESIRES . . . . . 7

IV. TVA CANNOT SUCCEED IN MINIMIZING ITS STORAGE NEEDS . . . . . 11

V. THE GOVERNMENT IS NOT REQUIRED TO PROVE WHAT THE RATE WOULD HAVE BEEN IN THE "BUT FOR" WORLD . . . . . 14

VI. TVA HAS FAILED TO DEMONSTRATE THAT ITS CLAIMED LABOR AND INTERNAL CHARGEBACK COSTS WERE INCREMENTAL TO THE PARTIAL BREACH . . . . . 15

VII. COSTS FOR TECHNICAL STUDIES RELATING TO BROWNS FERRY AND TO THE RAILROAD BAY FLOOR AT SEQUOYAH ARE NOT RECOVERABLE . . . . . 18

VIII. DR. HARTMAN UTILIZED THE PROPER ASSESSMENT OF CASK LOADING IN ANALYZING TVA'S DAMAGES . . . . . 19

IX. TVA IS NOT ENTITLED TO RECOVER AFUDC . . . . . 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . 16

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . 14

Autotrol Corp. v. Cont'l Water Sys. Corp,
918 F.2d 689 (7th Cir. 1990) . . . . . 17

Bank of America, FSB v. United States,
51 Fed. Cl. 500 (2002) . . . . . 9

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991)
aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table) . . . . . 5

Convoy v. Sperry Rand Corp.,
672 F. 2d 781 (9th Cir. 1982) . . . . . 15, 17

David Nassif Assocs. v. United States,
214 Ct. C 557 F.2d 249 (1977) . . . . . 2, 5, 6

Dunn Appraisal Co. v. Honeywell Information Sys. Inc.,
687 F.2d 877 (6th Cir. 1982) . . . . . 17

Indiana Michigan Power Co. v. United States,
No. 04-5122, 2005 WL 2173563 (Fed. Cir. Sept. 9, 2005) . . . . . 14

J.D. Hedin Constr. Co. v. United States,
11 Ct. Cl. 70, 108, 347 F. 2d 235 (1965) . . . . . 16

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . 5

National By-Products, Inc. v. United States,
186 Ct. C 405 F.2d 1256 (1969) . . . . . 9

New Hampshire v. Maine,
532 U.S. 742 (2001) . . . . . . . . . . 7

Precision Pine v. United States,
63 Fed. Cl. 122 (2004) . . . . . . . . . . 20

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) . . . . . . . . . . 20

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . 5

S.W. Eng'g Co. v. Cajun Elec. Power Coop.,
915 F.2d 972 (5th Cir. 1990) . . . . . . . . . . 17

Sandisk Corp. v. Memorex Products,
415 F.3d 1278 (Fed. Cir. 2005) . . . . . . . . . . 7

Selman v. United States,
204 Ct. C 498 F.2d 1354 (1974) . . . . . . . . . . 8

TVA v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . 3, 4, 7, 15

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . 5

United States v. The John R. Williams,
144 F.2d 451 (2d Cir. 1944) . . . . . . . . . . 17

Willred Co. v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) . . . . . . . . . . 17

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . 16

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . 16

## **FEDERAL STATUTES AND REGULATIONS**

42 U.S.C. §§ 10134(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 10168(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

42 U.S.C. § 10221(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10 C.F.R. § 961.11, Art. IV.B.5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

## **MISCELLANEOUS**

1 R. Lord, Williston on Contracts § 4:26, at 585 (4th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 S. Bandes & L. Solum, Moore's Federal Practice § 134-30, at 134-63 (3rd ed. 1998) . . . . . . . 7

Restatement (Second) of Contracts § 204 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TENNESSEE VALLEY AUTHORITY, Plaintiff, | ) | |
| v. | ) | No. 01-249C (Judge Lettow) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S RESPONSIVE POST-TRIAL BRIEF

Pursuant to the Court's pre-trial order dated June 13, 2005, defendant, the United States, respectfully responds to the post-trial brief that plaintiff, Tennessee Valley Authority ("TVA"), filed on September 16, 2005. In its post-trial brief, TVA essentially presents the following arguments. First, TVA argues that the rate of acceptance is a missing term in the Standard Contract and that the Court should simply supply a rate of 3000 Metric Tons Uranium ("MTU") beginning in the 11th year of the Department of Energy's program of spent nuclear fuel ("SNF") acceptance. Second, TVA argues that, if the Court does not accept TVA's litigation-driven arguments, it could have met its storage needs by other means. Third, TVA launches various attacks on the acceptance scenarios that the Government modeled to show the effect of inferring different rates of SNF acceptance into the Standard Contract. Further, TVA puts forth various assertions regarding its damages calculation. As set forth below, and as we demonstrated at trial, the Court should reject TVA's arguments.

DISCUSSION

I. THE STANDARD CONTRACT IS NOT MISSING A RATE TERM

TVA asserts that the absence of a specific acceptance schedule or rate in the Standard Contract creates an "omitted" or "missing" term. Its argument completely ignores the rulemaking process by which the Standard Contract was drafted, as well as the language of the contract itself.

In appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, and the contract is otherwise sufficiently definite to be enforceable, "a term which is reasonable in the circumstances [may be] supplied by the court." Restatement (Second) of Contracts § 204 (1981); see David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977) ("[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court"). However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or where "they . . . have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse." Restatement (Second) of Contracts § 204 cmt. b. To define the missing term, the Court must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7; see Restatement (Second) of Contracts § 204 cmt. d ("[s]ometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract).

Here, it is plain that the parties did not fail to foresee the issue of an acceptance rate. Rather, the parties' consideration of this issue is clearly set forth in the administrative record of the rulemaking process that was used to develop the Standard Contract. TVA and other utilities explicitly requested that DOE add a provision to the Standard Contract that would obligate DOE

to accept SNF at a rate that satisfied certain requirements. PX 1; DX5; see Def. Br. 8-9.[1] DOE, however, intentionally declined to do so because there were too many uncertainties in the program to allow it to make such a commitment. See, e.g., Tr. 2198:15-2199:3 (Morgan). Indeed, in May 1983, TVA acknowledged this result of the parties' negotiations, stating that "DOE did not accept TVA's suggestion that DOE should start accepting SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole." DX 28 at 3.

Instead, as this Court has already found, the Standard Contract "establishes a definite and detailed procedure that the parties agreed to employ to determine the applicable rate of acceptance." TVA v. United States, 60 Fed. Cl. 665, 671 (2004); see id. at 665 ("The Standard Contract did not establish a specific rate or schedule for the collection of SNF. Rather, it established a process by which a rate would be established for each utility."). Further, as TVA has already acknowledged, and this Court has held, that process began with the issuance of annual capacity reports ("ACRs") beginning in 1987, which identified "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility," JX 1 (10 C.F.R. § 961.11, Art. IV.B.5(b)), and, beginning April 1, 1991, of annual priority rankings ("APRs") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a); see Tr. 1626:5-1627:2. As the Court has already acknowledged in this case, the contract holders would then submit delivery commitment schedules ("DCSs") identifying the

[1] "PX__" refers to plaintiff's trial exhibits, and "DX__" refers to defendant's trial exhibits. "Def. Br. ___" refers to defendant's post-trial brief. "Pl. Br. __" refers to "TVA's Proposed Findings of Fact and Conclusions of Law as to Damages," filed September 16, 2005.

SNF that they wished to deliver to DOE starting 63 months later, 10 C.F.R. § 961.11, Art. V(B)(1); Tr. 1686:9-19 (Zabransky); 1613:11-21 (Pollog); followed by an administrative process for ultimate agreement upon an acceptance schedule. JX1; Tr. 1686:20-1687:4 (Zabransky); 1689:1-8 (Zabransky).[2]

Because of the detailed schedule terms in the Standard Contract, the acceptance rate is not an unintentionally "missing" term, but instead was to be established in the future through an arrangement similar to an "agreement to agree," wherein the parties agreed that, in the future,

---

[2] TVA itself has already acknowledged the presence of the DCS process in the contract, as well as its import in creating the Government's rate obligation. As an initial matter, TVA acknowledged the import of the DCS process in earlier proceedings on the parties' dispositive motions by accepting that the rate set forth in the 1995 ACR would have governed the first ten years of the program. TVA, 60 Fed. Cl. at 669. Indeed, in those proceedings, counsel for TVA even explicitly stated that "we do have a very definite rate for DOE. We can definitize [sic] this contract here because we can turn and look and see exactly what DOE said and exactly what DOE allocated to TVA under the contract, and TVA stepped up and said, Yes, sir, we'll take it." Id. at 671 (quoting Hr'g Tr. at 31:8-12). During trial, TVA never attempted to distance itself from this critical admission. TVA has further acknowledged its expectation that the 1995 APR/ACR would have governed acceptance for the first ten years in its response to one of the Government's interrogatories. DX 176 at 9a. Moreover, TVA witnesses even acknowledged the function of the DCS process at trial. Mr. Hutson acknowledged that he used the 1995 APR/ACR to determine acceptance rates, Tr. 1050:9-13 (Hutson), and Mr. Hayslett explained that

> the delivery commitment schedule [process] is the process defined in the contract that basically provides the opportunity for the utility to lay claim to its allocation. DOE publishes the annual capacity report which has in it what DOE says is each utility's allocation for each year for the first 10 years, and then the utility's required by contract to submit the delivery commitment schedule 63 months prior to pickup indicating that, yes, I am going to use my allocation.

Tr. 80:19-81:5 (Hayslett) (emphasis added); see also Tr. 127:21-128:9 (Hayslett). TVA has repeatedly submitted DCSs in accordance with this rocess. Tr. 84:10-23 (Hayslett). Accordingly, TVA's claim that the Standard Contract lacks a rate term and that the Court should supply one is not only wrong, but is flatly contradicted by the Standard Contract and the evidence adduced at trial.

DOE would identify the amounts of SNF that it anticipates being able to accept, the contract holders would identify the SNF that it wants to deliver, and DOE would evaluate the contract holder's request. That is, the parties agreed that, in the future, they would attempt to agree to definitize a specific acceptance schedule. "[I]f an essential element is reserved for the future agreement of both parties, as a general rule it can give rise to no legal obligation until such future agreement." 1 R. Lord, Williston on Contracts § 4:26, at 585 (4th ed. 1990).

Based upon the evidence in this case, the Court cannot identify a rate that the "parties would have agreed upon at the time of their initial . . . negotiations," as established in Nassif, where the parties specifically considered but refused to agree upon a rate and instead agreed to defer that issue until a later date through an "agreement to agree." TVA's requests that the Court view the acceptance rate as "missing" from this contract and that the Court apply the rules applicable to "missing" terms are unsupportable.

## II. THE COURT HAS ALREADY FOUND THAT THE PARTIES SUFFICIENTLY DEFINITIZED THE CONTRACT WITH RESPECT TO THE FIRST TEN YEARS OF SNF ACCEPTANCE

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table).

As indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the missing term may have been an "essential" part of the contract, it was not, as here, a central part of the contract which will have an extraordinary effect upon damages.

As previously discussed, this Court, accompanied by TVA's admission, has already held that DOE's obligations to accept TVA's SNF were already definitized during contract performance for the first 10 years of SNF acceptance – that is, from 1998 through 2008. Accordingly, in this case, for at least the first 10 years of contract performance, the Court need not consider whether this contract is sufficiently definite to perform. In its brief, however, TVA now appears to argue that DOE was required to accept its SNF at a different rate than that previously adopted by the Court – in fact, it now advocates a rate higher than that which it presented at trial. TVA states that its "position is that DOE had an obligation to begin picking up SNF in 1998 and to ramp up to a 3,000 metric ton steady-state rate no later than six years after 1998." Pl.'s Br. at 13-14 (citing DX 176 at answer to interrog. No. 1(a)).[3]

---

[3] The interrogatory response that TVA cites was not only superceded by its claims at the hearing on the parties' dispositive motions, but was preliminary on its face and presents an admitted litigation position as to what the rate would have been that conflicts with TVA's admitted contemporaneous understanding of what the rate would have been in the "but for" world. DX 176 at 9a.

TVA should be judicially estopped from making this argument. "Judicial estoppel is an equitable doctrine that prevents a litigant from 'perverting' the judicial process by, after urging and prevailing on a particular position in litigation, urging a contrary position in a subsequent proceeding – or at a later phase of the same proceeding – against one who relied on the earlier position." Sandisk Corp. v. Memorex Products, 415 F.3d 1278, 1290 (Fed. Cir. 2005); see also 18 S. Bandes & L. Solum, Moore's Federal Practice § 134-30, at 134-63 (3rd ed. 1998). Judicial estoppel is appropriate where the party's later position is "clearly inconsistent" with the earlier position; the party succeeded in persuading a court to adopt the earlier position; and the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Id. (citing New Hampshire v. Maine, 532 U.S. 742, 749 (2001)).

TVA's effort fits squarely within these parameters. Not only did it advance the view during the hearing on the parties' dispositive motions that the rate for the first 10 years was provided by the 1995 ACR, TVA, 60 Fed. Cl. at 671, but that was the only rate that it modeled at trial. See Tr. 105:2-9 (Hayslett); 219: 6-23 (Holton). Indeed, in the very same pleading where it now advances this argument, TVA also states its trial position that "a steady-state rate of not less than 3,000 tons annually beginning not later than 2008 is required by DOE's implied obligation to carry out its contractual duties within a reasonable time." Pl. Br. 21. Moreover, the Court has accepted for the purposes of this case "that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract." TVA, 60 Fed. Cl. at 671. TVA should not be permitted to change that position now in the 11th hour of its case.

## III. TO THE EXTENT THAT THE COURT CAN DEFINITIZE THE ACCEPTANCE SCHEDULE BEYOND THE 10 YEARS IN THE 1995 ACR/APR, THERE IS NO BASIS FOR THE RATE THAT TVA DESIRES

To recover damages in this case, TVA must establish that, absent DOE's delay, it would not have incurred the costs that it is seeking to recover here. Because of the nature of the schedule terms in this contract, and because the parties did not definitize or "agree" to acceptance rates beyond the first 10 years of SNF acceptance, TVA has no basis for establishing that DOE was obligated to, or would have agreed to, accept TVA's SNF at a sufficient rate to preclude TVA from needing to build dry storage. Accordingly, for the reasons explained in our post-trial brief, its damages claims should fail.

Even if the Court were required to supply a rate beyond the first 10 years of SNF acceptance, TVA has not shown any basis for the rate that it now advocates. TVA argues, first, that its rate accords with the alleged purpose of the NWPA "to avoid the need for additional storage at nuclear plant sites after 1998," based on a lone comment by a DOE official. Pl. Br. 9, 22. Remarkably, TVA ignores the plain evidence that we presented at trial, where TVA itself acknowledged that DOE expressly rejected TVA's request during the rulemaking process that the Standard Contract include a requirement of no additional at-reactor storage. DX 28 at 3. Further, the statement to which TVA refers does not actually convey the meaning that TVA ascribes to it and, more importantly, is not an appropriate source for determining the intent of the NWPA. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (views of those participating in the legislative process let alone those outside the process are irrelevant regarding statutory requirements).

TVA has also pointed to the December 1983 Draft Civilian Radioactive Waste Management Program Mission Plan as supporting a requirement that DOE accept SNF at TVA's proposed rate to prevent the need for utilities to provide additional at reactor storage. Pl. Br. 10.

This argument, however, fails to account for the limited purpose given to the Mission Plans under the statute, the rulemaking process wherein DOE declined to give them greater significance, and the plain language of those documents. The NWPA states that the purpose of the Mission Plan was simply "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." 42 U.S.C. § 10221(a).[4] In promulgating the Standard Contract as a final rule, DOE specifically rejected commenters' requests that DOE place a provision in the Standard Contract making the rates in the Mission Plan the minimum contractual acceptance rates for the Standard Contract. See DX 5. Although TVA cites language from the December 1983 draft of the Mission Plan to establish that DOE contemplated that the acceptance schedule in the first five years would be sufficient to preclude the need for additional at-reactor storage, that language is not only not binding, but was not contained in any subsequent draft or final version of the Mission Plan or any of its amendments.[5] In fact, in the Mission Plan and those earlier drafts formally circulated by DOE, DOE explicitly stated that the documents were simply statements of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." DX 45 at iii (HQR0031091); see Tr. 1405:24-1406:13 (Kouts), and further explained that the acceptance schedule would be developed in accordance with the procedures set forth in the Standard Contract. DX 38 at 2-2 (CTR-042-1071); see 0042

---

[4] Indeed, the draft Mission Plan makes clear that the federal repository upon which acceptance rates are based , was subject to significant uncertainty. PX 7 at 2-7, 2-8.

[5] The fact that this language, contained in the very first draft of the Mission Plan, was omitted from subsequent drafts and final versions demonstrates that this early draft is unreliable for purposes of determining DOE's programmatic goal with respect to the acceptance schedule. Cf. Bank of America, FSB v. United States, 51 Fed. Cl. 500, 510-11 (2002) (draft letter rejected as unreliable to establish date of accrual of claim).

at 2-1. Particularly in light of DOE's express declination to make the rates in the Mission Plan contractually binding, coupled with DOE's express statements that the rates there were only plans and not commitments, TVA cannot properly add to the Standard Contract obligations that DOE expressly declined to agree to impose upon itself when the Standard Contract was promulgated. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 571, 405 F.2d 1256, 1270 (1969) (program goal is not contractually binding unless in form of promise or binding commitment).[6]

TVA's argument that DOE's use of a 3000 MTU rate in fee adequacy assessments and Total System Life Cycle Cost analyses show that DOE would have accepted SNF at that rate in the "but for" world is also unavailing. Pl. Br. 3, 11, 13, 22. As Mr. Kouts testified at trial, the assumptions used in preparing a fee adequacy study

> typically are fairly conservative assumptions because we're trying to determine how the Nuclear Waste Fund will perform over time and how the fee will work out into the future as we identify our costs of the program so it's what we call a conservative analysis. It actually is kind of on the high side, if you will, because we want to make sure that even if, if the implementation of the program is at a high cost end, that the fee is still adequate. We are always looking to make a conservative estimate of fee adequacy based on the cost of the program.

Tr. 1409:13-1410:2 (Kouts). In other words, as Mr. Kouts makes clear, DOE has made an effort to be financially prepared for acceptance at the highest possible rate until the details of actual acceptance become concrete. This effort, however, simply does not show the rate at which DOE

[6] Nevertheless, even had the purpose that TVA derives from the Draft Mission Plan existed, that still would not mandate the rate that TVA asserts. As the evidence at trial showed, DOE determined that its 900 MTU rate was theoretically sufficient to eliminate in the aggregate "the need for additional at-reactor out-of-pool storage starting in 1998." DX 78; Tr. 1662:8-1664:9 (Pollog). Further, an acceptance rate of 2100 MTU per year in the aggregate would be "sufficient to keep up with the discharge rate of utilities and begin to work off the backlog at the utilities," in the aggregate. Tr. 1655:11-1656:15 (Pollog).

would have accepted fuel in the "but for" world, much the less the rate at which DOE was obligated to accept SNF.[7]

Finally, TVA's argument that DOE hopes to accept SNF at a reasonable steady state rate of 3000 MTU at a Federal repository does not advance its cause. Pl. Br. 10, 18, 22. TVA makes the same mistake in its post-trial brief that it made at trial – specifically confusing the capacity of a Federal repository with DOE's contractual obligation regarding rate. As discussed in prior briefing, and as TVA witnesses have acknowledged, DOE was not obligated to begin SNF acceptance at a Federal repository in 1998 and, instead, could have accepted SNF at an MRS. Tr. 172: 12-23 (Hayslett); 1121:1-22 (Hutson); DX 133.. The fact that 3000 MTU/year might work as a steady state rate at a repository simply does not show that DOE was contractually obligated to accept TVA's SNF at a 3000 rate.

IV. TVA CANNOT SUCCEED IN MINIMIZING ITS STORAGE NEEDS

TVA argues that it would not have needed dry storage at the rates modeled by the Government. First, it advances several arguments designed to minimize its actual storage needs.

[7] Likewise, the Government's statements in its 2002 Final Environmental Impact Statement for a Geologic Repository, PX 32, and the 2004 ACR/APR, PX 36, do not have the significance that TVA would attribute to them. Pl.'s Br. at 11-12, 14, 22. Those statements simply describe the repository that is currently being planned. The fact that the current planning will allow acceptance at a rate that TVA prefers does not indicate that DOE was required to accept fuel at that rate, particularly at another type of facility. To the contrary, Congress limited the rate at which DOE could accept fuel at an MRS when it capped the amount of fuel that could be accepted during the 12 years that it was anticipated the MRS would operate before a repository was operational. 42 U.S.C. § 10168(d)(3); Tr. 1450:8-12 (Kouts). These same amendments also undercut TVA's argument that a rate with a short ramp-up to 3000 MTU/year was required to avoid economic waste, comport with the expeditious provision of the NWPA, and meet DOE's obligation to carry out its contractual duties within a reasonable amount of time and comply with its fiduciary duty, Pl. Br. 17, 21-22, as plainly Congress did not require or even permit such a ramp-up at the authorized MRS. Moreover, the testimony at trial indicated that, although "it's a goal of the program to operate in an efficient, cost-effective manner," that goal doesn't translate into a specific acceptance rate. 1376:7:1377:7 (Zabransky counterdesignation).

It claims that its storage needs can be accurately described in MTUs rather than assemblies, which would reduce its storage deficit, referring to the fact that "DOE's annual capacity reports and acceptance priority rankings routinely use metric tons uranium as the unit of measurement for defining spent nuclear fuel allocations." Pl. Br. 5-6. TVA's point in this regard, however, compares apples and oranges. DOE's documents refer to MTUs because DOE's storage concerns involve MTUs. Its authority to receive SNF at various facilities has always been limited to receipt of a certain number of MTUs. 42 U.S.C. §§ 10134(d) & 10168(d)(3). TVA's storage concerns, in contrast, deal with whether it has a sufficient number of spaces in its spent fuel pool to hold the number of spent fuel assemblies it needs to store. As both Mr. Brewer and Mr. Holton testified, a spent fuel pool is licensed for a fixed number of assemblies. Tr. 1941:11-18 (Brewer); see Tr. 274:1-4 (Holton). Therefore, it simply does not make sense to describe a pool's storage capacity in terms of MTU because it may not accurately reflect the amount of SNF that can be stored in the pool. Tr. 1941:19-1942:2 (Brewer). Thus, TVA itself describes the installed pool capacity in terms of the space for SNF assemblies. Tr. 272:21-275:17 (Holton).[8]

In the same vein of distancing itself from itself from the type of analyses that it uses in the ordinary course of business, TVA has also tried to minimize its storage needs by implying that its business projections of SNF discharges, like its business methodology of quantifying the number of spaces in this pool, should not be used for the purposes of this litigation. Pl. Br. 6. Here, too, TVA's suggestion lacks merit. As established at trial, TVA's own projections account for

---

[8] In fact, when counsel for TVA attempted to elicit testimony showing a direct relationship between the number of MTUs and the number of assemblies, Mr. Holton responded, "I am not sure, Mr. Shea, exactly what you're asking me. The number of cells are there regardless of the metric tons per fuel assembly, okay?" Tr. 1247:25-1248:6 (Holton).

activities taking place at TVA for which the Government's projections do not account. Tr. 2315:17-20 (Hartman); 2309:11-21 (Hartman); 1649:25-1650:18 (Pollog); 256:19-257:23. These activities would have also taken place in the but for world and should be accounted for there. Tr. 182:17-183:21 (Hayslett); 1201:16-1203:4 (Spates).

Finally, TVA argues that temporary impingement on its full core reserve "would have been highly unlikely" first because DOE would have worked to accommodate TVA's proposed schedule. Pl. Br. 7. However, the testimony to which TVA cites is actually qualified in that it states "[t]o the extent DOE could accommodate them, along with its needs and the needs of other utilities," Tr. 1773:14-19, and even TVA does not suggest that this statement means that DOE would have necessarily picked up its fuel when it requested, particularly in each of the many years where TVA would face a storage deficit. See Def. Br. 19-20. In fact, TVA's witnesses acknowledged that DOE could pick up at any time during year. Tr. 1153:1-16 (Hutson); 1234:9-12 (Holton).

TVA also argues that even failing perfect accommodation by DOE, TVA would not have needed dry storage because it would have met its storage needs through exchanges, seeking acceptance of an additional 20 percent over its allocation, seeking an emergency delivery, transshiping fuel, or simply operating without full core reserve. Pl. Br. 8. However, not only was significant evidence presented at trial that TVA would not have pursued these options, and/or that DOE would not have authorized these options, but TVA did not even present a rudimentary model of how it would have implemented these approaches. See Def. Br. 18-32; see, e.g., Tr. 1126:16-1127:5 (Hutson). In this regard, TVA has not only failed to demonstrate any of the details of how these possibilities would have worked, but has also failed to quantify the cost that TVA would have incurred to implement these approaches. See, e.g., Tr. 1150:9-12

(Hutson); 1150:25-1151:3 (Hutson). Without this "but for" world cost to compare to its actual costs, TVA cannot show whether it was damaged at all, much the less show that it was damaged by a preponderance of the evidence, as it must do here. See Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004).

## V. THE GOVERNMENT IS NOT REQUIRED TO PROVE WHAT THE RATE WOULD HAVE BEEN IN THE "BUT FOR" WORLD

TVA attacks the models presented by the Government's experts on various bases. It criticizes the Government's experts for having modeled three rates provided by the Government rather than saying what the rate would have been. Pl. Br. 14-15. It also criticizes the rates themselves, and it criticizes various other assumptions used in the Government models. Id. at 14-17, 21-22. TVA's arguments are unavailing.

TVA cannot gain any leverage from the first line of argument because the Government's experts were not proffered as experts on rate. Rather, they were simply provided to show the effect of three possible rates on TVA's damages. Moreover, it is TVA's burden to show what the rate would have been – not the Government's – as it bears the burden on causation. Indiana Michigan Power Co. v. United States, No. 04-5122, 2005 WL 2173563, at 5* (Fed. Cir. Sept. 9, 2005). Contrary to TVA's second line of argument, ample evidence supported each of these rates. Although TVA contends that DOE never planned for a 900 or 2100 steady state rate, the same can certainly be said about the rate that TVA is pursuing. Even Mr. Holton and Mr. Bailey, TVA's witnesses, acknowledged as much. Tr. 280:16-20 (Holton); 781:18-22 (Bailey). Moreover, DOE both contemplated having no rate at all, making virtually any rate sufficient to meet its contractual obligation, and that the 900 rate and the 2100 rate would be sufficient to meet certain departmental goals. See Pl. Br. 8-9; Tr. 1662:8-1664:9 (Pollog); 1655:11-1656:15

(Pollog). TVA's claim that Dr. Hartman should have assumed "simultaneous operations with shipment to an MRS beginning in 1998 and then to the repository beginning in 2003," Pl. Br. 16, is contradicted both by TVA's own statements, see DX 176 at 9a, and because the 1995 ACR has already been determined to govern the rate for the first ten years. See TVA, 60 Fed. Cl. at 665.

## VI. TVA HAS FAILED TO DEMONSTRATE THAT ITS CLAIMED LABOR AND INTERNAL CHARGEBACK COSTS WERE INCREMENTAL TO THE PARTIAL BREACH

The Government established at trial and in its opening post-trial brief that TVA should not recover at least $669,841 of its claimed costs for labor and $2,129,437 of Internal Chargeback costs because those costs are fixed, and, further, TVA presented no evidence at trial that the costs were incremental to the breach.[9] Def. Br. 35-36. TVA did not adequately respond to our argument at trial and does not cure this fatal flaw in its post-trial brief. TVA defended its inclusion of the TVA labor costs by trying to shift the burden of proof to the Government, stating, incorrectly, that "no accounting or auditing principles compel such a conclusion, nor has any court adopted the tests proposed by Mr. Kiraly." Pl. Br. 25. TVA has failed to demonstrate, as it must, that TVA labor costs were "effectively lost" to it because of work on TVA's dry storage projects. See Convoy v. Sperry Rand Corp., 672 F. 2d 781, 785-86 (9th Cir. 1982). Instead of gathering the relevant evidence, TVA reverts in its post-trial brief again to citations from tort cases, of little or no relevance to this breach of contract case. Pl. Br. 37-41. The same must be said for TVA's arguments that its Internal Chargeback costs are recoverable. Def. Br.

---

[9] Mr. Kiraly explained at trial that trade labor would be paid on an hourly basis and therefore, would be incremental, while the salaried labor was a fixed cost, and not incremental. Tr. 2061:4-8 (Kiraly). Mr. Kiraly removed the fixed costs of the salaried employees at TVA for TVA damages, with the exceptions noted in our opening brief, because they were not demonstrated by TVA to be incremental to the breach. Tr. 2063:5-16 (Kiraly); Def. Br. 36-37.

37. TVA fails to demonstrate that the work represented by those costs was "effectively lost" to TVA because of work on its dry storage projects.

"[T]he proper amount of damages for defendant's breaches is the amount of plaintiff's extra costs directly attributable to said breaches." Id. (quoting J.D. Hedin Constr. Co. v. United States, 11 Ct. Cl. 70, 108, 347 F.2d 235, 259 (1965)). Simply put, TVA may only recover for labor performed by its employees to the extent that it can show that labor represents an incremental cost. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay). Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee additional monies because of the breach. See Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend on project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). TVA presented no specific evidence of who it would have terminated, the work that these individuals otherwise would have performed, or the costs that TVA had to pay to non-salaried employees to perform the work.

Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp, 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W.

Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate because TVA failed to demonstrate any alternative, profitable responsibilities to which it could have allocated its employees but for the Government's breach.[10]

Mr. Kiraly concluded that TVA's damages claim improperly included labor hours for TVA personnel who were typically charging few hours to the dry storage project, or who were charging to the project on a sporadic basis. Tr. 2057:18- 2064:7 (Kiraly). He explained at trial that a cost that would have been incurred regardless of the breach is not a proper element of damages. Id. TVA did not provide data to support its internal chargeback costs at trial, or in its post- trial brief. TVA merely identified generally the operations of the various TVA organizations that it claimed supplied labor and equipment for the dry storage projects. TVA Br. 27-28. However, Mr. Kiraly testified that, to properly take credit for these costs, TVA should have provided information about the identity of the employees that were included in the charges, the rate or cost at which each employee was being charged, how much of each employee's time was being charged to the projects, and an analysis indicating that TVA had to hire other persons

[10] The cases that TVA cites do not change this conclusion. As an initial matter, most of the cases cited by TVA in support for its conclusion that labor costs are incremental to the breach are tort cases rather than contract cases. Further, in citing to Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982), TVA completely ignores the test used there to determine whether costs are incremental. See Def. Br. 36. In Convoy, the United States Court of Appeals for the Ninth Circuit expressly noted that the district court found that the plaintiff had lost the benefit of its supervisors' services as a direct result of the breach. Id. at 785-86. The court in Dunn Appraisal Co. v. Honeywell Information Sys. Inc., 687 F.2d 877 (6th Cir. 1982), reached a similar conclusion. Id. at 884 (relying upon Convoy and holding that the breach deprived the plaintiff of the salary employee's services). TVA failed to make this showing in this case.

to perform the other work that it claims each of these employees would have performed had they not been working on the projects. Tr. 2105:22-2107:3 (Kiraly); 2108:9-2109:1 (Kiraly); DX-218, Exs. 4.1 and 4.2. After the fact, general explanations by counsel of the contributions made by each department are insufficient to justify TVA's claimed costs.

TVA has the burden to show, with specific evidence, that its employees and equipment would otherwise have been utilized for other projects or terminated but for the Government's breach. At trial, and again in its post-trial brief, all TVA could do is claim that TVA employees spent time on the project and that equipment was used for the projects. TVA Br. 27-28. These statements, do nothing to establish that TVA's labor costs and internal chargebacks were incremental to the breach. Because TVA failed to provide the necessary support for these costs, its damages should be reduced by at least $669,841 for labor costs and $2,129,437 for internal chargebacks.

## VII. COSTS FOR TECHNICAL STUDIES RELATING TO BROWNS FERRY AND TO THE RAILROAD BAY FLOOR AT SEQUOYAH ARE NOT RECOVERABLE

TVA has claimed $180,000 in damages for technical studies performed at Browns Ferry and another $100,000 for technical studies of the railroad bay floor at Sequoyah. TVA claims that these studies were performed for environmental and safety reasons and should, therefore, be recoverable. Pl. Br. 31-33. However, Charles Davis, the project manager for the Sequoyah ISFSI project, testified that the $180,000 technical studies were not necessary. Def. Br. 39; Tr. 425:22- 430:18 (Davis). Nothing in TVA's arguments is persuasive in overcoming the admissions of Mr. Davis, and the concurrence of the Government's expert witness, Mr. Brewer, who agreed that the studies were not necessary. Tr. 1906:2-1933:25 (Brewer).

With respect to the $100,000 incurred by TVA for a study of the railroad bay floor, Mr. Brewer testified that the study would have been required in the "but for" world because it is more likely than not DOE would have used large casks to pick up fuel from Sequoyah to minimize loading costs. Tr. 1899:5-21; 1900:6-11. (Brewer). Under the circumstances, the cost of that study is not recoverable.

VIII. DR. HARTMAN UTILIZED THE PROPER ASSESSMENT OF CASK LOADING IN ANALYZING TVA'S DAMAGES

Using Mr. Brewer's low and high estimates for cask loading costs, Dr. Hartman calculated a range of $353,00 to $430,000 as a credit for loading costs that were postponed by TVA through fiscal year 2004. Def. Br. 49-50; DX 219 at 28 ¶ 45, 29 ¶ 47; Tr. 2363:3-15 (Hartman). TVA agrees that it owes a credit to account for the postponement of the loading costs. Pl. Br. 34-35. However, TVA challenges the economic analysis of Dr. Hartman by stating that the loading offset is overstated by $21,252.[11]

TVA states that it would have used either exchanges or its right to add its allocation of 5.5 metric tons to a later TVA allocation under the plus or minus twenty percent provision of the Contract, which would have reduced its loading cost by $21,252. Pl. Br. 34. However, as we explained in our opening brief, TVA's attempt to use the exchange and 20-percent provisions of the Standard Contract is after-the-fact litigation strategy that is not supported by the evidence. First, TVA assured the Government that it did not intend to pursue an exchange theory strategy. See Def. Br. 20. Second, there is no evidence in the record that a market for exchanges would have developed early in the DOE SNF acceptance program, as TVA hoped. See Def. Br. 22-23. Second, TVA pins its argument challenging the amount of offset on the assumption that DOE

[11] TVA also challenges the acceptance rates used by Dr. Hartman in his analysis. We address those arguments above.

would have picked up its 5.5 metric ton allocation in a subsequent year, thus avoiding sending partial casks. However, TVA can identify no evidence that DOE would have permitted TVA to do so, and, in fact, DOE witnesses testified that there are various reasons that this may not have happened during different periods of SNF acceptance. Def. Br. 22-23. Further, TVA simply ignores the testimony of Mr. Kouts and Mr. Zabransky that DOE has made clear that any allocation made under the Standard Contract plus or minus 20-percent provision would result in a reduction of the overall allocation to all utilities. Tr. 1515:7-11 (Kouts); 1706:10-1708:4 (Zabransky). Thus, the two methods TVA proposes to avoid some of the offset damages have no support in the evidence.

IX. TVA IS NOT ENTITLED TO RECOVER AFUDC

TVA contends that it is entitled to recover its claimed AFUDC costs because those interest costs were a foreseeable consequence of the breach at issue. Pl. Br. 44-45. As support, it has argued that it allocates this interest expense to all of its capital projects in a manner that is customary in the electric utility industry. Id. TVA, however, has not proven how, under the Standard Contract, DOE would have been expected to foresee that TVA would have needed to borrow the funding necessary to construct its dry cask storage project. Unlike the agreements at issue in the Winstar cases upon which TVA relies, the Standard Contract did not require TVA to borrow money as a result of DOE's delay. See Prudential Ins. Co. v. United States, 801 F.2d 1295, 1301 (Fed. Cir. 1986) (recognizing that claimed costs must be foreseeable at the time of contracting to be recoverable); Precision Pine v. United States, 63 Fed. Cl. 122, 137 (2004) (outstanding loans and increased interest payments too remote to be recoverable in breach claim).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-0534
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

KEVIN B. CRAWFORD
SHARON A. SNYDER
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

October 19, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 19th day of October, 2005, a copy of the foregoing "Defendant's Responsive Post-Trial Brief," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield